**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | | |
|---|---|---|
| **DANIELLE SNODGRASS,** | : | |
| | : | |
| **Plaintiff,** | : | **CIVIL ACTION FILE NO.** |
| | : | **1:13-cv-03958-SCJ-AJB** |
| **v.** | : | |
| | : | |
| **INDEPENDENT PHYSICIANS** | : | |
| **RESOURCE, INC., and** | : | |
| **APPOLLOMD, INC.,** | : | |
| | : | |
| **Defendants.** | : | |

**UNITED STATES MAGISTRATE JUDGE'S ORDER**
**<u>AND FINAL REPORT AND RECOMMENDATION</u>**

In this action, Plaintiff Danielle Snodgrass alleges claims for wrongful employment actions taken against her during her employment with Defendants Independent Physicians Resource, Inc., ("IPRI") and ApolloMD, Inc.[1] (Compl. [Doc. 1]). The matter is presently before the Court on Defendants' Motion for Summary Judgment, [Doc. 83]. For the reasons herein, the undersigned **RECOMMENDS** to the District Judge that he **GRANT** the motion.

---

[1]     ApolloMD, Inc., is presently referenced on the docket as "AppolloMD, Inc.," which appears to reflect a typographical error. (*See* Compl. at 1). The Clerk is **DIRECTED** to amend the case style to correct the error.

## I.       Introduction[2]

### A.       Facts

As required when considering a motion for summary judgment, the Court has viewed the evidence and factual inferences in the light most favorable to Plaintiff, the nonmoving party.   *See United States v. Four Parcels of Real Prop.*, 941 F.2d 1428, 1437 (11th Cir. 1991) (en banc).  To the extent that material facts are genuinely in dispute, the Court has resolved the disputes in Plaintiff's favor.  *See Vaughan v. Cox*, 343 F.3d 1323, 1326 n.1 (11th Cir. 2003).  The facts of the case, for the purpose of adjudicating Defendants' motion for summary judgment, are therefore as follows.

Plaintiff is a registered radiologist assistant who began working for West Georgia Health Systems ("WGHS") in 2006. (PSMF ¶ 1).[3]  IPRI is a medical-staffing company.

---

[2]       The facts recited in this section are intended to establish the context of the case.  Additional facts will also be recited in the discussion section below.

[3]       Citations that reference only paragraph numbers preceded by "DSMF" refer to Defendants' statements of material facts, or portions thereof, that are not disputed, [Doc. 83-1], and citations that reference only paragraph numbers preceded by "PSMF" refer to Plaintiff's statements of material facts, or portions thereof, that are not disputed, [Doc. 106-2].  Pursuant to the Local Rules of this Court, each of the proponent's facts will be deemed admitted unless the respondent "(i) directly refutes the movant's fact with concise responses supported by specific citations to evidence (including page or paragraph number); (ii) states a valid objection to the admissibility

2

(DSMF ¶ 1).   IPRI is wholly owned by ApolloMD Business Services, LLC. (DSMF ¶ 2).

During the summer of 2009, WGHS began contracting with IPRI to provide staffing for its radiology department.  (PSMF ¶ 3; DSMF ¶ 11).  In August 2009, Plaintiff commenced an employment contract with IPRI entitled "Physician Extender Employment Agreement" (hereinafter, "the Agreement").  (PSMF ¶ 3; Deposition of Danielle Snodgrass ("Pl. Dep.") [Doc. 97] at 80 & Exh. 4 [Doc. 97-1] at 18-22).  Under the Agreement, Plaintiff was subject to termination with or without cause; specifically, if she was terminated for cause or professional misconduct, she was subject to immediate termination, and if she was terminated without cause, she was entitled to ninety days' written notice.  (DSMF ¶ 34; Pl. Dep., Exh. 4 ¶ 9 [Doc. 97-1 at 20]).

---

of the movant's fact; or (iii) points out that the movant's citation does not support the movant's fact or that the movant's fact is not material or otherwise has failed to comply with the provisions set out in LR 56.1 B.(1)." LR 56.1B(2), (3), NDGa. Accordingly, for the purposes of the adjudication of Defendants' motion for summary judgment, Plaintiff's statements of material facts 40, 49, 53, 56, 59, 84, 131, 135, 178-81, and 200-01, and Defendants' statements of material facts 2, 31, 34, 42, 59-60, 69, 71, 76, 123, 137, 146 and 205 are deemed admitted.  Conversely, where a factual assertion or portion thereof is properly disputed, [*see, e.g.,* Doc. 106-1 (Pl.'s Resp. ¶¶ 27, 89, 135); Doc. 114 (Defs.' Resp. ¶¶ 3, 11, 34-35, 41, 43, 114-15, 119, 124-25, 130, 143, 170, 203, 213, 239-40)], the Court will cite to the paragraph appearing in the proponent's statement of material fact; will, as stated above, view the evidence and factual inferences in the light most favorable to Plaintiff; and, where appropriate, will also cite directly to the evidence supporting the Court's resulting factual recitation.

3

Throughout her employment under the Agreement, Plaintiff worked under radiologists Dr. Edward Bass, Dr. Paul Forsyth, and Dr. Jeremy Ferris. (PSMF ¶ 10). Each radiologist was an independent-contractor physician. (DSMF ¶ 29). The radiologists were responsible for patient care and for overseeing the medical and clinical aspects of the radiology assistants' and assisting nurses' work. (PSMF ¶ 10; DSMF ¶ 28). Each radiology assistant worked under the license of his or her supervising radiologist. (DSMF ¶ 32).

Virginia Viscardi was the staffing company's physician recruiter for emergency medicine and the vice-president of operations over the radiologists. (PSMF ¶ 19). She reported to Christopher Krubert, the staffing company's chief executive officer. (DSMF ¶ 26). Thea Dellinger was the staffing company's vice-president of human resources. (PSMF ¶ 20; DSMF ¶ 27).

Ms. Viscardi made the decision to hire Plaintiff because Plaintiff had worked as a radiology assistant for the medical group that had previously provided radiology services at WGHS. (DSMF ¶ 22). Although Plaintiff reported to her supervising radiologist for clinical purposes, Ms. Viscardi was her direct supervisor and was responsible for hiring, firing, counseling, and overseeing Plaintiff's employment with IPRI. (DSMF ¶ 25).

4

The radiology department's medical treatment of patients and day-to-day scheduling was overseen by the director of radiology (medical director), who was, like the other radiologists, an independent-contractor physician. (DSMF ¶ 30). At the time that the staffing company took over the contract at WGHS, Dr. Forsyth became WGHS's director of radiology. (PSMF ¶ 21).

Plaintiff worked forty-hour weeks and regularly worked with both Dr. Forsyth and Dr. Bass. (PSMF ¶¶ 23, 30). Although Plaintiff's work as a radiology assistant was at all times under the license and supervision of the treating radiologist, she was permitted to perform some procedures by herself with the appropriate level of supervision from the treating radiologist. (DSMF ¶ 31). The levels of supervision ranged from personal supervision, where the radiologist must be in the room during performance of the procedure, to general supervision, where the radiologist must have overall direction and control but is not required to be present during the procedure. (DSMF ¶¶ 31, 32; Deposition of Virginia Viscardi, Mar. 12, 2015 ("Viscardi Dep. I") [Doc. 98] at 193-94 & Exh. 253 [Doc. 98-5 at 52]). When Plaintiff became credentialed to perform a particular procedure, she was informed in writing of the procedure's required level of supervision in a certified letter from WGHS. (DSMF ¶ 36).

5

Dr. Forsyth did not have formal disciplinary authority over Plaintiff but did oversee her clinical duties and counseled her on his concerns about her conduct and patient issues. (DSMF ¶ 42). He also informed Ms. Viscardi of any issues he had with employees on the clinical side, so that Ms. Viscardi could counsel the employees or take formal disciplinary action when necessary. (DSMF ¶ 43). In the beginning, Plaintiff did not have any problems with Dr. Forsyth. (PSMF ¶ 22; Pl. Dep. at 83-84).

On February 1, 2010, Plaintiff was diagnosed with breast cancer. (PSMF ¶ 24). Plaintiff required a double mastectomy, chemotherapy, and reconstructive surgery. (PSMF ¶ 28).

Plaintiff told Ms. Viscardi shortly after she was diagnosed. (PSMF ¶ 27). On February 24, 2010, Ms. Dellinger discussed with Plaintiff that, although she was not eligible to take leave under the Family Medical Leave Act ("FMLA"), the staffing company intended to provide her a medical leave of absence for her treatment. (DSMF ¶ 57).

On March 1, 2010, Plaintiff submitted medical documentation from one of her treating physicians, Dr. Lawrence Gynther, confirming that Plaintiff was scheduled to undergo surgery on March 3, 2010, and likely would need a recovery period of four to six weeks. (DSMF ¶ 58). The documentation further indicated that Plaintiff would be

AO 72A
(Rev.8/8
2)

restricted from lifting more than five pounds; would need a part-time or reduced work schedule of eight hours per day, three days per week from March 29 through October 1, 2010, while she received chemotherapy; and would be expected to have two-day incapacitating flare-ups over the next six months at a frequency of two times every three weeks. (DSMF ¶¶ 59-60; Pl. Dep. [Doc. 97] at 96-98 & Exh. 6 [Doc. 97-1 at 24-27]).

Based upon Dr. Gynther's note, Ms. Dellinger and Ms. Viscardi began to search for a radiology assistant to temporarily fill in for Plaintiff while she was out on leave, which was the immediate need, and also for a part-time radiology assistant to fill in the gaps created by the doctor's assessment that Plaintiff would need a reduced twenty-four-hour work week for six months. (DSMF ¶ 69). Ms. Viscardi posted job advertisements and reached out to hospital personnel as part of her efforts to locate a part-time radiology assistant. (DSMF ¶ 70).

Dr. Forsyth recommended that Ms. Viscardi consider Kevin Quinn, a radiology assistant with whom Dr. Forsyth had previously worked, as a replacement for Plaintiff while she was out on her leave of absence. (DSMF ¶ 71). As a result, Ms. Viscardi contacted Mr. Quinn to ask if he was interested in working as a temporary replacement while Plaintiff was on leave. (DSMF ¶ 72). Ms. Viscardi was impressed by

7

Mr. Quinn's long work history, and after interviewing Mr. Quinn and consulting with Dr. Krubert, on March 3, 2010, Ms. Viscardi hired Mr. Quinn to work as a temporary full-time employee while Plaintiff was on leave recovering from her surgery and treatment. (PSMF ¶ 32; DSMF ¶¶ 73, 76).

Plaintiff underwent her mastectomy and began her first medical leave on March 3, 2010. (PSMF ¶¶ 28, 33). After the surgery, Plaintiff began her chemotherapy treatments. (DSMF ¶ 63).

On March 25, 2010, Ms. Dellinger called Plaintiff to see how she was doing and to go over her requested accommodations. (DSMF ¶ 64). Plaintiff told Ms. Dellinger that she did not need all of the accommodations Dr. Gynther had anticipated because her job did not require her to lift or move patients; she would not need assistance putting on her eleven-pound lead apron; her range of motion was sufficient to allow her to move the fluoro tower, a piece of equipment necessary to her job; she would not need a reduced work schedule; and her chemotherapy-related flare-ups would not last six months. (PSMF ¶¶ 36-37; Pl. Dep. [Doc. 97] at 103-05). Plaintiff also asked her doctors to call Ms. Dellinger to tell her that Plaintiff was not prohibited from wearing the eleven-pound lead apron. (PSMF ¶ 35; Pl. Dep. [Doc. 97] at 101-02).

AO 72A
(Rev.8/8
2)

On March 26, 2010, Plaintiff's plastic surgeon, Dr. Wibur L. Baird, filled out a leave form for Plaintiff in which he indicated that Plaintiff would need approximately four to six weeks to recover from the March 3 surgery; would need time off for post-operative follow-up visits and stages of reconstruction; and would be unable to perform some portion of her job functions for some unspecified period of time after March 3, but he did not indicate the functions she would be unable to perform. (PSMF ¶ 34; Pl. Dep. [Doc. 97] at 98-101 & Exh. 7 [Doc. 97-1 at 28-31]).

On March 30, 2010, Dr. Gynther told Ms. Dellinger that Plaintiff was not restricted from wearing the eleven-pound apron and that she would have the range of motion necessary to move the fluoro tower.  (PSMF ¶ 38).  The staffing company did not, however, allow Plaintiff to return to work at that time, despite her requests to return to work full time.  (PSMF ¶¶ 40-41).  Instead, it proceeded as though Plaintiff required a part-time work schedule, and it continued searching for a part-time radiology assistant to fill in the gaps created by Dr. Gynther's assessment that Plaintiff needed a reduced twenty-four-hour work week for six months.  (DSMF ¶ 69).

On or about April 2, 2010, Ms. Viscardi asked Mr. Quinn whether he would be interested in continuing after the six-week period in a part-time capacity to cover the balance of Plaintiff's schedule during the time her doctors said she would only be able

9

to work twenty-four hours per week.  (DSMF ¶ 78).  Mr. Quinn told Ms. Viscardi that he was only interested in working full time because a part-time position would not justify his lengthy commute.  (DSMF ¶ 79).

On April 22, 2010, Ms. Dellinger informed Plaintiff that the staffing company had not yet been able to locate a radiology assistant willing to work part time to accommodate the reduced work schedule Plaintiff's doctor said she would need.  (DSMF ¶ 80).   Ms. Dellinger acknowledged that Plaintiff had informed her in a telephone conversation that she was not asking for a part-time position, but she also noted that a full-time schedule would contradict Dr. Gynther's medical statement.  (Pl. Dep., Exh. 13 [Doc. 97-1 at 41]).  Ms. Dellinger further stated to Plaintiff that if the staffing company was unable to find a part-time radiology assistant, it might be unable to accommodate the reduced work schedule, in which case it would have to fill Plaintiff's position on a full-time basis and reevaluate her employment status.  (DSMF ¶ 82).

On April 30, 2010, Dr. Gynther submitted a certification that Plaintiff was released to return to work with no restrictions, noting that she would need two days off of work for chemotherapy on May 3 and May 17, 2010.[4]  (PSMF ¶ 43).

In or around April 2010, while Plaintiff was out on leave, the hospital had opened a new facility called the Women's Center, a women's imaging center where radiologists performed mammography, ultrasounds, and other procedures for women. (PSMF ¶ 45; DSMF ¶ 84).  Dr. Bass took over main operations for the Women's Center, while Dr. Forsyth was the main supervisor at the hospital's radiology unit. (PSMF ¶ 46).  Dr. Bass requested that Plaintiff work for him at the Women's Center. (DSMF ¶ 89).

At some point before Plaintiff returned from leave, the staffing company hired Mr. Quinn on a permanent full-time basis.  (PSMF ¶ 49).  On May 18, 2010, the staffing company informed Plaintiff that she was permitted to return to work, that she

---

[4]       Defendants object to Plaintiff's representation that on April 30, her physicians "again" informed Defendants that she was released to work with no restrictions, arguing that the April 30th notification was the first indication that she was fully released to work.  (Defs.' Resp. [Doc. 114] ¶ 43).  After careful review of all of the evidence cited in support of Plaintiff's statements of fact relating to her release to work, the Court is likewise unable to find support for her suggestion that she had been released to work with no restrictions as of March 26, 2010.  (*See* PSMF ¶¶ 34-43).  The objection is therefore **SUSTAINED**.

11

would be transferred to the Women's Center, and that her hours would be cut from forty to thirty-two hours per week. (PSMF ¶¶ 44, 51-53; Pl. Dep. [Doc. 97] at 132-34 & Exh. 17 [Doc. 97-1 at 50]). Plaintiff was thrilled to accept the offer of working primarily at the Women's Center but was concerned about the reduction in her hours. (PSMF ¶ 57; DSMF ¶ 93; Pl. Dep. [Doc. 97] at 134). When she expressed her concern, she was told the reduction in hours was because the staffing company was also keeping Mr. Quinn, could not pay them both for forty hours per week, and was therefore cutting them both to thirty-two hours per week. (PSMF ¶ 56; Pl. Dep. [Doc. 97] at 115-16, 134 & Exh. 17 [Doc. 97-1 at 50]).

Plaintiff returned to work on May 20, 2010. (PSMF ¶ 44). She worked primarily with Dr. Bass at the Women's Center and occasionally still worked at the hospital under Dr. Forsyth. (DSMF ¶ 99). Although Plaintiff's schedule was reduced to thirty-two hours per week, Mr. Quinn was scheduled and paid for forty hours per week, whether he actually worked forty hours or not. (PSMF ¶ 59; DSMF ¶ 98; Deposition of Joseph E. Bass, M.D. ("Bass Dep.") [Doc. 101] at 127-29). Mr. Quinn was also paid at a substantially higher hourly rate than Plaintiff was. (PSMF ¶ 91).

Upon her return from her first medical leave, Plaintiff was instructed to copy Dr. Forsyth on e-mails regarding scheduling changes, including medical leave.

(Declaration of Danielle Snodgrass ("Pl. Decl.") [Doc. 106-3] ¶ 12).   When she occasionally failed to do so, she was counseled.  (DSMF ¶ 47).  She was also reminded on multiple occasions that she needed to come to work on time and let people know where she was.  (DSMF ¶ 46).  Also sometime in 2010, Dr. Forsyth began to question what she was doing and whether it was within the scope of Plaintiff's practice to do those procedures.  (Pl. Dep. at 83-84).  For example, he questioned whether Plaintiff had the pharmacy training to do medical reconciliation forms.  (Pl. Dep. at 84).

Plaintiff planned to take medical leave for breast reconstruction surgery and for a hysterectomy related to her cancer diagnosis in October 2010.  (PSMF ¶ 81; DSMF ¶ 103). On September 14, 2010, Plaintiff called Ms. Dellinger to discuss severe issues her son was having with separation anxiety and to request an earlier start to her medical leave so that she could be home with him.  (DSMF ¶¶ 104-05).  The leave was approved and ran from September 23, 2010, through the end of Plaintiff's recovery from surgery.  (PSMF ¶ 83; DSMF ¶ 106).

On November 2, 2010, Plaintiff was released to work on November 8, with no restrictions.  (PSMF ¶ 84).  Upon her return to work, Plaintiff requested and received a modification to her schedule so that she could care for her son after school each day. (PSMF ¶¶ 85-86).

13

After her return, Plaintiff had a number of run-ins with Dr. Forsyth, where he accused her of being late, socializing too much, using an office inappropriate for her position, conducting herself in an insubordinate manner, operating outside the scope of her privileges, making a patient wait an unreasonable amount of time for counseling and a procedure, missing morning meetings, and noticing a technician's error in preparing for a procedure but failing to correct it.  (DSMF ¶¶ 109-13; Pl. Dep., Exhs. 31-34 [Doc. 97-1 at 81-87]).  On January 28, 2011, after Dr. Forsyth complained to Ms. Viscardi that Plaintiff missed a 7:30 a.m. meeting and Ms. Viscardi e-mailed her about it, Plaintiff responded to Ms. Viscardi stating that she believed she was being treated less favorably than Mr. Quinn and that it was because she is a woman and he is a man.  (PSMF ¶ 109).

In February 2011, Plaintiff had an additional reconstructive surgery and was off work on approved leave from February 15 through February 22, 2011.  (PSMF ¶¶ 112-13; DSMF ¶¶ 124-25).  On February 21, 2011, Dr. Forsyth complained to Ms. Viscardi and Dr. Krubert that Plaintiff did not give him notice that she would be missing shifts with him.  (PSMF ¶¶ 114-15; Viscardi Dep. I, Exh. 148 [Doc. 98-5 at 11-15]).  After she returned from the leave, Plaintiff was no longer allowed to work at the hospital on Fridays but was not told why.  (PSMF ¶ 118).

14

AO 72A
(Rev.8/8
2)

On March 24, 2011, Dr. Forsyth sent an e-mail to Dr. Krubert, copying Ms. Viscardi, in which he stated, "Over the past few days I have carefully reviewed the job description for [Plaintiff] at the Womens Center [sic].   In my opinion, this document is flawed and oversteps accepted medical standards and must now recommend [sic] that immediate changes be made.   Ginni Viscardi has all of the details."  (PSMF ¶ 119, Viscardi Dep. I, Exh. 160 [Doc. 98-5 at 34]).

In June 2011, Plaintiff again took four more days of FMLA leave when she began experiencing abdominal pain and was hospitalized. (PSMF ¶ 121; DSMF ¶ 126). That same month, she complained to Ms. Dellinger that she believed she was being discriminated against, but did not provide details or complete the grievance form Ms. Dellinger provided to her.  (PSMF ¶ 124; Deposition of Thea Dellinger ("Dellinger Dep.") [Doc. 100] at 58-59, 80-81).

In or shortly before October 2011, Dr. Forsyth was let go.  (DSMF ¶¶ 12, 114; PSMF ¶ 125; Pl. Dep. at 91).[5]  Dr. Ferris took over for Dr. Forsyth; after a trial period working as a contracted radiologist, Dr. Ferris assumed the medical director position

---

[5]     Defendants object to the statement of material fact on hearsay grounds. As the statement relies on Plaintiff's testimony that Ms. Viscardi told her about the dismissal while acting within the scope of her employment, it appears that the statement may be admitted as a statement of a party opponent's employee. *See* Fed. R. Evid. 801(d)(2)(D).

15

in or around November 2011. (DSMF ¶¶ 12, 114-15; PSMF ¶ 129). Like Dr. Forsyth, Dr. Ferris had supervisory authority over employees only with regard to clinical matters and did not personally discipline, hire, or fire the staffing company's employees. (DSMF ¶ 116).

Dr. Ferris also complained about Plaintiff's performance, accusing her of failing to follow his clinical direction during a procedure and of accruing unapproved overtime. (DSMF ¶¶ 130-37). For instance, in April 2012, Dr. Ferris accused Plaintiff of performing a procedure incorrectly; however, when Dr. Ferris told her how to correct the needle position, she did so. (PSMF ¶ 152; DSMF ¶ 135). Shortly thereafter, when performing a kidney biopsy, Plaintiff tried to put a needle into the upper pole on the right kidney despite the fact that Dr. Ferris had specifically instructed her that he preferred that kidney biopsies be done in the lower pole of the left kidney. (DSMF ¶ 137). In the spring of 2012, Dr. Ferris commented to Dr. Bass in reference to Plaintiff, "sometimes I wonder if she has chemo brain."  (PSMF ¶¶ 134-35; Bass Dep. [Doc. 101] at 14).  Thereafter, Dr. Ferris commented to Dr. Bass several times about Plaintiff's judgment.  (PSMF ¶ 143).[6]

---

[6]    Defendants object to the statement of material fact on hearsay grounds. Because Dr. Ferris's out-of-court statement is not offered for the truth of the matter asserted, it cannot be excluded on hearsay grounds. *See* Fed. R. Evid. 801(c).

On numerous occasions, including on June 27, 2012, Plaintiff complained to Dr. Ferris about the reduction in her hours after her medical leave and about the disparity between Mr. Quinn's pay and hours and her own.  (PSMF ¶¶ 130-31, 170; Deposition of Jeremy Ferris, M.D. ("Ferris Dep.") [Doc. 102] at 68, 207-08; Pl. Decl. [Doc. 106-3] ¶ 26).

As a radiology assistant, Plaintiff was credentialed by WGHS to perform several procedures, including paracentesis[7] procedures, under the "direct supervision" of the treating radiologist.  (PSMF ¶¶ 153-54; DSMF ¶ 35).  Where "direct supervision" is required, the "[r]adiologist must be present in the office suite and immediately available to furnish assistance and direction throughout the performance of the procedure" but "is not required to be present in the room when the procedure is performed." (PSMF ¶ 155; Viscardi Dep. I, Exh. 253 [Doc. 98-5 at 52] (cited in Pl.'s Resp. [Doc. 106-1 ¶ 31]); Pl. Dep. [Doc. 97] at 156-57).

On June 29, 2012, an oncologist at another institution called and asked whether Dr. Ferris could perform a paracentesis on an elderly patient who was very sick with

_____

Accordingly, the objection is **OVERRULED**.

[7]     A paracentesis procedure involves removing fluid from the abdomen by needle.  (DSMF ¶ 37).

17

terminal cancer.  (DSMF ¶ 144).  Dr. Ferris, who was covering for Dr. Bass at the Women's Center, spoke with Plaintiff, who was working at the hospital that day, about the patient and the procedure, which was to be performed later in the afternoon at the hospital.  (DSMF ¶ 146; Def. Exh. 13 (Ga. Dep't of Labor Tr.) [Doc. 83-14 at 97-98]). Dr. Ferris asked Plaintiff whether they had seen the patient before, and when she said that the patient was new to them, he told her to tell the oncologist they could do the procedure and to make sure to call him and let him know when they were ready to get started but not to call "until you are ready to stick . . . the patient."  (Def. Exh. 13 (Ga. Dep't of Labor Tr.) [Doc. 83-14 at 97-98]).

Later that afternoon, Plaintiff, believing that the nurse had told her that Dr. Ferris was already in the building, started the paracentesis procedure.  (PSMF ¶¶ 178-81; Def. Exh. 13 (Ga. Dep't of Labor Tr.)  [Doc. 83-14 at 99]).  After Plaintiff started the procedure, Dr. Ferris walked into the room and talked to the patient for a minute, observed that the procedure was going well, filled out paperwork, and left the room. (PSMF ¶ 181; Pl. Dep. [Doc. 97] at 218-19).  When the procedure was done, Plaintiff went to Dr. Ferris in the radiology reading room with more paperwork.  (Pl. Dep. [Doc. 97] at 211).  Dr. Ferris was upset and pacing, told her that he was upset because he was not in the building when she began the procedure, and asked Plaintiff why she

18

had started the procedure without him.  (DSMF ¶ 160).  Plaintiff apologized to Dr. Ferris and told him that she had thought that the nurse had told her Dr. Ferris was in the building.  (DSMF ¶¶ 162-63).

Dr. Ferris told Plaintiff to leave for the day and then called Ms. Viscardi to report that Plaintiff had performed the procedure without him present.  (PSMF ¶ 203; DSMF ¶¶ 164, 175).  Dr. Ferris also followed up with an e-mail to Ms. Viscardi in which he wrote, "I . . . am very uncomfortable with the frank disregard for specific instructions and the repeated difficulty in following the protocols in the radiology department that has been a recurrent issue with [Plaintiff].  I feel that this significantly jeopardizes patient care and places both the radiologists, ApolloMD, and West Georgia in serious liability issues [sic]."  (DSMF ¶¶ 176-77).

After talking with Dr. Ferris, Ms. Viscardi forwarded Dr. Ferris's message to Dr. Krubert.  (DSMF ¶ 182).  He agreed that it was appropriate to terminate Plaintiff's employment, stating only, "Talk to hospital with Ferris and explain we need to move on her and get their ok."  (PSMF ¶ 209; DSMF ¶ 182).  That evening, Ms. Viscardi contacted Charis Acree, the senior vice-president of operations at WGHS, to inform her of the incident and the staffing company's intent to terminate Plaintiff's employment.

19

(PSMF ¶ 206; DSMF ¶¶ 13, 180).   Ms. Acree responded that it was the staffing company's decision to make since Plaintiff was their employee.  (PSMF ¶ 207).

The next day, Plaintiff received an e-mail from Ms. Viscardi stating that "due to the circumstances that happened on Friday," Plaintiff was not to come to work on Monday but was instead to meet with Ms. Viscardi on Monday at 2:00 p.m. (DSMF ¶ 183; PSMF ¶ 204; Pl. Dep. [Doc. 97] at 222-23, 227-28 & Exh. 42 [Doc. 97-1 at 101]).  Ms. Viscardi also left Plaintiff a voicemail message.  (DSMF ¶ 184).  Plaintiff returned Ms. Viscardi's call and asked if the meeting was related to the Friday incident; Ms. Viscardi responded that they would talk about it on Monday.  (DSMF ¶ 185).

Plaintiff, concerned about Dr. Ferris's agitation during their conversation in radiology reading room, also called Dr. Ferris to talk to him about the procedure. (PSMF ¶ 200).  She told him again that she had understood from the nurse that he was in the building when she started the procedure and that it had been a miscommunication.  (PSMF ¶ 201).  He responded that he had called Ms. Viscardi and that it was out of his hands.  (Pl. Dep. [Doc. 97] at 218).

On Monday, July 2, 2012, Plaintiff met with Ms. Viscardi, Dr. Ferris, and Les Handlin, the director of imaging for WGHS, in Mr. Handlin's office. (DSMF ¶¶ 50, 193; PSMF ¶ 211).  In the meeting, Ms. Viscardi told Plaintiff that the

20

the staffing company had "decided to go in a new [or different] direction" and that it would not renew her contract.  (PSMF ¶ 212).  Ms. Viscardi also stated, in reference to the Agreement's termination clause, that the staffing company would pay her "[her] 90 days" but that she was not to return to work after that day.  (PSMF ¶ 213; DSMF ¶ 200; Pl. Dep. [Doc. 97] at 229-30).  Also on July 2, 2012, Ms. Viscardi sent Plaintiff a letter confirming that the staffing company was terminating her contract according to the terms of the Agreement.  (PSMF ¶ 235).  "Contract terminated" was stated as the reason for Plaintiff's termination in the Georgia Department of Labor Separation Notice.  (PSMF ¶ 237).

The day of Plaintiff's termination, Dr. Ferris also met with Katie Olivares, the manager over the Women's Center, to inform her that Plaintiff was being let go. (DSMF ¶ 196).  Ms. Olivares recalls that Dr. Ferris said they had to get rid of Plaintiff because she was making "stupid mistakes" and no one liked working with her. (DSMF ¶ 197).  Ms. Olivares also says that Dr. Ferris said Plaintiff was "goofy" and needed "counseling."  (PSMF ¶¶ 226, 229, 231-32; DSMF ¶ 198).

On August 3, 2012, Ms. Viscardi e-mailed a proposed separation agreement and release to Plaintiff.  (DSMF ¶ 204).  The separation agreement provided, among other things, that in consideration of Plaintiff's release of all claims arising from her

21

employment with IPRI, IPRI would pay her separation pay in the amount of $21,656.88 ($6,650.00 for July 2012; $7,030.00 for August 2012; $6,080 for September 2012; $1,125.00 for professional licenses and dues; and $771.88 for any and all remaining paid time off).  (Viscardi Dep., Exh. 229 [Doc. 98-5 at 42]).  Plaintiff received the proposed release of claims but did not sign it.  (Pl. Dep. [Doc. 97] at 234-37 (cited at PSMF ¶ 240)).

On August 7, 2012, the staffing company received its first notice of representation and claims of discrimination from Plaintiff's attorney.  (DSMF ¶ 205; PSMF ¶ 239; Declaration of Virginia Viscardi ("Viscardi Decl.") [Doc. 83-2] ¶ 31; Pl.'s Resp. Defs.' Mot. Summ. J. [Doc. 106 at 24]).

On August 28, 2012, Ms. Viscardi sent Plaintiff a letter stating that she had been fired for insubordination—namely, for beginning the procedure on July 29, 2012, without first notifying Dr. Ferris and for "incidents with Dr. Forsyth"—and that because she had been fired for cause and refused to sign the release, the staffing company would no longer pay her the ninety-day severance described in the Agreement.  (DSMF ¶ 207; PSMF ¶ 240;  Pl. Dep. [Doc. 97] at 236-37 & Exh. 44 [Doc. 97-1 at 103]).

22

**B.     Procedural History**

On August 21, 2012, Plaintiff filed a charge of discrimination against "ApolloMD Physician Services" with the Equal Employment Opportunity Commission ("EEOC").[8]   (DSMF ¶ 219; PSMF ¶ 240;  Pl. Dep. [Doc. 97] at 249 & Exh. 46 [Doc. 97-1 at 107]).  In the charge, she asserted that she had suffered discrimination on the basis of her sex and disability and that she had suffered retaliation.  (DSMF ¶ 219; Pl. Dep., Exh. 46 [Doc. 97-1 at 107]).  The particulars of her charge were as follows:

I.      I began employment with ApolloMD in August 2009 as a Registered Radiology Assistant.  I am a qualified individual with a disability as defined by the Americans with Disabilities Act, as amended by the Americans with Disabilities Amendments Act in that I have a physical impediment that substantially limits me in one or more major life activities.  I also have a record of disability, and ApolloMD regarded me as disabled.  I am capable of performing the essential functions of my position with an accommodation.

II.     ApolloMD discriminated against me in violation of the ADAAA and retaliated against me because of my disability by:

a.      reducing my hours;

b.      changing my job duties;

_____

[8]     The EEOC assigned the matter Charge No. 846-2012-62354.  (Pl. Dep., Exh. 46 [Doc. 97-1 at 107]).

23

   c.  paying me less than non-disabled Radiology Assistant that is less qualified than I am [sic] but was hired to fill in while I was on medical leave;

   d.  terminating my employment in July 2012.

III. On multiple occasions, ApolloMD also accused me of having "chemo brain."

IV. ApolloMD also discriminated against me on the basis of my sex when it replaced my duties and ultimately my job with a less qualified male who was consistently paid more than me while at the same time he worked fewer hours.

V. The reason given for my termination was false, and another male employee has committed the same infraction without being terminated.

VI. ApolloMD is also discriminating against me because of my disability in failing to pay money owed to me under my employment contract.

VII. I request that the EEOC investigate both my ADAAA discrimination and retaliation claims and my gender discrimination claims.

(Pl. Dep., Exh. 46 [Doc. 97-1 at 107]).  On or about August 30, 2012, Plaintiff amended her charge to specify that it had been Dr. Ferris who accused her of having "chemo brain"; to specify that her employment contract was entitled "Physician Extender Employment Agreement"; and to make additional allegations:

VIII.   On August 3, ApolloMD told me that I would not be paid severance due and owing to me under my Physician Extender Employment Agreement unless I signed an agreement releasing all claims against ApolloMD.

IX.   I contacted ApolloMD on August 7, 2012, through my counsel about the discrimination and retaliation in my termination and failing to pay my severance under my Physician Extender Employment Agreement. I informed ApolloMD that I would not sign the release, and that I believed that I continued to be discriminated against because I could not be required to sign a release of my claims in order to receive my separation payment under my Physician Extender Employment Agreement. With this correspondence, I included a copy of a draft Charge of Discrimination, informing ApolloMD that I believed I was being discriminated against and retaliated against and that I intended to file the Charge if the situation was not cured.

X.   ApolloMD's counsel responded, on August 9, 2012, acknowledging having received my communication, which included my draft Charge.

XI.   Hearing nothing further from ApolloMD, I filed my first Charge of Discrimination on August 21, 2012.

XII.   On August 28, 2012, ApolloMD . . . informed me that because I did not sign the general release of all claims, they would not be paying my separation payment due and owing under my Physician Extender Employment Agreement.

XIII.   I believe that ApolloMD continues to discriminate against me on the basis of my gender and disability, and has continued to retaliate against me for exercising my rights and engaging in protected activity, including filing my first EEOC Charge.

AO 72A
(Rev.8/8
2)

(DSMF ¶ 220; Pl. Dep., Exh. 47 [Doc. 97-1 at 108-09]).

On August 30, 2013, the EEOC issued Plaintiff a Notice of Right to Sue in which it stated that based upon its investigation, it was "unable to conclude that the information obtained establishes violations of the statutes." (Pl. Dep., Exh. 48 [Doc. 97-1 at 110]). Plaintiff filed suit in this Court on November 27, 2013, alleging two counts for discrimination in violation of the Americans with Disabilities Act, as amended by the ADA Amendments Act of 2008 ("ADAAA"), 42 U.S.C. § 12101 *et seq.* (Counts I and II); one count for gender discrimination in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. § 2000e *et seq.* (Count III); one count for retaliation in violation of the ADAAA and Title VII (Count IV); one count for breach of contract (Count V); and one count for expenses of litigation pursuant to O.C.G.A. § 13-6-11 (Count VI). (Compl., *passim*).

After close of extended discovery, on June 17, 2015, Defendants filed the motion for summary judgment that is presently pending before the Court. [Doc. 83]. During a briefing period extended by consent of the parties and leave of Court, Plaintiff filed a response to the motion for summary judgment on August 7, 2015, [Doc. 106], and Defendant filed a reply on September 14, 2015, [Docs. 113, 114]. With briefing complete, the Court now considers the motion.

26

## II.   *Summary Judgment Standard*

Summary judgment is proper when no genuine issue as to any material fact is present, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a).  The moving party carries the initial burden of "informing the court of the basis for its motion and of identifying those materials that demonstrate the absence of a genuine issue of material fact."  *Rice-Lamar v. City of Fort Lauderdale*, 232 F.3d 836, 840 (11th Cir. 2000) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).  A fact is "material" if it "might affect the outcome of the suit under the governing law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The moving party may also meet its burden by pointing out that there is an absence of evidence to support an element of the case on which the nonmoving party bears the burden of proof.  *Celotex*, 477 U.S. at 325.  "Only when that burden has been met does the burden shift to the non-moving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment."  *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991).

The nonmoving party is then required "to go beyond the pleadings" and present competent evidence in the form of affidavits, depositions, admissions, and the like, designating "specific facts showing that there is a genuine issue for trial."  *Celotex*,

27

477 U.S. at 324.   "The mere existence of a scintilla of evidence" supporting the nonmovant's case is insufficient to defeat a motion for summary judgment. *Anderson*, 477 U.S. at 252.   "[F]acts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts."   *Scott v. Harris*, 550 U.S. 372, 380 (2007).   "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."   *Id.*   If the record does not blatantly contradict the nonmovant's version of events, the court must determine "whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented."   *See Anderson*, 477 U.S. at 252; *see also EPL Inc. v. USA Fed. Credit Union*, 173 F.3d 1356, 1362 (11th Cir. 1999); *Duke v. Cleland*, 884 F. Supp. 511, 514 (N.D. Ga. 1995).   "If the record presents disputed issues of material fact, the Court may not decide them; rather, it must deny the motion and proceed to trial."   *FindWhat Inv. Grp. v. FindWhat.com*, 658 F.3d 1282, 1307 (11th Cir. 2011) (citing *Tullius v. Albright*, 240 F.3d 1317, 1320 (11th Cir. 2001)).

28

### III.    *Analytical Framework*

### A.    *Title VII Framework*

Title VII makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Title VII also makes it unlawful for an employer to retaliate against an employee for her participation in certain statutorily protected activities:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because [s]he has opposed any practice made an unlawful employment practice by this subchapter, or because [s]he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e-3(a); *see also Biniashvili v. Bohne*, 397 Fed. Appx. 597, 598-99 (11th Cir. Sept. 28, 2010).

To establish such a claim under Title VII, an individual may proffer direct or circumstantial evidence of discrimination.  *Burke-Fowler v. Orange Cnty., Fla.*, 447 F.3d 1319, 1323 (11th Cir. 2006).  When a party relies on circumstantial evidence to prove his or her case of discrimination, as Plaintiff does in the instant case, courts

29

AO 72A
(Rev.8/8
2)

employ the familiar burden-shifting framework articulated by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248 (1981); and *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502 (1993). *Jackson v. State of Ala. State Tenure Comm'n*, 405 F.3d 1276, 1289 (11th Cir. 2005); *see also Lawver v. Hillcrest Hospice, Inc.*, 300 Fed. Appx. 768, 772 (11th Cir. Nov. 24, 2008) (citing *Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1331 (11th Cir. 1998)).

Under the *McDonnell Douglas* framework, a plaintiff first must establish a *prima facie* case of discrimination. *See, e.g.*, *Brooks v. Cnty. Comm'n of Jefferson Cnty., Ala.*, 446 F.3d 1160, 1162 (11th Cir. 2006). If a plaintiff establishes a *prima facie* case, she has created an inference of discrimination, and the defendant has the burden of producing a legitimate, non-discriminatory reason for its employment action. *Id.* If the defendant meets this light burden, then the inference of discrimination is rebutted, and the inquiry "proceeds to a new level of specificity in which the plaintiff must show that the proffered reason really is a pretext for unlawful discrimination." *Id.* (quoting *EEOC v. Joe's Stone Crab, Inc.*, 296 F.3d 1265, 1272 (11th Cir. 2002)). To demonstrate pretext, the plaintiff must provide evidence that "reveal(s) 'such weaknesses, implausibilities, inconsistencies, incoherencies or contradictions in the employer's

30

proffered legitimate reasons for its actions that a reasonable factfinder could find them unworthy of credence.' " *Vessels v. Atlanta Ind. Sch. Sys.*, 408 F.3d 763, 771 (11th Cir. 2005) (quoting *Cooper v. Southern Co.*, 390 F.3d 695, 725 (11th Cir. 2004)). Despite this burden-shifting framework, the "ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1088 (11th Cir. 1999) (quoting *Burdine*, 450 U.S. at 253).

## B.    ADA Framework

The ADA prohibits covered entities from discriminating "against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."  42 U.S.C. § 12112(a). "[T]here are two distinct categories of disability discrimination claims under the ADA: (1) failure to accommodate and (2) disparate treatment." *E.E.O.C. v. Eckerd Corp.*, Civil Action No. 1:10-cv-2816-JEC, 2012 WL 2726766, at *4 (N.D. Ga. July 9, 2012) (Carnes, J.).  Retaliation against a person claiming a right under the ADA or opposing a practice made unlawful by the ADA is also prohibited.  42 U.S.C. § 12203.  "The burden-shifting analysis of Title VII employment discrimination claims is applicable

AO 72A
(Rev.8/8
2)

to ADA claims." *Holly v. Clairson Indus., L.L.C.*, 492 F.3d 1247, 1255-56 (11th Cir. 2007).

## IV.    Discussion

Defendants seek summary judgment on all of Plaintiff's claims. [Doc. 83]. The Court considers each argument in its logical order.

### A.    ApolloMD, Inc., as Plaintiff's "Employer"

Defendants first argue that Defendant ApolloMD, Inc., is not a proper party to this suit because there is no evidence that ApolloMD, Inc., employed Plaintiff or controlled Plaintiff's employment; that it maintained joint operations with her employer; or that there is any other basis for a determination that ApolloMD, Inc., may be held legally responsible for Plaintiff's claims. [Doc. 83-17 at 7 (citing DSMF ¶¶ 1-5, 24); Doc. 113 at 6-7 (same)]. In support of the argument, Defendants assert statements of material fact in which they represent that the Physician Extender Employment Agreement Plaintiff signed was exclusively between Plaintiff and IPRI, (DSMF ¶¶ 1, 24); that IPRI is wholly owned by ApolloMD Business Services, LLC, which is a separate legal entity from ApolloMD, Inc., (DSMF ¶ 2); that Apollo MD, Inc., does not own or manage IPRI, (DSMF ¶ 3); that radiologists are independent contractors and the radiology assistants are employees of IPRI, (DSMF ¶ 4); and that

32

none of the radiologists or radiology assistants working with IPRI were employed by or contracted by ApolloMD, Inc., (DSMF ¶ 5).

Plaintiff, in response, points out that in analyzing whether related entities are a single employer, courts in the Eleventh Circuit are to consider the four factors set out in *McKenzie v. Davenport-Harris Funeral Home*, 834 F.2d 930, 933 (11th Cir. 1987); reminds the Court that "employer," as utilized in Title VII, "is to be construed liberally"; and suggests that, as the court did in *Thornton v. Mercantile Stores Co.*, 13 F. Supp. 2d 1282, 1295 (M.D. Ala. 1998), this Court should apply the *McKenzie* factors to find a material dispute over whether Defendants are a "single employer." [Doc. 106 at 3-4 (citing PSMF ¶¶ 5, 6, 8, 29, 39, 82, 87, 120, 122, 238)]. Plaintiff does not deny Defendants' assertions that Plaintiff's employment agreement was between her and IPRI only, that IPRI is owned by ApolloMD Business Services, LLC, that ApolloMD Business Services, LLC, and ApolloMD, Inc., are separate legal entities, or that ApolloMD, Inc., does not own or manage IPRI, (Pl. Resp. ¶¶ 2, 3, 24), but she contends that she has shown a genuine issue of material fact as to whether ApolloMD, Inc., may nevertheless be held liable as her joint employer by proffering evidence that the employment application she completed was for employment with "Independent Physicians Resource, Inc. (ApolloMD)," (PSMF ¶ 5); that she executed an application

33

form waiver with "Independent Physicians Resource, Inc. (ApolloMD)," (PSMF ¶ 6); that IPRI and ApolloMD, Inc., share a corporate address, (PSMF ¶ 8); that her employer listed "Independent Physicians Resource, Inc./ApolloMD" as Plaintiff's "employer name and contact" in the Certification of Health Provider provided to Plaintiff for her medical leaves, (PSMF ¶¶ 29, 82, 122); and that her employer listed "ApolloMD" as Plaintiff's employer on her Georgia Department of Labor Separation Notice, (PSMF ¶¶ 39, 87, 120, 238).  [Doc. 106 at 3-4].

Accepting Plaintiff's legal authority and viewing the proffered evidence in the light most favorable to her, the undersigned is nevertheless unable to conclude that Plaintiff has established a genuine issue of material fact as to whether Defendant ApolloMD, Inc., may held liable as her joint employer. *McKenzie* provides that a court must consider four factors when analyzing whether two businesses may be held liable as a joint employer:  "(1) interrelation of operations, (2) centralized control of labor relations, (3) common management, and (4) common ownership or financial control." *McKenzie*, 834 F.2d at 933.

Here, the only assertions Plaintiff makes specifically as to ApolloMD, *Inc*., as opposed to any other ApolloMD entity, are that IPRI and ApolloMD, Inc., share the same officers and corporate address.  (PSMF ¶ 8; Pl. Resp. ¶¶ 2-3).  However, as

34

Defendants point out, the evidence Plaintiff proffers in support of her statement of material fact regarding the allegedly shared address does not include any information about IPRI's corporate address and therefore is insufficient to support the statement. (*See* PSMF ¶ 8 (citing Dellinger Dep. [Doc. 100] at 65 & Exh. 84 [Doc. 100-1 at 38-41])).   Likewise, Plaintiff's assertion that ApolloMD, Inc., Independent Physicians Resource, Inc., and Apollo Business Services, LLC, share the same officers is supported by citations to evidence that shows nothing of the sort. (*See* Pl. Resp. ¶¶ 2-3 (citing Dellinger Dep. [Doc. 100] at 65 & Exh. 84 [Doc. 100-1 at 38-41])).   And Plaintiff's other numerous references to "ApolloMD," (PSMF ¶¶ 5, 6, 29, 39, 82, 87, 120, 122, 238), suggest no other conclusion but that they refer to IPRI's undisputed owner: ApolloMD Business Services, LLC, (*see* DSMF ¶ 2).

Because Plaintiff has failed to proffer any factual support whatsoever for a determination that ApolloMD, *Inc.*, and IPRI had interrelated operations, centralized control of labor relations, common management, common ownership, or common financial control, or that ApolloMD, *Inc.*, otherwise maintained any control over Plaintiff's employment, the Court is entirely without any basis for a determination that Plaintiff has established a genuine issue of material fact as to whether ApolloMD, Inc. may be considered her joint employer.

35

Accordingly, the undersigned **RECOMMENDS** that the District Judge **GRANT** summary judgment in favor of ApolloMD, Inc., and **DROP** ApolloMD, Inc., as a party to this case.

### B.   *Claims Arising from Transfer to the Women's Clinic*

Defendants raise numerous arguments as to why any claims arising from the change of Plaintiff's primary work location from the hospital to the Women's Clinic are due to be dismissed as a matter of law. [Doc. 83-17, *passim*]. Plaintiff, in response, states that her claims are "not related to the transfer itself, which admittedly [Plaintiff] welcomed." [Doc. 106 at 4].

In light of Plaintiff's response, it is clear that she has disclaimed any right to action arising from having been assigned primarily to the Women's Clinic. Consequently, the undersigned **RECOMMENDS** to the District Judge that he **GRANT** Defendants' motion to dismiss so far as the complaint could be construed to assert claims arising from such reassignment.

### C.   *Waiver and Exhaustion Defenses to Claims for Reduction in Hours*

Defendants next argue that Plaintiff's claims arising from the reduction in her hours should be barred in their entirety because she accepted the transfer to the Women's Center knowing that it came with the reduced schedule, because she did not

36

timely file her EEOC charge within 180 days after the reduction in hours was effected, and because a reduction in hours is not a "continuing violation" and therefore is not renewed with each paycheck.[9]  [Doc. 83-17 at 7-10, 32; Doc. 113 at 8].  They also contend that even if Plaintiff is not deemed to have volunteered initially for the reduction in hours, her claim should be limited to the period beginning on May 20, 2010, with the start of her work at the Women's Clinic after her first medical leave, and ending on November 15, 2010, when she requested a schedule adjustment that would allow her to be at home in the afternoons with her son and therefore effectively acceded to a thirty-two hour schedule.  [Doc. 83-17 at 10 & n.1 (citing DSMF ¶ 108); Doc. 113 at 7 (citing DSMF ¶¶ 93-94)].

In response, Plaintiff, relying on *Calloway v. Partners National Health Plans*, 986 F.2d 446, 448-49 (11th Cir. 1993), contends that the reduction in hours and

---

[9]     Plaintiffs proceeding under the ADA must comply with the same procedural requirements articulated in Title VII, including the duty to exhaust administrative remedies.  *See* 42 U.S.C. § 12117(a) (incorporating 42 U.S.C. § 2000e-5); *Duble v. FedEx Ground Package Sys., Inc.*, 572 Fed. Appx. 889, 892-93 (11th Cir. July 24, 2014) (per curiam) (applying Title VII exhaustion requirement to ADA claim).  Thus, prior to filing a claim for discrimination under the ADA, a plaintiff must first file a charge of discrimination with the EEOC. 42 U.S.C. § 2000e-5(e)(1).  In general, failure to file the charge within 180 days of the alleged unlawful employment practice bars the claim.  *Alexander v. Fulton Cnty.*, 207 F.3d 1303, 1332 (11th Cir. 2000), *overruled in part on other grounds by Manders v. Lee*, 338 F.3d 1304, 1328 n.52 (11th Cir. 2003) (en banc).

37

resulting reduction in her pay constitute a continuing violation of Title VII and the ADAAA. [Doc. 106 at 5]. She also argues that she objected to the reduced work schedule throughout the duration of her employment and that her November 15, 2010, request was not acquiescence to the thirty-two-hour-per-week schedule but instead was merely a request to adjust the times of her shifts within the shortened work schedule to which she continued to object. [*Id.* at 4-6 (citing PSMF ¶¶ 53, 54, 57, 60)].

To the extent that Defendants' motion relies on Plaintiff's alleged consent to the thirty-two-hour work week, the Court finds that Plaintiff has established a genuine issue of material fact. Review of the evidence proffered in relation to this issue shows that while Plaintiff was indeed "thrilled" to accept the offer to work primarily at the Women's Center and was told at the time that she would be limited to thirty-two hours per week upon her return to work, the evidence shows that she was not assigned exclusively to the Women's Center and therefore her hours were not dictated exclusively by the needs of the Women's Center, (DSMF ¶ 99), and her testimony also supports her position that from the beginning, she questioned and protested the reduction in her work hours, (Pl. Dep. [Doc. 97] at 110-11, 125, 134 & Exh. 17 [Doc. 97-1 at 49-50]; Dellinger Dep. [Doc. 100] at 47-51 & Exh. 63 [Doc. 100-1 at 21], Exh. 66 [Doc. 100-1 at 32]; Bass Dep. [Doc. 101] at 110-12). And while it is clear that

38

Plaintiff later requested that her schedule be adjusted so that she could be with her son in the early afternoon after school, (Pl. Dep. [Doc. 97] at 139), and that she was able to negotiate a schedule within the thirty-two hour week that allowed her to do so, (Pl. Dep. [Doc. 97] at 120-21, 147 & Exh. 24 [Doc. 97-1 at 69]), viewing the evidence in the light most favorable to Plaintiff, there is still enough in the record to allow a reasonable finder of fact to determine that Plaintiff did not choose to work part-time, (Pl. Dep. [Doc. 97] at 111 (stating that she although she needed to be home in the afternoons, she never needed to work part time)). The undersigned therefore concludes that it would be inappropriate to recommend to the District Judge that any portion of Plaintiff's claims arising from the reduction in hours be granted on grounds that she consented to the reduced schedule or requested it.

The Court is also persuaded that Plaintiff has presented evidence sufficient to raise a genuine issue of material fact as to whether the reduction in hours was a continuing violation.

To be sure, Plaintiff has not presented a strong legal argument to support her position. Her citation to *Calloway* is minimally persuasive, as *Calloway* involved a claim for wage discrimination and did not contemplate any allegations of discrimination in the number of hours assigned to hourly employees, *see Calloway*,

39

986 F.2d at 448-49, and Plaintiff makes no attempt to explain why the Court should find the issues analogous, [*see* Doc. 106 at 5].  Additionally, while Defendants point to numerous district-court opinions holding that a reduction in hours is a discrete act of discriminatory conduct, Plaintiff proffers no authority holding to the contrary. [*See* Doc. 113 at 8 (citing *Kafka v. Grady*, No. 12 C 50123, 2014 WL 4725399, at *7 (N.D. Ill. Sept. 23, 2014)  (holding that reduction in hours is a discrete discriminatory act); *Heggie v. TJX Cos.*, Civ. Action No. 11-11624-RWZ, 2012 WL 2061806, at *2 (D. Mass. June 6, 2012) (same); *Carter v. Susquehanna Police Dep't*, Civ. Action No. 08-4764, 2009 WL 1183415, at *5 (E.D. Pa. Apr. 30, 2009) (same); *Baird v. Outlook Pointe*, No. 4:07-CV-1580, 2008 WL 4287382, at *6 (M.D. Pa. Sept. 17, 2008) (same)].

Moreover, while the Court's own research yielded little more authority on the issue, what it did find also tends to support Defendants' position.  *See Clayton v. Pa. Dep't of Welfare*, 304 Fed. Appx. 104, 108 (3d Cir. Dec. 22, 2008) (relying on *Ledbetter v. Goodyear Tire & Rubber Co., Inc.*, 550 U.S. 618, 622-32 (2007), *superseded by statute*, Lilly Ledbetter Fair Pay Act of 2009, Pub. L. No. 111-2, 123 Stat. 5, for holding that after reduction in hours, each paycheck does not constitute a new and separate violation of Title VII: "[a] new violation does not occur, and a new

40

charging period does not commence, upon the occurrence of subsequent nondiscriminatory acts that entail adverse effects resulting from past discrimination"); *Humphrey v. Sisters of St. Francis Health Servs., Inc*., 979 F. Supp. 781, 787 (N.D. Ind. 1997) (holding that reduction in hours was a discrete event and that because the plaintiff had failed to show any reason that her appreciation of actionable nature of her demotion occurred only in light of events falling within the 180-day limitations period, the claim was time barred).

It also appears that Defendants are correct in asserting that the Lilly Ledbetter Fair Pay Act of 2009 does not undermine the basis for the Third Circuit and the other district courts' pre-Act determination that a simple claim for reduction in hours is not renewed with each paycheck reduced by the allegedly discriminatory decision. The Ledbetter Fair Pay Act, of course, overturned *Ledbetter*, and provided, in relevant part, that "an unlawful employment practice occurs, with respect to discrimination in compensation . . . , when a discriminatory compensation decision or other practice is adopted, when an individual becomes subject to a discriminatory compensation decision or other practice, or when an individual is affected by application of a discriminatory compensation decision or other practice, *including each time wages, benefits, or other compensation is paid*, resulting in whole or in part from such a

41

decision or other practice." Pub. L. No. 111-2, 123 Stat. at 6 (italics added). Although the Eleventh Circuit Court of Appeals does not appear to have spoken on whether a reduction in hours constitutes a continuing violation, the Court is persuaded by the Second Circuit's recent determination of a similar issue in *Davis v. Bombardier Transportation Holdings (USA) Inc*., 794 F.3d 266, 269-71 (2d Cir. 2015). In *Davis*, the plaintiff alleged that the decision to demote her and reduce her compensation was made with discriminatory intent and that, even though the statutory period had expired between the pay-reduction decision and the time she filed her charge of discrimination with the EEOC, her claims arose from a continuing violation and were therefore current as of her most recent paycheck. *Id*. at 269. The *Davis* court carefully considered the nature of the holding that the Ledbetter Act overturned, the reasoning of the dissent to that holding, the stated purpose of the Act, and the Act's language, and held that because the plaintiff's pay-reduction claim was not supported by allegations that she was paid less than others outside her protected class for the same work, the claim was not a continuing violation under the Ledbetter Act and was thus untimely. *Id*. at 269-71. In reaching its determination, the *Davis* court referred to the portion of the Ledbetter Act providing that "[a]n unlawful employment practice occurs, with respect to discrimination in compensation . . . each time compensation is paid [pursuant to a

42

discriminatory compensation decision]"; remarked upon the fact that the *Ledbetter* claims arose from allegations of disparate pay rates; paid careful attention to Justice Ginsberg's dissent in *Ledbetter*, in which she argued that "the 'realities of the workplace' reveal why claims of discriminatory compensation should accrue when discriminatory wages are paid" and explained "that '[w]hen an employer makes a decision of [an] open and definitive character, [such as promotions, transfers, hirings, and firings,] an employee can immediately seek out an explanation and evaluate it for pretext," in contrast to pay disparities, "which are frequently concealed by both employers and employees," *Davis*, 794 F.3d at 270 (quoting *Ledbetter*, 550 U.S. at 649-51 (Ginsberg, J., dissenting)) (alterations in *Davis*); and pointed to the Ledbetter Act's congressional findings section, which states, " 'The limitation imposed by the Court on the filing of discriminatory compensation claims ignores the reality of wage discrimination and is at odds with the robust application of the civil rights laws that Congress intended,' " *Davis*, 794 F.3d at 270 (quoting the Ledbetter Act, Pub. L. No. 111-2, 123 Stat. at 5). The *Davis* court then went on to reason that because the employee receives notice of a reduction in pay in short order once the decision is made, the employee " 'can immediately seek out an explanation and evaluate it for pretext,' " and thus is not among those deemed to be in need of the protection of the

43

Ledbetter Act's "generous accrual provisions." *Davis*, 794 F.3d at 270-71 (quoting *Ledbetter*, 550 U.S. at 649 (Ginsberg, J., dissenting)).

In the matter presently before the Court, the reduction-in-hours claims Plaintiff raises are much like the plaintiff's in the *Davis* case, to the extent that her claims may be construed to allege simply that her hours were reduced as a result of a discriminatory decision. Here, however, in addition to alleging a simple claim for reduction in hours, Plaintiff has also alleged—and proffered evidence showing—that she was led to believe that she and Mr. Quinn were both assigned thirty-two-hour work weeks, that he was in fact paid for forty hours per week, and that Mr. Quinn was not actually required to work the full forty hours and therefore may have appeared to have also been assigned to the thirty-two-hour-per-week schedule. (PSMF ¶ 59 (citing Snodgrass Dep. 134:1-25; Bass Dep. 127:14-129:3, 191:23-192:14; Viscardi Dep. 172:10-16, 104:15-105:13, Ex. 19)). Thus, under this unusual set of facts, it appears that the evidence could reasonably support a determination that the reduction in Plaintiff's hours may have resulted in her being paid less than Mr. Quinn for the same amount of work, even had she and Mr. Quinn been paid the same hourly rate, and that the discriminatory nature of the reduction in Plaintiff's hours indeed may have been concealed from her. Accordingly, the undersigned concludes that Plaintiff's reduction-in-hours claims may be construed

44

as traditional disparate-treatment claims falling within the "generous accrual provisions" of the Ledbetter Act and therefore may not, at this point in the litigation, be deemed untimely as a matter of law.[10]

The undersigned therefore **RECOMMENDS** to the District Judge that he **DENY** Defendants' motion for summary judgment so far as it seeks dismissal of Plaintiff's reduction-in-hours claims on grounds that Plaintiff consented to the reduction in hours, requested the reduction, or failed to timely raise any portion of her reduced-hours claims in an EEOC charge of discrimination.

### D.   *McDonnell-Douglas Analysis of Claims for Reduction in Hours*

Defendants further argue that the claims arising from the reduction in work hours are subject to summary judgment because Plaintiff has failed to establish a *prima facie* case of discrimination; the staffing company had legitimate, non-discriminatory reasons for assigning Plaintiff to a reduced schedule; and Plaintiff cannot show that those reasons were a pretext for discrimination.   The Court considers each step of the *McDonnell-Douglas* analysis in turn.

---

[10]   While Plaintiff may have become aware of the disparity earlier, the record presently before the Court does not clearly establish a date falling any earlier than June 27, 2012, (PSMF ¶ 170), which was well within 180 days of the date Plaintiff filed her first EEOC complaint on August 21, 2012, (DSMF ¶ 219).

45

### 1.    Prima Facie *Case*

To state a disparate-treatment claim under Title VII or the ADA based on circumstantial evidence, a plaintiff must first establish her *prima facie* case by showing that (1) she is a member of a protected class; (2) she was subjected to adverse employment action; (3) her employer treated similarly situated employees outside her class more favorably or otherwise indicated that discriminatory animus was the cause of the adverse employment action; and (4) she was qualified to do the job.  *Brown v. Jacobs Eng'g, Inc.*, 572 Fed. Appx. 750, 751-52 (11th Cir. July 17, 2014) (per curiam) (Title VII) (citing *Maniccia v. Brown*, 171 F.3d 1364, 1368 (11th Cir. 1999) (Title VII)); *Mazzeo v. Color Resolutions Int'l, LLC*, 746 F.3d 1264, 1268 (11th Cir. 2014) (ADA).

Defendants argue that Plaintiff cannot establish that she suffered an adverse employment action or establish that discriminatory animus was the cause of the reduction in hours.  [Doc. 83-17 at 11-14, 32].  As to the adverse-employment-action element, Defendants contend that Plaintiff could not have suffered an adverse employment action because she welcomed or at least accepted the reduction in hours, [Doc. 83-17 at 12 (citing DSMF ¶¶ 93-94)]—in effect, a reiteration of the waiver arguments the Court rejected above.  *See supra* Part IV.B.

Defendants further assert that Plaintiff could not have suffered an adverse

46

employment action because Plaintiff "never utilized the [staffing company's] EEO complaint procedures to make such a claim."   [Doc. 83-17 at 12 (DSMF ¶ 96)]. Defendants do not, however, present any argument as to why Plaintiff's reduction-in-hours claim is subject to dismissal on these grounds, and thus, absent briefing on the issue, Defendants have supplied the Court with no grounds for such a determination. *See Outlaw v. Barnhart*, 197 Fed. Appx. 825, 827 n.3 (11th Cir. Aug. 10, 2006) (per curiam) (finding that plaintiff waived an issue by failing to elaborate on his argument or provide a citation to authority regarding the argument); *see also Cheffer v. Reno*, 55 F.3d 1517, 1519 n.1 (11th Cir. 1995) (concluding that issue was waived, even though party's brief listed the issue in the statement of issues, because party provided no argument on the merits of the claim).  It also bears noting that because it has not been established when Plaintiff became aware that she and Mr. Quinn were receiving disparate treatment with regard to scheduling, it is likewise unclear whether Plaintiff had a reasonable opportunity to raise a formal complaint any earlier than she did.  *See supra* Part IV.B.

The Court is also unpersuaded by Defendants' argument that Plaintiff failed to raise a genuine issue of material fact as to causation.  Defendants argue that because it is undisputed that Plaintiff and Dr. Bass wanted to work together at the Women's

47

Center, because there is evidence that Dr. Forsyth told Ms. Viscardi that Plaintiff had performance issues and he therefore did not want to work with Plaintiff at the hospital, because there is evidence that Ms. Viscardi determined that the opening of the Women's Center and the anticipated increase in volume of procedures justified adding another radiology assistant, and because it is undisputed that Mr. Quinn, the additional radiology assistant Ms. Viscardi hired, would only agree to work a full-time schedule to justify his commute, it is beyond dispute both that Ms. Viscardi made a reasonable business decision to assign Plaintiff to the thirty-two-hour work week and that Ms. Viscardi would have made the same decision even if Plaintiff was never diagnosed with cancer or had never taken medical leave.  [Doc. 83-17 at 13-14].

Defendants' argument demands too much.  As Plaintiff points out, in order to set forth a *prima facie* case of discrimination, she need not definitively establish that discriminatory animus was the reason the adverse action was taken against her, but instead must merely "present facts from which an inference of discrimination can be made."  *Brandon v. Lockheed Marin Aeronautical Sys.*, 393 F. Supp. 2d 1341, 1345 (N.D. Ga. Sept. 29, 2005) (Vining, J.) [quoted in Doc. 106 at 11-12].  Here, Plaintiff has shown evidence that her full-time work schedule was reduced in favor of Mr. Quinn, who was a non-disabled, male employee, (*see* PSMF ¶¶ 30, 31, 49, 51, 52),

48

and Defendants have made no argument that, at least for the purposes of setting their hours, Plaintiff and Mr. Quinn were not similarly situated, [*see* Doc. 83-17 at 13-14]. As a result, the undersigned finds that Plaintiff has satisfied the third element necessary to establishing a *prima facie* case of discrimination and therefore has presented facts from which a reasonable decisionmaker could infer that her reduction in hours was due to her disability or her sex.

Thus, there is no basis for a recommendation that Plaintiff's claims for discriminatory reduction in hours be dismissed for failure to establish the adverse-employment-action or causation elements of a *prima facie* case.

### 2.   *Legitimate, Non-Discriminatory Reason*

Defendants rely upon the same facts asserted in support of their causation argument to show that Ms. Viscardi had "solid business reasons" for hiring Mr. Quinn full time while assigning Plaintiff the reduced hours:  at the time Plaintiff returned to work, the staffing company needed more than one but less than two full-time radiology assistants, (DSMF ¶¶ 84, 85, 91, 94); while Dr. Bass wanted to work with Plaintiff, Dr. Forsyth did not, (DSMF ¶¶ 44-48, 86, 89, 90); Plaintiff likewise wanted to work with Dr. Bass, (DSMF ¶ 88); and while Mr. Quinn stated that he would not work part-time, Plaintiff did not outright refuse the part-time schedule, (DSMF ¶¶ 79, 94).

49

[Doc. 83-17 at 13-14].

In response to Defendants' articulated reason, Plaintiff argues that she did not have difficulties getting along with Dr. Forsyth until after her cancer diagnosis, (*see* Pl. Resp. [Doc. 106-1] ¶¶ 44-48); that shortly before her return to work, Dr. Forsyth commented that he had seen her at the Women's Center and that "[s]he looked tired and weak," was wearing a wig, and was "[n]ot her old self, maybe in 6 months or a year," (PSMF ¶ 48; Viscardi Dep., Exh. 60 [Doc. 98-4 at 51]), and made her get an additional medical evaluation before he would let her return to his service, despite her physicians already having released her to work with no restrictions, (PSMF ¶ 77); and that after her return, Dr. Forsyth treated her less favorably than Mr. Quinn by doing things like complaining when Dr. Bass gave Plaintiff access to the same type of equipment as Mr. Quinn, (PSMF ¶ 74; Olivares Dep. [Doc. 88] at 29-30).  [Doc. 106 at 13-14]. Indeed, review of the evidence cited in support of Defendants' statements of material fact suggesting that Dr. Forsyth had problems with Plaintiff before her first medical leave shows that Defendants' assertions rely on witness testimony and therefore present the sort of classic "he said / she said" dispute that cannot be resolved upon summary judgment.  (*See* Pl. Resp. [Doc. 106-1] ¶¶ 44-48).

Nevertheless, in Plaintiff's response to Defendants' articulated reason, she does

50

not dispute that with the opening of the Women's Center, it was anticipated that the number of radiology procedures would increase such that an additional radiology assistant could be financially feasible, (Pl.'s Resp. [Doc. 106-1] ¶ 91); that Mr. Quinn was not willing to work part time, (*id.* ¶ 79); and that, although Plaintiff expressed concern about the cut in her hours, she did not outright refuse to work the part-time schedule, (*id.* ¶ 94).

To avoid summary judgment, a plaintiff " 'must introduce significantly probative evidence showing that the asserted reason is merely a pretext for discrimination,' " *Brooks*, 446 F.3d at 1163 (quoting *Clark v. Coats & Clark, Inc.*, 990 F.2d 1217, 1228 (11th Cir. 1993)), since a plaintiff's *prima facie* case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated.  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148 (2000).  "Provided that the proffered reason is one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it."  *Chapman v. AI Transport*, 229 F.3d 1012, 1030 (11th Cir. 2000).  Moreover, in order to avoid summary judgment, a plaintiff must produce sufficient evidence for a reasonable factfinder to conclude that each of the employer's proffered nondiscriminatory reasons is pretextual.  *Id.* at 1037 (requiring a plaintiff to rebut " 'all

51

of the defendant's proffered nondiscriminatory reasons for its actions' " to avoid

judgment as a matter of law) (quoting *Combs v. Plantation Patterns*,

106 F.3d 1519, 1543 (11ᵗʰ Cir. 1997)).[11]

There can be little question that where one employee refuses to consider a

part-time schedule and another—even under protest—is willing to work the schedule,

a reasonable employer would be motivated to assign the full-time schedule to the one

that insists upon it and to assign the part-time schedule to the other employee.  Thus,

---

[11]    The Court recognizes Plaintiff's assertions that in *Chapman*, the court
stated that it did "not hold that, to avoid summary judgment, the plaintiff must cast
doubt on each proffered reason in a vacuum," and that the court went on to explain that

> [i]f the defendant proffers a bagful of legitimate reasons, and the plaintiff
> manages to cast substantial doubt on a fair number of them, the plaintiff
> may not need to discredit the remainder . . . because the factfinder's
> rejection of some of the defendant's proffered reasons may impede the
> employer's credibility seriously enough so that a factfinder may rationally
> disbelieve the remaining proffered reasons, even if no evidence
> undermining those remaining rationales in particular is available.

[Doc. 106 at 26 (quoting *Chapman*, 229 F.3d at 1049)].  Review of *Chapman* reveals,
however, that Plaintiff did not quote the court's holding but instead quoted from the
dissent without disclosing that she was doing so.  Moreover, as Defendants did not
supply a "bagful" of reasons for the reduction in Plaintiff's hours, but instead relied
principally on an objectively reasonable explanation that Plaintiff failed to dispute, the
undersigned finds no reasonable basis for a determination that Defendants' proffer of
legitimate, non-discriminatory reasons for the reduction in hours undermined their own
credibility.

52

the undersigned finds that Plaintiff has failed to produce sufficient evidence for a reasonable finder of fact to conclude that Defendants' proffered nondiscriminatory reason for reducing her hours in favor of Mr. Quinn was a pretext for sex or disability discrimination.  It is therefore **RECOMMENDED** that the District Judge **GRANT** Defendants' motion for summary judgment on Plaintiff's reduction-in-hours claims.

### E.     *Title VII Pay-Discrimination Claim*

Defendants argue that Plaintiff's claim for disparate pay is subject to summary judgment because she cannot show that she was "similarly situated" to Mr. Quinn with regard to compensation; because Defendants can show evidence that the decision to pay Mr. Quinn at a higher hourly rate was a result of the leverage he held in negotiations, his strong recommendations, and his comparatively greater experience; and because Plaintiff cannot show that these legitimate, non-discriminatory reasons were a pretext for discriminatory animus.  [Doc. 83-17 at 27-32 (citing DSMF ¶¶ 53, 71, 73-75, 78-79)].

In her response brief, Plaintiff argued generally that the pay differential was "circumstantial evidence of discrimination" because Mr. Quinn had less education, fewer certifications, and less tenure with the staffing company and WGHS, and could not perform or assist with as many interventional procedures as Plaintiff. [*See* Doc. 106

53

AO 72A
(Rev.8/8
2)

at 14 (citing PSMF ¶ 91)].  She did not, however, argue that the disparate pay was the *result* of discriminatory animus, nor did she respond to Defendants' arguments that even if Mr. Quinn did indeed have less education, fewer certifications, and less tenure with the staffing company and WGHS, his situation is distinguishable from Plaintiff's based on his negotiations, his recommendations, and his longer professional experience. [*See* Doc. 106, *passim*].  Despite Defendants' having pointed out the omission in their reply brief, [Doc. 113 at 22], Plaintiff has not sought to supplement her response, (*see* Dkt., *passim*).

Plaintiff's failure to respond to Defendants' arguments concerning the disparate-pay claims mandates that summary judgment on these claims be entered against Plaintiff.  *See Floyd v. Home Depot U.S.A., Inc.* 274 Fed. Appx. 763, 765 (11th Cir. 2008) (per curiam) (finding claim waived where plaintiff's brief did not respond to defendant's challenge to his *prima facie* case); *Edmondson v. Bd. of Trustees of Univ. of Ala.*, 258 Fed. Appx. 250, 253 (11th Cir. Dec. 4, 2007) (per curiam) ("There is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment.  Rather, the onus is upon the parties to formulate arguments; grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned.") (citing *Resolution Trust Corp.*

54

*v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995).[12]   A party has an obligation to respond to an argument raised in a motion for summary judgement.   *Orquiola v. Nat'l City Mortg. Co.*, 510 F. Supp. 2d 1134, 1139 (N.D. Ga. 2007) (Forrester, J.) (granting summary judgment as to plaintiff's state-law claims because plaintiff did not respond to defendant's summary judgment motion on those claims); *Burnette v. Northside Hosp.*, 342 F. Supp. 2d 1128, 1140 (N.D. Ga. 2004) (Duffey, J.) ("Failure to respond to the opposing party's summary judgment arguments regarding a claim constitutes an abandonment of that claim and warrants the entry of summary judgment for the opposing party."); *Welch v. Delta Air Lines*, 978 F. Supp. 1133, 1137 (N.D. Ga. 1997) (Hull, J.) ("Plaintiff's failure to respond to [d]efendant's argument alone entitles

_____

[12]   These cases appear to conflict with another line of Eleventh Circuit cases which direct district courts to review a motion for summary judgment and supporting documents to determine whether genuine issues of material fact exist despite a party's failure to respond.   *See Trs. of the Cent. Pension Fund of the Int'l Union of Operating Eng'rs and Participating Employers v. Wolf Crane Serv., Inc.*, 374 F.3d 1035, 1039-40 (11th Cir. 2004); *United States v. One Piece of Prop., 5800 S.W. 4th Ave., Miami, Fla.*, 363 F.3d at 1101-02.

The Court resolves the conflict in the following manner.  Where a party wholly fails to respond to a summary judgment motion, the district court must make sure that it nonetheless is appropriate to enter summary judgment against the party that did not respond.  Where, however, the non-movant fails to address a particular claim asserted in the summary judgment motion, but has responded to other claims made by the movant, the district court may properly consider the non-movant's default as intentional, and therefore consider the claim abandoned.

AO 72A
(Rev.8/8
2)

[d]efendant to summary judgment on these claims.").

Thus, Plaintiff has abandoned her pay-discrimination claims. *See Denney v. City of Albany*, 247 F.3d 1172, 1182 (11th Cir. 2001) (holding that issues not briefed are deemed abandoned); *Carter v. ALK Holdings, Inc.*, 510 F. Supp. 2d 1299, 1302 n.3 (N.D. Ga. 2007) (Camp, J.) ("Because Plaintiff failed to respond to Defendants' argument regarding this claim, the Court deems it abandoned."), *rev'd, in part, on other grounds* 605 F.3d 1319 (Fed. Cir. 2010); *Bowden ex rel. Bowden v. Wal-Mart Stores, Inc.*, 124 F. Supp. 2d 1228, 1236 (M.D. Ala. 2000) (explaining that "[i]t is not for the court to manufacture arguments on Plaintiff's behalf"); *Bute v. Schuller Int'l, Inc.*, 998 F. Supp. 1473, 1477 (N.D. Ga. 1998) (Hunt, J.) ("Because plaintiff has failed to respond to this argument or otherwise address this claim, the Court deems it abandoned."). Accordingly, the undersigned **RECOMMENDS** that Defendants' motion for summary judgment be **GRANTED** on the claims.[13]

---

[13] It also bears noting that even if Plaintiff had not abandoned the claims, it is undisputed that Mr. Quinn had Dr. Forsyth's recommendation, (DSMF ¶ 71); that Mr. Quinn started work as a radiology technician in 1987, ten years before Plaintiff began working as a staff technologist at a hospital, (DSMF ¶¶ 73-74); that Ms. Viscardi was impressed by Mr. Quinn's long work history, (DSMF ¶ 73); and that Mr. Quinn made clear in his negotiations that his pay had to be enough to warrant his long commute, (DSMF ¶ 79), and that the staffing company therefore had legitimate, non-discriminatory reasons for paying Mr. Quinn more than it paid Plaintiff for the same work.

**F.      *Discriminatory Termination***

Defendants contend that Plaintiff's claims for discriminatory termination are subject to summary judgment because Plaintiff has failed to establish a *prima facie* case of discrimination; the staffing company had legitimate, non-discriminatory reasons for terminating Plaintiff's employment; and Plaintiff cannot show that those reasons were a pretext for discrimination. [Doc. 83-17 at 16-27, 32-33]. Again, the Court will analyze the claim under the *McDonnell-Douglas* framework.

**1.      Prima Facie *Case***

Defendants do not challenge Plaintiff's ability to meet the first and second elements of the *prima facie* case as to her discriminatory termination claims: that she is a member of a protected class and that she was subjected to an adverse employment action. They argue, however, that Plaintiff cannot establish the third and fourth elements because she cannot show that she was qualified for her job or establish that there was a similarly situated comparator who was treated more favorably than she. [*Id*. at 16-19, 32-33].

Defendants contend that Plaintiff is precluded from establishing that she was qualified for her position because she cannot present evidence that she was performing her basic job skills in a satisfactory manner. [*Id*. at 16-18 (citing *Williams v. Motorola,*

57

*Inc.*, 303 F.3d 1284, 1293 (11th Cir. 2002), *Daniels v. Hale*, 350 Fed. Appx. 380, 385 (11th Cir. Oct. 26, 2009) (per curiam); *Moghadam v. Morris*, 87 F. Supp. 2d 1255, 1264 (N.D. Fla. 2000))].  Defendants also proffer testimony and documents indicating that Dr. Forsyth and Dr. Ferris complained to Ms. Viscardi about various aspects of Plaintiff's performance and that she disregarded hospital rules and defied Dr. Ferris's express orders by performing an unsupervised medical procedure.  [*See* Doc. 83-17 at 17-18 (citing DSMF ¶¶ 32-33, 35-51, 100-02, 109-13, 120-22, 127-38, 144-92)].

In response, Plaintiff argues that the simple fact that she held her position for a significant period of time is sufficient to meet the "qualification" element of her *prima facie* case.  [Doc. 106 at 7-8 (citing *Damon v. Fleming Supermarkets of Fla., Inc.*, 196 F.3d 1354, 1360 (11th Cir. 1999); *Rosenfield v. Wellington Leisure Prods, Inc.*, 827 F.2d 1493, 1495 n.2 (11th Cir. 1987) (per curiam); *Pace v. S. Ry. Sys.*, 701 F.2d 1383, 1386 n.7 (11th Cir. 1983); *Puckett v. Bd. of Trs. of the First Baptist Church of Gainesville, Inc.*, No. 2:13-cv-00131-RWS, 2014 WL 1572748, at *3 (N.D. Ga. Apr. 17, 2014) (Story, J.)].  She points out in particular that she had been credentialed to perform paracentesis procedures at WGHS for approximately five years before her termination and had performed the procedures regularly over the course of her employment; she also proffers testimony from Dr. Bass stating that he had

58

performed numerous paracentesis procedures with Plaintiff over the prior three years, that she did an excellent job on the procedures, and that he trusted her and enjoyed working with her; and she shows that she received a favorable performance evaluation from WGHS.  [Doc. 106 at 8 & n.4 (citing PSMF ¶¶ 11, 14-16, 154, 161)].

Defendants, in reply, argue that "prior performance in a position does not establish that Plaintiff was qualified."  [Doc. 113 at 11 (citing *Clarke v. One Source Facility Servs., Inc.*, 168 F. Supp. 2d 91, 97 (S.D.N.Y. 2001); *Pouncy v. Vulcan Materials Co.*, 920 F. Supp. 1566, 1582 (N.D. Ala. 1996))].

Plaintiff has the better end of the argument.  The authority Plaintiff relies upon clearly provides that a significant tenure at a position raises an inference of qualification for that position.  *See, e.g., Damon*, 196 F.3d at 1360 ("Our precedent holds that if a plaintiff has enjoyed a long tenure at a certain position, we can infer that he or she is qualified to hold that particular position."); *id.* ("We also have unambiguously held that allegations of poor performance against plaintiffs discharged from long-held positions may be properly considered, only after a prima facie case has been established, when a court evaluates the pretextual nature of an employer's proffered nondiscriminatory reasons for termination."); *Rosenfield*, 827 F.2d at 1495 n.2 ("[I]n cases where a plaintiff has held a position for a significant

period of time, qualification for that position sufficient to satisfy the test of a prima

facie case can be inferred."); *Pace*, 701 F.2d at 1386 n.7 ("[I]n discharge or demotion

cases, where a plaintiff has held a position for a significant period of time, qualification

for *that* position, sufficient to satisfy the test of a prima facie case[,] can be inferred.").

Additionally, *Williams*, the only controlling authority Defendants cite, is readily

distinguishable from the matter at hand, as in *Williams*, the court had before it

"*overwhelming* evidence of [the plaintiff's] inability to work with others" and no

evidence that she was performing satisfactorily, *Williams*, 303 F.3d at 1291, 1293

(italics added).  Here, in contrast, while there is evidence that Plaintiff had issues at

work, the evidence is by no means "overwhelming":  the evidence presently before the

Court appears to indicate that the criticism of Plaintiff's performance originated from

only two sources—Dr. Forsyth and Dr. Ferris—and Plaintiff further presented evidence

that she had the credentials necessary to do her job, (PSMF ¶ 154); that she consistently

had favorable clinical results, (PSMF ¶ 161); that Dr. Bass evaluated her performance

favorably, (PSMF ¶¶ 14-16); and that she had received at least one favorable

performance evaluation from WGHS, (PSMF ¶ 11).

    *Daniels* is likewise distinguishable because it presents overwhelming evidence

of the plaintiff's lack of qualification for her position: there, the plaintiff's record

60

included "objective evaluations of [her] performance from numerous witnesses indicat[ing] that she had difficulty communicating and handling calls, which were skills required" in her job description, and it showed "continuing complaints about her performance." *See Daniels*, 350 Fed. Appx. at 385. Similarly, in *Moghadam*, the plaintiff had worked only a "short stint" with the defendant police department, had been unfavorably evaluated by his prior employer, and himself admitted that "he could not find his way to calls to which he had been dispatched." *Moghadam*, 87 F. Supp. 2d at 1263-64. The cases Defendants rely upon in their reply brief are also of little value here, as *Clarke* relies on an unpublished case from the Southern District of New York, *see Clarke*, 168 F. Supp. 2d at 97 n.3, and *Pouncy* relies on Fourth Circuit precedent, *Pouncy*, 920 F. Supp. at 1582, rather than authority, like Plaintiff's, that is binding upon this Court.

For these reasons, the undersigned concludes that Defendants are not entitled to a grant of summary judgment on the grounds that Plaintiff cannot establish that she was qualified to perform the position from which she was dismissed.

Defendants also argue that Plaintiff cannot establish a *prima facie* case of discrimination because although she argues that Mr. Quinn is a similarly situated comparator who was treated more favorably, she cannot establish that Dr. Ferris or

61

Ms. Viscardi was aware of any time when Mr. Quinn performed a procedure that required direct supervision without Dr. Ferris being present in the immediate vicinity. [Doc. 83-17 at 18-19 (citing DSMF ¶¶ 120-23)].  Plaintiff, in response, proffers her own testimony in which she states that Mr. Quinn also performed an unsupervised paracentesis but was not terminated for the conduct.  [Doc. 106 at 31-32 (citing PSMF ¶¶ 195, 203)].  She does not, however, proffer any evidence that Dr. Ferris or Ms. Viscardi *knew* that Mr. Quinn had performed an unsupervised paracentesis, [*see id.*], nor does she object to or show any contravening evidence in the face of Defendants' assertion that "neither Dr. Ferris nor Ms. Viscardi are aware of a time when Mr. Quinn performed a procedure that required direct supervision without Dr. Ferris present in the department," (Pl. Resp. [Doc. 106-1] ¶ 123 (stating only that Plaintiff was aware of a time when Mr. Quinn performed a direct supervision procedure without Dr. Ferris present in the department)).

In determining whether employees are similarly situated, the Eleventh Circuit has held that employees "must be 'similarly situated in all relevant respects.' " *Griffin Indus., Inc. v. Irvin*, 496 F.3d 1189, 1204 (11th Cir. 2007) (emphasis omitted) (quoting *Knight v. Baptist Hosp. of Miami, Inc.*, 330 F.3d 1313, 1316 (11th Cir. 2003)).  When making such a determination, courts "evaluate whether the employees were accused of

62

the same or similar misconduct and were disciplined differently," *Floyd v. Fed. Express Corp.*, 423 Fed. Appx. 924, 930 (11th Cir. Apr. 19, 2011) (citing *Burke-Fowler v. Orange Cnty., Fla.*, 447 F.3d 1319, 1323 (11th Cir. 2006), and require that " 'the quantity and quality of the comparator's misconduct be nearly identical' to the disciplined employee's misconduct," *Floyd, id.* (quoting *Maniccia*, 171 F.3d at 1368), " 'to prevent courts from second-guessing employers' reasonable decisions,' " *Horn v. United Parcel Servs., Inc.*, 433 Fed. Appx. 788, 793 (11th Cir. July 7, 2011) (quoting *Burke-Fowler*, 447 F.3d at 1323). "The burden of identifying similarly situated individuals is a heavy one." *Hicks v. Jackson Cnty. Comm'n*, 374 F. Supp. 2d 1084, 1096 (N.D. Ala. 2005), *quoted in Griffin*, 496 F.3d at 1205.

Here, because there has been no showing that Dr. Ferris or Ms. Viscardi were aware that Mr. Quinn had performed a procedure that required direct supervision without Dr. Ferris present in the department after being warned not to do so, it necessarily follows that there has been no showing that Plaintiff and Mr. Quinn were "accused of the same or similar conduct." Consequently, the fact that Plaintiff and Mr. Quinn were not similarly disciplined cannot raise an inference of discrimination.

Plaintiff, however, does not rely exclusively on her comparison to Mr. Quinn, but also proffers what she argues is "convincing mosaic of circumstantial evidence"

that shows that the decision to terminate her employment constituted disability discrimination. [Doc. 106 at 13-15]. In addition to her assertions that she did not have difficulties getting along with Dr. Forsyth until after her cancer diagnosis, (*see* Pl. Resp. [Doc. 106-1] ¶¶ 44-48); that shortly before her return to work, Dr. Forsyth commented that he had seen her at the Women's Center and that "[s]he looked tired and weak," was wearing a wig, and was "[n]ot her old self, maybe in 6 months or a year, (PSMF ¶ 48; Viscardi Dep., Exh. 60 [Doc. 98-4 at 51]), and required that she get an additional medical evaluation before he would let her return to his service, despite her physicians already having released her to work with no restrictions, (PSMF ¶ 77); that after her return, Dr. Forsyth treated her less favorably than Mr. Quinn by doing things like questioning whether she was exceeding the scope of her practice, reprimanding her for missing meetings, and complaining when Dr. Bass gave Plaintiff access to the same type of equipment as Mr. Quinn, (PSMF ¶¶ 62, 65, 74; Olivares Dep. [Doc. 88] at 29-30); and that Mr. Quinn was paid at a substantially higher hourly rate, (PSMF ¶ 91), Plaintiff also points out that Dr. Forsyth questioned Plaintiff's disability and medical leave, (PSMF ¶ 97), and that there is evidence that Dr. Ferris commented about her disability in connection with her performance, questioning whether Plaintiff had "chemo brain" and then making it the "running theme" of his comments related to

64

Plaintiff's performance, (PSMF ¶¶ 134-48, 226, 229, 231; Bass Dep. [Doc. 101] at 14-15, 81-83, 193-95; Ferris Dep. [Doc. 102] at 152-55).  [Doc. 106 at 13-15].

The majority of the circumstantial evidence Plaintiff cites is associated with Dr. Forsyth, who was no longer involved with Plaintiff's employment at the time of her termination, and therefore is, at best, of highly questionable value as evidence that Plaintiff's employment was terminated for discriminatory reasons.   However, Dr. Ferris's admission that he wondered about whether Plaintiff had chemo brain and Dr. Bass's testimony that Dr. Ferris made it the "running theme" of his comments related to Plaintiff's performance is certainly sufficient to raise an inference that the decision to terminate Plaintiff's employment may have been motivated by her disability.   *See Hopkins v. New England Health Care Emps. Welfare Fund*, 985 F. Supp. 2d 240, 252 (D. Conn. 2013) (finding that plaintiff's evidence that her supervisor referred to her as "chemo brain" and made disparaging comments about her breast cancer was sufficient to raise an inference that plaintiff was fired because of her disability).   Thus, the undersigned finds that Plaintiff has established a *prima facie* case of discrimination, at least as to her disability.

### 2.      *Legitimate, Non-Discriminatory Reason*

Defendants assert that Plaintiff's employment was terminated because she had

AO 72A
(Rev.8/8
2)

ongoing performance issues, and when she performed the unsupervised paracentesis procedure on June 29, 2012, and did so in direct contradiction to Dr. Ferris's instructions, Ms. Viscardi concluded that she was either unable or unwilling to perform her duties in accordance with WGHS's or the staffing company's guidelines. (DSMF ¶¶ 42-55, 100-02, 109-13, 127-38, 169-72, 178-79, 209-212, 214-18). [Doc. 83-17 at 19-24 & n.5].

In response to Defendants' articulated reason for her termination, Plaintiff argues that "the facts surrounding the 'incident' " leading to her termination "are hotly in dispute," pointing to her own testimony that she and Mr. Quinn "regularly began and conducted paracentesis procedures without the physician in the building," [Doc. 106 at 28 (citing PSMF ¶ 195)]; that Dr. Ferris did not tell her not to begin the procedure until he was present in the room, that he had any concern about that particular patient, or that the patient was complicated, [Doc. 106 at 28 (citing PSMF ¶¶ 174, 176)]; and that Dr. Ferris "was acting extremely strange during the meeting after the procedure but because the procedure was fine and she followed normal procedures, she had no reason to think anything was wrong," [Doc. 106 at 28-29 (citing PSMF ¶¶ 191-92)]. Plaintiff also argues that aside from Dr. Forsyth and Dr. Ferris, "no individual had personal knowledge of any alleged performance

66

issues," and that, instead, the evidence shows that Plaintiff "received rave performance reviews throughout her tenure from colleagues and supervisors," [Doc. 106 at 29 (citing PSMF ¶ 11)]; that Dr. Bass thought highly of her, [Doc. 106 at 29-30 (citing PSMF ¶¶ 12, 15-17, 146)]; and that none of the decision makers had personal knowledge or investigated whether Dr. Forsyth or Dr. Ferris's complaints about her were true, [Doc. 106 at 30 (citing PSMF ¶¶ 203, 208, 210, 215)]. Plaintiff also points out that when she was terminated, Ms. Viscardi told her not that she was being terminated for performing the unsupervised paracentesis procedure but rather that she was being terminated because the staffing company had "decided to move in a different direction," [Doc. 106 at 30 (citing PSMF ¶ 212)], and cites cases in which courts found such explanations sufficient to establish pretext, [Doc. 106 at 30 (citing *Terry v. Real Talent, Inc.*, No. 8:09-cv-1756-T-30TBM, 2010 WL 3749224, at *7-9 (M.D. Fla. Sept. 20, 2010) (pretext established where plaintiff was not told she was terminated for performance reasons); *Saridakis v. S. Broward Hosp. Dist.*, 681 F. Supp. 2d 1338, 1351-52 (S.D. Fla. 2009) (pretext established where plaintiff was told that she was being terminated because she was not part of the decision maker's "vision for the department"))]. Additionally, Plaintiff contends that she can show a convincing mosaic of circumstantial evidence of discrimination, as Dr. Forsyth

67

questioned her coworkers about her illness and discussed her medical leave with her co-workers, [Doc. 106 at 31 (citing PSMF ¶¶ 48, 77, 97)], and Dr. Ferris " 'routinely" discussed [Plaintiff's] alleged performance deficiencies in connection with 'chemo brain' or other factors related to her disability," [Doc. 106 at 31 (citing PSMF ¶¶ 135, 143-45)].  Finally, Plaintiff contends that Dr. Ferris used the June 29 paracentesis as the grounds for Plaintiff's termination but did not terminate Mr. Quinn for the same conduct.  [Doc. 106 at 31-32 (citing PSMF ¶¶ 195, 203)].

The undersigned finds that Defendants have satisfied their burden to produce a legitimate, nondiscriminatory reason for the termination of Plaintiff's employment, as a radiologist assistant's performance of a paracentesis procedure while the supervising radiologist is not in the building is certainly a reason that might motivate a reasonable employer.  The undisputed evidence shows that the supervision requirements of a radiology assistant by a radiologist are necessary because a radiology assistant works under the license of his or her supervising radiologist, (DSMF ¶ 32); the proper level of supervision by the treating physician ensures patient safety and protects the hospital, the radiologist, and the radiologist assistant from liability for practicing medicine outside the scope of their privileges, (DSMF ¶ 33); WGHS policy required that a radiology assistant must be under "direct supervision" in order to perform a

68

paracentesis procedure, (DSMF ¶ 35); and "direct supervision" is defined as supervision where the "radiologist must be present in the office suite and immediately available to furnish assistance and direction throughout the performance of the procedure but not required to be present in the room where the procedure is performed," (PSMF ¶ 155); yet Plaintiff does not dispute that Dr. Ferris was not in fact present in the office suite before beginning that paracentesis procedure at issue in this case, (DSMF ¶ 158).

After careful review of the evidence, however, the undersigned concludes that Plaintiff has been unable to establish a genuine issue of material fact as to the pretextual nature of Defendants' stated reasons for her termination. First, while it is true the evidence shows that Ms. Viscardi did not tell Plaintiff at the time of her termination that she was being fired for performing the unsupervised paracentesis procedure but instead told her that the termination was taking place because the staffing company had decided to move in a different direction, it is nevertheless clear that Plaintiff knew at the time of the termination that the decision was motivated by the unsupervised paracentesis procedure: it is undisputed that Plaintiff did not personally verify that Dr. Ferris was there when she started the procedure; that immediately after the procedure, she saw that Dr. Ferris was upset and pacing, he told her he was upset because he was not in the

69

building when she began the procedure, he asked why she had started the procedure without him, she apologized for starting the procedure without him and tried to explain why it had happened, and he sent her home early; over the weekend, Ms. Viscardi sent Plaintiff an email stating that "due to the circumstances that happened on Friday," she was not to come to work on Monday but instead was required to attend a meeting in Mr. Handlin's office that day; also that weekend, Plaintiff asked Ms. Viscardi whether the Monday meeting was related to the Friday incident and again tried to explain to Dr. Ferris that starting the procedure without him had resulted from a miscommunication with the nurse. (DSMF ¶¶ 160, 162-64, 183, 185; PSMF ¶¶ 178-81; Def. Exh. 13 [Doc. 83-14 at 99]; Pl. Dep. [Doc. 97] at 218-19). Second, while it is undisputed that Dr. Bass expressed unqualified support for Plaintiff, (*see* PSMF ¶¶ 12, 15-17, 146), her assertion that she "received rave performance reviews throughout her tenure from colleagues and supervisors" is unsupported, as the evidence she cites otherwise consists solely of a single unsigned, undated job evaluation from WGHS, (*see* PSMF ¶ 11 (citing Pl. Decl. [Doc. 106-3] ¶ 5 & Exh. A [Doc. 106-4] at 2-6)). Third, despite her suggestions to the contrary, Plaintiff's own notes indicate that she knew that Dr. Ferris had previously become upset when Mr. Quinn had similarly violated WGHS's supervision policy a few weeks earlier and that Dr. Ferris had then

warned both Plaintiff and Mr. Quinn not to start any procedures requiring direct supervision without a physician on hand.  (DSMF ¶¶ 35-36; Pl. Dep. at 155-57 & Exh. 29 [Doc. 97-1 at 78], Exh. 38 [Doc. 97-1 at 94-95]; Viscardi Dep. I, Exh. 253 [Doc. 98-5 at 52] (cited in Pl. Resp. [Doc. 106-1 ¶ 31])).  Fourth, again despite Plaintiff's suggestion to the contrary, she has not presented any evidence that Mr. Quinn performed an unsupervised paracentesis or any other procedure requiring direct supervision *after* Dr. Ferris warned them both not to do so.  (*See* PSMF ¶ 195; Pl. Dep. at 190 (stating that both Plaintiff and Mr. Quinn had previously done paracentesis procedures without Dr. Ferris in the building, but providing no time frame)).  Fifth, presuming that Plaintiff is correct that none of the decision makers conducted a separate investigation into whether Dr. Ferris's allegations against her were true, Plaintiff presents no evidence suggesting that Dr. Ferris was in fact in the building at the time she began the paracentesis or that any of the alleged decision makers had any reason to believe that Dr. Ferris's complaint regarding her conduct was false. Sixth, while it gives the Court pause that Dr. Ferris "routinely" expressed concern that Plaintiff was making mistakes or "acting goofy" because she suffered from "chemo brain," Plaintiff has not supplied evidence showing that Dr. Ferris made the decision to terminate Plaintiff's employment, recommended that the staffing company terminate

71

Plaintiff's employment, or falsely represented the circumstances of the paracentesis. (*See* PSMF ¶ 203 (citing Viscardi Dep. I [Doc. 98] at 166-67)).

For these reasons, the undersigned concludes that Plaintiff has not introduced significantly probative evidence to rebut Defendants' explanation that her termination resulted from her performance of an unsupervised paracentesis or to otherwise show that the explanation was a pretext for what was in fact a discriminatory decision. *Brooks*, 446 F.3d at 1163; *Chapman*, 229 F.3d at 1030; *Clark*, 990 F.2d at 1228. It is therefore **RECOMMENDED** that the District Judge **GRANT** Defendants' motion for summary judgment on Plaintiff's discriminatory termination claims.

### G. Retaliation

Defendants also contend that Plaintiff cannot establish a *prima facie* case of discriminatory retaliation. [*See* Doc. 83-17 at 34-36]. To establish a *prima facie* case for a retaliation claim, a plaintiff must show that: (1) she engaged in statutorily protected activity; (2) she suffered a materially adverse action[14]; and (3) there was a

---

[14]   In *Crawford v. Carroll*, 529 F.3d 961, 973-74 (11th Cir. 2008), the Eleventh Circuit recognized that the Supreme Court's decision in *Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006), broadened the type of employer conduct considered actionable in a retaliation claim, from that which adversely affects the plaintiff's conditions of employment or employment status to that which has a materially adverse effect on the plaintiff, irrespective of whether it is employment- or workplace-related. *Crawford*, 529 F.3d at 973. Therefore, as a result of *Burlington*

AO 72A
(Rev.8/8
2)

causal link between the two.  *Dixon v. The Hallmark Cos., Inc.*, 627 F.3d 849, 856 (11th Cir. 2010); *see also Johnson v. Booker T. Washington Broad. Serv., Inc.*, 234 F.3d 501, 507 (11th Cir. 2000); *Holifield*, 115 F.3d at 1566.   To satisfy the causation prong, the prong Defendant challenges here, Plaintiff is only required to show that the "protected activity and the adverse action were not wholly unrelated."  *Shotz v. City of Plantation*, 344 F.3d 1161, 1180, n.30 (11th Cir. 2003) ("[A] plaintiff satisfies this element if he provides sufficient evidence that the decision-maker became aware of the protected conduct, and that there was a close temporal proximity between this awareness and the adverse action.") (alteration and citation omitted).

In Count IV of the complaint, Plaintiff asserts that Defendants' refusal to pay her "the separation payment due and owing to her under her Physician Extender Employment Agreement because she did not sign the general release of all of her

---

*Northern* and *Crawford*, the Court concludes that it is inappropriate to refer to this element as the adverse employment action element.  *Burlington Northern* explicitly states that "[t]he scope of the anti-retaliation provision extends beyond workplace-related or employment-related retaliatory acts and harm."  *Burlington Northern*, 548 U.S. at 67.  The decision merely requires the employee to show that a reasonable employee would have found the challenged action materially adverse, meaning the reasonable worker would be dissuaded from making or supporting a charge of discrimination.  *Id.* at 68 (quotation marks and citations omitted).  Thus, it is more appropriate to refer to the "adverse employment action" element as the "materially adverse action" element.

73

claims was committed with reckless disregard for [Plaintiff's] right to be free from retaliatory treatment on account of her opposition to discriminatory practices in violation of Title VII and the ADAAA." (Compl. ¶ 109). Defendants contend that they are entitled to summary judgment on the claim, arguing that the claim is, in essence, a claim that Plaintiff was asked to sign a release to receive severance pay only because of her alleged representation that she was going to file an EEOC charge, and that the claim necessarily fails because the undisputed chronology shows that Plaintiff never directly or through counsel stated that she intended to file an EEOC charge until after the staffing company conditioned her receipt of severance upon a release of claims. [Doc. 83-17 at 34-36 (citing DSMF ¶¶ 193-94, 201-02, 204-05, 219)].

In response, Plaintiff argues that she established a *prima facie* case for retaliatory denial of her severance pay, arguing that she "does not allege that she was asked to sign a release because she alerted Defendants that she planned to file a discrimination and retaliation charge with the EEOC" but rather that her retaliation claim is based on allegations that "it was only after she contacted Ms. Viscardi on August 7, 2012 and informed her that she planned to file a charge, [that] Defendants refused to pay her the severance owed under [the Physician Extender Employment Agreement]." [Doc. 106 at 24-25 (citing PSMF ¶¶ 212, 240)].   She also argues that Defendants' motion

74

"ignore[s] other facts pertinent to her retaliation claim including her use of medical leave and repeated complaints that she was being discriminated against because of her gender while she was employed by Defendants—as recently as two days before her termination," [Doc. 106 at 19-21 (citing PSMF ¶ 170)], and that the adverse employment actions she suffered included not only Defendants' failure to pay her severance but also included "reduced hours, pay, and termination," [*id.* at 21-24].

After careful review, the undersigned finds that Plaintiff has failed to establish a genuine issue of material fact as to her retaliation claims. First, there is nothing in Count IV that could be construed to allege that any reduction in hours, any reduction in pay, or Plaintiff's termination was effected in retaliation for Plaintiff having engaged in any protected activity. (Compl. ¶¶ 109-11). Instead, the only adverse action about which Plaintiff complains was the staffing company's refusal to pay her the separation payment she contends she was entitled to under the Physician Extender Employment Agreement. (*Id.* ¶ 109). A plaintiff cannot change or add new claims at the summary-judgment stage. *Davis v. Cothern*, 482 Fed. Appx. 495, 497 (11th Cir. July 24, 2012) (per curiam) (" 'A plaintiff may not amend her complaint through argument in a brief opposing summary judgment.' ") (quoting *Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004) (per curiam)); *Klauber*

75

*v. City of Sarasota*, 235 F. Supp. 2d 1263, 1268-69 (M.D. Fla. 2002) (granting summary judgment on a claim that was not raised in the complaint, explaining that the plaintiff had not complied with the "fair notice" required under the Federal Rules of Civil Procedure). Plaintiff therefore cannot raise claims for retaliatory reduction in hours or pay or for retaliatory termination in response to Defendants' motion for summary judgment.

Plaintiff's claim for retaliatory failure to pay her severance fails for similar reasons. There is nothing in Count IV that could be construed to suggest that the staffing company's refusal to pay Plaintiff severance was triggered by her use of medical leave or any complaints she may have raised about sex or disability discrimination. (Compl. ¶¶ 109-11). Instead, Plaintiff states that the staffing company's refusal to pay severance was a result of Plaintiff's own refusal to sign the general release of claims. (*Id.* ¶ 109). The proscription from raising new claims in response to a motion for summary judgment extends to the assertion of any "additional, separate statutory basis" for a claim appearing in the complaint. *See Hurlbert v. St. Mary's Health Care Sys., Inc*., 439 F.3d 1286, 1297 (11th Cir. 2006) (holding that where the complaint alleged entitlement to FMLA leave based on the plaintiff's own serious health condition, the district court had correctly rejected the plaintiff's

76

impermissible attempt to amend his claim by arguing that he was entitled to the leave to care for his mother). Thus, the Court limits its analysis to the retaliation claim actually asserted in the complaint: that the staffing company's refusal to pay severance to Plaintiff was impermissible retaliation triggered by Plaintiff's refusal to sign the general release of claims. (*See* Compl. ¶ 109).

However, Plaintiff's refusal to sign the general release of claims could not give rise to her claim for retaliatory failure to pay her severance. Plaintiff's own pleadings indicate that as of August 3, the staffing company had already informed Plaintiff "that she would not be paid the severance owed to her as a result of their failure to provide ninety days' notice due and owing to her under the Physician Extender Employment Agreement unless she signed an agreement releasing all of her claims against Defendants." (Compl. ¶ 69). Thus, because Plaintiff admits that the decision to condition her severance payments on her release of claims had been made on or before August 3, 2012, (*id.*), it necessarily follows that no reasonable finder of fact could determine that the decision could have been made in retaliation for conduct she undertook on August 7, 2012, (*see id.* ¶¶ 70, 109). Consequently, despite the fact that Ms. Viscardi notified Plaintiff on August 28, 2012, that the staffing company would indeed withhold severance, the decision to condition the severance on Plaintiff's

77

execution of the release was not retroactively rendered retaliatory by Plaintiff's refusal to sign the release.

For these reasons, the undersigned **RECOMMENDS** to the District Judge that he **GRANT** Defendants' motion for summary judgment on Plaintiff's retaliation claims.

### H.     Breach of Contract

Plaintiff also asserts a claim for breach of contract, asserting that under the Physician Extender Employment Agreement, she was entitled to either ninety days' notice of her termination or payment of her salary and benefits for ninety days after her termination without notice. (Compl. ¶¶ 113-20). She contends that IPRI is liable to her for breach of contract in the amount of $21,656.88, plus prejudgment interest accruing from July 2, 2012. (*Id.* ¶ 120).

Analogizing Plaintiff's breach-of-contract claim to *Alonso v. Hospital Authority of Henry County*, 175 Ga. App. 198, 201, 332 S.E.2d 884, 887 (1985), Defendants contend that summary judgment is warranted here because Plaintiff's contract permitted immediate termination for professional misconduct and "for cause," (citing DSMF ¶¶ 34, 101, 207), and a reasonable person would find that the performance of an unsupervised paracentesis constituted professional misconduct and warranted

78

termination for cause, (citing DSMF ¶¶ 32-33, 38, 173). [Doc. 83-17 at 36-38].

Defendants also contend that it is immaterial that the staffing company did not

immediately specify that Plaintiff's termination was "for cause" because, under Georgia

contract law, "the singular question is only whether the final determination is justified

by the conduct." [*Id.* at 38 (citing *Suwanee Pediatrics, LLC v. Fan*, 274 Ga. App. 456,

456, 618 S.E.2d 3, 4 (2005) (finding that trial court erred in determining that employer

had no right to immediately terminate the contract); *Odem v. Pace Acad.*,

235 Ga. App. 648, 654, 510 S.E.2d 326, 331-32 (1998) (distinguishing the plaintiff's

authority on the grounds that pretext arguments applicable under federal discrimination

law are immaterial to breach-of-contract claims))].

Plaintiff, in response, contends that under the Agreement, she was entitled to

ninety days' written notice of termination, arguing that it is "evident that her

termination was actually a dismissal without cause" and that "Defendants' actions were

a fraudulent effort to avoid paying the severance that was owed to her under her

contract," based on the facts that at Plaintiff's termination meeting, Ms. Viscardi told

her that the staffing company had decided to go in a different direction and would not

be renewing her contract, (PSMF ¶ 212), and it was only after Plaintiff filed for

unemployment and filed her charge of discrimination that the staffing company asserted

79

that she had been terminated for cause and was not entitled to ninety days' notice, (PSMF ¶¶ 239-40).  [Doc. 106 at 33-34].

To recover in a suit on contract under Georgia law, "the complaining party must establish both a breach of the contract and resulting damages." *Rise v. GAPVT Motors, Inc.*, 288 Ga. App. 246, 248, 653 S.E.2d 320, 322 (2007); *accord Canton Plaza, Inc. v. Regions Bank, Inc.*, 315 Ga. App. 303, 306, 732 S.E.2d 449, 454 (2012) ("The elements for a breach of contract claim in Georgia are the (1) breach and the (2) resultant damages (3) to the party who has the right to complain about the contract being broken.") (italics omitted).   "Where terms of a contract are clear and unambiguous, . . . and where there is no substantial issue as to material facts, construction of the contract is a question of law for the court, and there is nothing to be resolved by a jury." *Jahncke Serv., Inc. v. Dep't of Transp.*, 172 Ga. App. 215, 219, 322 S.E.2d 505, 509 (1984).  Where, as here, a contract does not define "just cause," courts apply an objective, rather than a personal or subjective test—in other words, "what a reasonable person would find sufficient." *Alonso*, 175 Ga. App. at 201, 332 S.E.2d at 887.  The existence of "just cause" is determined upon review of the totality of the circumstances surrounding the plaintiff's termination. *See Suwanee Pediatrics, LLC v. Fan*, 274 Ga. App. at 458, 618 S.E.2d at 5 (holding, upon

80

examination the circumstances of the plaintiff's termination, that the trial court had erred in concluding that the employer had no right to immediately terminate her contract); *Alonso*, 175 Ga. App. at 201, 332 S.E.2d at 887 (holding that the trial court "was justified in finding that the totality of the circumstances was sufficient cause so as to rise to the level of just cause for termination under the contract").

The undersigned finds no a genuine issue of material fact as to Plaintiff's breach-of-contract claim. The Physician Extender Employment Agreement provided that the staffing company had the right to terminate the agreement "immediately, for cause or personal or professional misconduct or malpractice," or "without cause, on ninety (90) days written notice." (Pl. Dep., Exh. 4 [Doc. 97-1 at 20]). As discussed above, the undisputed evidence shows that WGHS policy required that a radiology assistant must be under "direct supervision" of a radiologist in order to perform a paracentesis procedure, (DSMF ¶ 35); that "direct supervision" is defined as supervision where the "radiologist must be present in the office suite and immediately available to furnish assistance and direction throughout the performance of the procedure but not required to be present in the room where the procedure is performed, (PSMF ¶ 155); that prior to Plaintiff performing the unsupervised paracentesis, Plaintiff knew that Dr. Ferris had previously gotten upset when Mr. Quinn had similarly violated WGHS's supervision

81

policy a few weeks earlier, and both she and Mr. Quinn had been warned by Dr. Ferris not to start any procedures requiring direct supervision without a physician on hand, (DSMF ¶¶ 35-36; Pl. Dep. at 155-57 & Exh. 29 [Doc. 97-1 at 78], Exh. 38 [Doc. 97-1 at 94-95]; Viscardi Dep. I, Exh. 253 [Doc. 98-5 at 52] (cited in Pl. Resp. [Doc. 106-1 ¶ 31])); and Plaintiff does not dispute that Dr. Ferris was not present in the office suite before she started the paracentesis procedure at issue in this case, (DSMF ¶ 158). It is also undisputed that the supervision requirements are necessary because the radiology assistant works under the license of the supervising radiologist, (DSMF ¶ 32), and the proper level of supervision by the treating physician ensures patient safety and protects the hospital, the radiologist, and the radiologist assistant from liability for practicing medicine outside the scope of their privileges, (DSMF ¶ 33). Thus, Plaintiff concedes that she violated WGHS policy and her supervisor's direction and in doing so, omitted a safeguard in place to protect the patient's safety, her supervisor's license, and herself, her supervisor, and the hospital from necessary risk of liability. Her failure to abide by the supervision requirement certainly could be construed as professional misconduct or just cause for termination.

Moreover, as Defendants have pointed out, Plaintiff has not cited a single case to support her apparent theory that the staffing company was required to immediately

determine and specify that the termination should be characterized as "for cause" or forever be precluded from doing so.  [*See* Doc. 113 at 26-27].  And, as also discussed above, while the evidence does show that Plaintiff was told at the termination meeting that her contract would not be renewed because the staffing company had decided to move in a different direction, the undisputed evidence clearly shows that Plaintiff knew that the decision was motivated by the unsupervised paracentesis procedure:  Plaintiff did not see Dr. Ferris before she started the procedure; immediately after the procedure, she saw that Dr. Ferris was upset, he told her he was upset because he was not in the building when she began the procedure, he asked why she had started the procedure without him, she apologized for starting the procedure without him and tried to explain why it had happened, and he sent her home early; the next day, Ms. Viscardi sent Plaintiff an email telling her that "due to the circumstances that happened on Friday," she was not to come back to work but was instead to come to a meeting in Mr. Handlin's office on Monday afternoon; and prior to the meeting, Plaintiff asked Ms. Viscardi whether the Monday meeting was related to the Friday incident and again tried to explain to Dr. Ferris that starting the procedure without him had resulted from a miscommunication with the nurse.    (DSMF ¶¶ 160, 162-64, 183, 185; PSMF ¶¶ 178-81; Def. Exh. 13 [Doc. 83-14 at 99]; Pl. Dep. [Doc. 97] at 218-19).

83

Thus, there can be no reasonable argument that the unsupervised paracentesis was a fraudulent post-hoc effort to avoid paying Plaintiff severance.

These circumstances, viewed in their totality, provide a basis for the staffing company's decision to terminate Plaintiff's contract for cause or professional misconduct. Thus, the staffing company had authority under the Physician Extender Employment Agreement to terminate Plaintiff's employment, and no breach of contract occurred. *See Suwanee Pediatrics, LLC*, 274 Ga. App. at 458, 618 S.E.2d at 5; *Odem*, 235 Ga. App. at 652-54, 510 S.E.2d at 331-32. Accordingly, the undersigned **RECOMMENDS** to the District Judge that Defendants' motion for summary judgment be **GRANTED** as to Plaintiff's claim for breach of her employment agreement.

### I.    *Bad Faith*

Plaintiff also asserts a claim of bad faith under O.C.G.A. § 13-6-11, which may provide for an award of attorneys' fees "where the plaintiff has specifically pleaded and has made prayer therefor and where the defendant has acted in bad faith, had been stubbornly litigious, or has caused the plaintiff unnecessary trouble and expense." O.C.G.A. § 13-6-11. However, an award of expenses of litigation under O.C.G.A. § 13-6-11 is ancillary, and thus a party may recover them only upon relief on an underlying claim. *Lee v. Ga. Power Co.*, 296 Ga. App. 719, 721, 675 S.E.2d 465,

AO 72A
(Rev.8/8
2)

468 (2009).

Because the undersigned **RECOMMENDS** that the District Judge **GRANT** Defendants' motion for summary judgment as to all of Plaintiff's substantive claims, Plaintiff has no underlying claim to support her claim for fees.  Consequently, the undersigned **RECOMMENDS** that the District Judge **GRANT** Defendants' motion for summary judgment as to Plaintiff's claim for expenses of litigation pursuant to O.C.G.A. § 13-6-11.

## V.    *Conclusion*

For the reasons discussed above, the undersigned **RECOMMENDS** to the District Judge that he **GRANT** Defendant's motion for summary judgment, [Doc. 83], and **DIRECT** the Clerk to close the case.

Because this case presents no other issues referred to Magistrate Judges pursuant to Standing Order 14-01, the Clerk is hereby **DIRECTED** to **TERMINATE** reference to the undersigned.

**IT IS SO ORDERED, RECOMMENDED and DIRECTED,** this the 7th day of December, 2015.

_____
**ALAN J. BAVERMAN**
**UNITED STATES MAGISTRATE JUDGE**

AO 72A
(Rev.8/8
2)