UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| DANIELLE SNODGRASS, | ) | |
| | ) | |
| Plaintiff, | ) | CIVIL ACTION |
| | ) | FILE NO. 1:13-cv-03958-SCJ |
| v. | ) | |
| | ) | |
| INDEPENDENT PHYSICIANS | ) | |
| RESOURCE, INC. and | ) | |
| APOLLOMD, INC., | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF DANIELLE SNODGRASS' OBJECTIONS TO THE
MAGISTRATE COURT'S REPORT AND RECOMMENDATION**

I.     **Introduction**

Danielle Snodgrass ("Ms. Snodgrass" or "Plaintiff") worked for Defendant

Independent Physicians Resource, Inc. d/b/a ApolloMD ("ApolloMD")[1] for three

years and was a dedicated employee who had a good performance record and was

loved by her colleagues and patients alike.  Ms. Snodgrass never received any

complaints about her performance or personality until she was diagnosed with breast

cancer, a disability under the Americans with Disabilities Act, as amended by the

Americans with Disabilities Act Amendments Act ("ADAAA"), 42 U.S.C. § 1201 *et*

_____

[1] Plaintiff does not object to the Magistrate Court's conclusion that she was not
employed by ApolloMD, Inc. or that her pay disparity claim is waived.

1

*seq.*, and took medical leave to receive treatments related to her disability.

Ms. Snodgrass was employed by ApolloMD until shortly after Defendant's Medical Director, Dr. Jeremy Ferris ("Ferris"), questioned another physician about whether he thought Ms. Snodgrass had "chemo brain" and proceeded to regularly question her abilities in connection with his perception that she had "chemo brain." A short time later, Defendant terminated Ms. Snodgrass based on a disputed and pretextual reason. In terminating Ms. Snodgrass' employment, Defendant also breached her contract by failing to pay her ninety (90) days' severance owed to her under the contract.

Ms. Snodgrass brings five claims in this action: (1) disability discrimination under the ADAAA; (2) gender discrimination under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*, ("Title VII"); (3) retaliation under the ADAAA and Title VII; (4) breach of contract under Georgia state law; and (5) expenses of litigation under O.C.G.A. § 13-6-11.

Ms. Snodgrass presented strong circumstantial evidence of discrimination and retaliation under the ADAAA and Georgia state law. Nevertheless, in the Magistrate Court's Report and Recommendation ("R&R"), the Magistrate Court concluded that Plaintiff did not demonstrate genuine disputes in the material facts to warrant a jury trial. Due to this erroneous conclusion, Plaintiff files her Objections to the R&R

pursuant to Fed. R. Civ. P. 72 and 28 U.S.C. § 636(b)(1). (*See* Doc. No. 72).[2]

Under Fed. R. Civ. P. 72 and 28 U.S.C. § 636, the Court reviews the recommended order of a Magistrate Judge to determine if it is either "clearly erroneous" or "contrary to law."  Normally, factual determinations fall under the deferential "clearly erroneous" standard while legal issues and dispositive matters fall under the "contrary to law" standard, which mandates de novo review.  Mixed questions of fact and law are reviewed de novo.  Wright, Miller & Marcus, Federal Practice & Procedure § 3070.2 (2008) (collecting and discussing numerous authorities).

In this case, Plaintiff's objections to the R&R involve mixed questions of fact and law and as such, it must be examined *de novo.*  As a starting point, the Magistrate failed to consider disputed facts in Plaintiff's favor, which would have required the denial of summary judgment.  Plaintiff specifically objects to the Court's grant of summary judgment on the following claims:

1.      Her disability discrimination claim arising out of her hours/pay cut;

_____

[2] Under 28 U.S.C. § 636(b)(1) objecting parties file objections and not a brief.  The page limit guidelines in the Northern District of Georgia Local Rules, accordingly do not apply to these objections.  However, if this Court finds that the page limitations do, in fact, apply, Plaintiff reserves the right to move the Court to file a brief in excess of twenty-five pages and for an additional thirty-five pages to permit Plaintiff sufficient space to respond the Magistrate Court's eighty-five page R&R.

2.     Her disability discrimination claim arising out of her termination;

3.     Her retaliation claim relating to Defendant's withdrawal of its offer to pay her ninety (90) days' severance pay under her contact; and

4.     Her breach of contract and O.C.G.A. § 13-6-11 claims.

Having come to these wrong conclusions by substituting itself for the jury in favor of Defendant, the Magistrate's R&R should not be adopted.  To do so would render this Court outside the bounds of its authority and proper role at summary judgment and violate Plaintiff's fundamental right to a trial by jury under the 7th Amendment.

## II.     Background Facts As Presented To The Magistrate[3]

Ms. Snodgrass is a Registered Radiologist Assistant ("RRA") who began working for West Georgia Health Systems ("WGHS") in 2006.  (Deposition of Danielle Snodgrass ("Snodgrass Dep.") 12:13-13:8; Deposition of Virginia Viscardi March 12, 2015, ("Viscardi Dep. I") 23:9-22.)  As an RRA, Ms. Snodgrass is a midlevel provider who is registered in computer tomography, mammography, and radiology.  (Snodgrass Dep. 30:14-22.)

Throughout her employment with Defendant, Ms. Snodgrass worked for Dr.

---

[3] For the most part, and with a few notable exceptions, the Magistrate Court properly viewed the facts in the light most favorable to Ms. Snodgrass.  Where Ms. Snodgrass objects to the Magistrate Court's view of particular facts or omission of certain critical, material facts, she will note so here in bold.

Edward Bass, Dr. Paul Forsyth, and Dr. Jeremy Ferris, each of whom supervised the medical aspects of Ms. Snodgrass' job. (Snodgrass Dep. 72:23-25, 76:4-9.) Ms. Snodgrass consistently scored "Exceeds Standards" in her performance evaluations, and Defendant noted that Ms. Snodgrass was an "Excellent physician extender. Loyal and patient centered." (Doc. 106-4.) Ms. Snodgrass was very good at what she did and her patients loved her and the service she provided; she was very empathetic with all patients. (Deposition of Joseph E. Bass ("Bass Dep.") 124:7-10, 145:5-10.)

**Plaintiff objects to the Magistrate Court's failure to address the following Statements of Fact in the R&R because they are strong circumstantial evidence of pretext:**

- **Dr. Bass performed numerous paracentesis procedures with Ms. Snodgrass. (Bass Dep. 39:9-40:14, 50:12-18.) (Doc. 106-2, ¶ 14.)**

- **In Dr. Bass' experience, Ms. Snodgrass does an excellent job on paracentesis procedures and he never had an issue with her performing these procedures throughout the three year tenure of his working with her. (Bass Dep. 26:8-10, 40:20-41:2, 50:19-51:3.) (Doc. 106-2, ¶ 15.)**

- **Dr. Bass had never had any problems working with Ms. Snodgrass and always enjoyed working with her; the extent to which he trusted her was that he would let her "handle the sharp instruments." (Bass Dep. 42:11–25.) (Doc. 106-2, ¶ 16.)**

- **Throughout the time that he worked with her, Dr. Bass would describe Ms. Snodgrass as possessing as a high level of competency;**

> "…it was like clockwork.  Great, great operation we had going."
> **(Bass Dep. 45:2-21.)  (Doc. 106-2, ¶ 17.)**

- **Ms. Snodgrass "gave 100 percent while she was at WGHS [and the Women's Center].  She cared for the patients like they were her family.  (Doc. 106-2, ¶ 18.)**

- **When she left, it was devastating to the whole team.  She was very good at her job."  (Deposition of Katie Oliveras ("Oliveras Dep.") 44:25-45:9.) (Doc. 106-2, ¶ 19.)**

When Defendant took over the contract at WGHS, Dr. Paul Forsyth became WGHS's Director of Radiology.  (Snodgrass Dep. 81:9-14.)  Initially, Dr. Forsyth and Ms. Snodgrass got along fine.  (Snodgrass Dep. 83:18-84:4.)  In addition to Dr. Forsyth, Ms. Snodgrass worked regularly with Dr. Bass.  (Snodgrass Dep. 72:23-25; Bass Dep. 39:9-40:14.)

### A.     Ms. Snodgrass' First Medical Leave

On February 1, 2010, Ms. Snodgrass was diagnosed with breast cancer. (Snodgrass Dep. 93:20-94:1.)

**Plaintiff objects to the Magistrate's failure to include the following fact in its analysis to the extent it is evidence that Dr. Forsyth had Plaintiff's disability top of mind and had discriminatory animus:**

- **Dr. Forsyth became aware of Ms. Snodgrass' biopsy results almost immediately because he checked them himself even though he shouldn't have been privy to it; "[o]nly the performing physician and the referring physician and the pathologist should be in the loop on that."  (Bass Dep. 78:1-13.)  (Doc. 106-2, ¶ 26.)**

Ms. Snodgrass told Ms. Viscardi about her disability shortly after she was diagnosed in February 2010. (Viscardi Dep. I 29:13-30:1.) Ms. Snodgrass required a double mastectomy, chemotherapy, and reconstructive surgery, and she took her first medical leave for surgery related to her disability in March 2010. (Snodgrass Dep. 92:12-94:13, 96:3-11, Ex. 5; Viscardi Dep. I 32:3-8.) Before she went out on medical leave, Ms. Snodgrass worked with Drs. Forsyth and Bass at the hospital and worked 40 hour weeks. (Snodgrass Dep. 114:13-115:11.)

Originally, Ms. Viscardi told Ms. Snodgrass that for the limited time that she was out on medical leave, her position was going to be covered by a male, non-disabled employee, Kevin Quinn, who was in the same position as Ms. Snodgrass. (Snodgrass Dep. 108:18-109:3; Bass Dep. 159:16-19; Viscardi Dep. I 34:8-35:10, 145:4-20, 146:8-10; Dellinger Dep. 46:3-17.) Defendant hired Kevin Quinn for a full time temporary position on March 3, 2010. (Dellinger Dep. 42:13-43:11, Ex. 56; Viscardi Dep. I 40:14-22, Ex. 16.) Ms. Snodgrass' mastectomy also took place on March 3, 2010. (Snodgrass Dep. 98:7-99:13, Ex. 7.)

On March 26, 2010, Ms. Snodgrass' physician released her to return to work full time with the only accommodation being able to attend chemotherapy treatments for three to six months and occasional time off for flare-ups related to the chemotherapy treatments. (Snodgrass Dep. 98:7-99:13, 100:4-101:5; Snodgrass Dep.

Ex. 7.)  Ms. Snodgrass informed Ms. Dellinger that she did not need assistance to

move the "fluoro tower," that she did not have to lift or move patients as a part of her

job, that she was not returning to work on a reduced schedule, and that potential

chemotherapy related flare ups would not last six months.  (Snodgrass Depo. 103:3-

105:17; Dellinger Dep. 38:16-39:8, 63:15-20.)  On March 30, 2010, Ms. Snodgrass'

physician confirmed to Ms. Dellinger that Ms. Snodgrass was not restricted in

wearing the lead apron or using the fluoroscopy tower.  (Dellinger Dep. 35:11-36:9,

Ex. 51.)  Defendant did not allow Ms. Snodgrass to return to work at that time.

(Dellinger Dep. 47:18-48:1, 48:17-49:8, 50:21-51:3, 53:5-16, Ex. 63, 66; Snodgrass

Dep. 110:23-111:10.)  Ms. Snodgrass continued to inform Ms. Dellinger that she did

not request a reduced work schedule or part time work, and was released and wanted

to return full time.  (Snodgrass Dep. 110:23-111:10, 124:3-7, Ex. 13; Dellinger Dep.

35:11-36:9, 36:14-38:15, 47:18-48:1, 48:17-49:8, 50:21-51:3, 53:5-16, Ex. 51, 63,

66.)

        On April 30, 2010, Ms. Snodgrass' physicians released Ms. Snodgrass to return

to work with no restrictions, noting that she would need two days off of work for

chemotherapy on May 3 and May 17.  (Dellinger Dep. 54:12-55:14, Ex. 67.)  On May

18, Defendant finally informed Ms. Snodgrass that they would permit her to return to

work and she did so on May 20.  (Snodgrass Dep. 132:21-133:22, Ex. 17; Viscardi

Dep. I 43:14-20, Ex. 12.)

While Ms. Snodgrass was out on leave, Defendant opened a new facility called

the Women's Center, a women's imaging center where the radiologists performed

mammography, ultrasounds, and other procedures for women.  (Snodgrass Dep.

113:13-114:3; Bass Dep. 34:23-35:10.)  Ms. Snodgrass did not request to be

transferred to the Women's Center before she returned from leave and when the

transfer was brought to her attention, she did not know that her work hours would be

reduced nor did she agree to a reduction in work hours.  (Snodgrass Decl. ¶¶ 9-10.)

**Plaintiff objects to the Magistrate's failure to include the following fact in**

**its analysis to the extent it is evidence that Dr. Forsyth had Plaintiff's disability**

**top of mind and had discriminatory animus:**

- **While Ms. Snodgrass was out on medical leave, Dr. Forsyth "saw Dannie Snodgrass at the Women's Center [].  She looked tired and weak and she had a wig on" and then complained about her presence in the Women's Center.  (Viscardi Dep. I 84:24-86:1, 87:19-89:2, Ex. 60.)  (Bass Dep. 78:1-13.)  (Doc. 106-2, ¶ 48.)**

### B.    Ms. Snodgrass' Return From Her First Medical Leave

On May 18, Ms. Dellinger informed Ms. Snodgrass that, upon her return from

medical leave, her hours would be cut from 40 hours per week to 32 hours per week.

(Snodgrass Dep. 115:21-116:11, 120:14-21, 132:19-133:22, Ex. 17; Viscardi Dep. I

93:24-94:4.)  Ms. Snodgrass told Ms. Dellinger that she was concerned that her hours were cut to 32 per week and told her that she did not want to return part time but wanted to return to work full time.  (Snodgrass Dep. 132:19-135:12, Ex. 17; Dellinger Dep. 47:18-48:1, 48:17-49:8, 50:21-51:3, 53:5-16, Ex. 63, 66.)  Ms. Snodgrass also complained to Dr. Bass that her hours were cut.  (Bass Dep. 110:21-112:13.)  Defendant told Ms. Snodgrass that Mr. Quinn was going to be assigned to a 32 hours per shift week after Ms. Snodgrass returned from medical leave ready to work full time; however Defendant actually scheduled him to work 40 hours a week and paid him for 40 hours a week whether he actually worked 40 hours or not. (Snodgrass Dep. 110:15-111:7, 115:21-116:11, 120:14-21, 124:3-7, 125:3-13, 132:19-135:12, Ex. 13, 17; Bass Dep. 127:14-129:3, 191:23-192:14; Viscardi Dep. I 72:10-16, 104:15-105:13, Ex. 19.)  Ms. Snodgrass again expressed concern that Defendant cut her hours to 32 hours a week when she returned from medical leave. (Snodgrass Dep. 134:8-11.)

## C.    Dr. Forsyth's Treatment of Ms. Snodgrass After Her First Medical Leave

**Plaintiff objects to the Magistrate's failure to include the following facts in its analysis of discriminatory animus and pretext:**

- **After Ms. Snodgrass was diagnosed with breast cancer and took medical leave to care for herself, Dr. Forsyth began "questioning what she was doing and if it was within [her] scope of practice to do**

those procedures" and medical reconciliation forms. (Snodgrass Dep. 84:2-22; Deposition of Charis Acree ("Acree Dep.") 33:19-35:4.) (Doc. 106-2, ¶ 62.)

- In questioning Ms. Snodgrass' scope of practice Dr. Forsyth never described or cited to any specific instance. (Bass Dep. 55:10-14; Acree Dep. 33:19-35:4.) (Doc. 106-2, ¶ 63.)

- In Dr. Bass's experience during the three year time period he worked with Ms. Snodgrass, she never did anything outside of the scope of her privileges. (Bass Dep. 55:15-56:4, 115:19-24; Snodgrass Decl. ¶ 32.) (Doc. 106-2, ¶ 64.)

- Ms. Snodgrass was the only individual whose scope of practice was questioned by Dr. Forsyth, despite the fact that Ms. Snodgrass' job description and Mr. Quinn's job description were the same. (Bass Dep. 58:25-59:9; Krubert Dep. 116:18-117:14, 119:3, Exs. 3, 14.) (Doc. 106-2, ¶ 65.)

- Dr. Forsyth favored Mr. Quinn, Ms. Snodgrass' male, non-disabled coworker, over Ms. Snodgrass. (Oliveras Dep. 29:19-30:25.) (Doc. 106-2, ¶ 73.)

- For instance, Mr. Quinn was allowed to use a radiologist reading monitor whereas Dr. Forsyth would not allow Ms. Snodgrass the same setup at the Women's Center despite the fact that Dr. Bass allowed her to use the machinery. (Oliveras Dep. 29:19-30:25; Bass Dep. 117:11-119:3, 146:10-147:2, Ex. 136; Viscardi Dep. I 190:13-191:6.) (Doc. 106-2, ¶ 74.)

- On May 12, 2010, Dr. Forsyth emailed Ms. Viscardi and Ms. Dellinger, telling them that he "require[d] an independent medical evaluation of Dannie Snodgrass to insure [sic] that she is qualified to lift a heavy load as required by her job description" and suggested a particular doctor to perform the evaluation, despite the fact that Ms. Snodgrass's physicians had already released her with no restrictions. (Dellinger Dep. 30:22-32:7, 32:15-34:19, 35:11-36:9, 47:18-48:1, 48:17-49:8, 50:21-51:3, 53:5-16, 61:8, 63:3-8, Exs. 49-51, 63, 66; Snodgrass Dep. 129:5-131:14, Ex. 15.) (Doc. 106-2, ¶ 77.)

- **In the summer of 2010, Ms. Snodgrass called Dr. Jeremy Ferris, who had previously temporarily worked at WGHS, and complained to him about Dr. Forsyth's treatment of her, including mentioning "harassment." (Ferris Dep. 34:11-36:16; Snodgrass Decl. ¶ 15.) (Doc. 106-2, ¶ 78.)**

- **Dr. Ferris advised Ms. Snodgrass to bring her issues to HR and that if HR did not solve the problem she might need to seek legal remedy. (Ferris Dep. 36:20-39:5; Snodgrass Decl. ¶ 15.) (Doc. 106-2, ¶ 79.)**

- **During this conversation Ms. Snodgrass told Dr. Ferris that she had been diagnosed with breast cancer and recently returned from medical leave for her double mastectomy. (Snodgrass Decl. ¶ 15.) (Doc. 106-2, ¶ 80.)**

### D. Ms. Snodgrass's Second Medical Leave

In October 2010, Ms. Snodgrass took FMLA covered medical leave for a hysterectomy related to her disability. (Snodgrass Dep. 111:8-112:11, 141:1-2, Ex. 19, 142:7-19; Dellinger Dep. 69:3-70:1, Ex. 92.)

Dr. Forsyth reprimanded Ms. Snodgrass for missing meetings, whereas Mr. Quinn missed meetings and was not reprimanded. (Viscardi Dep. I 114:10-11, Ex. 139.) After she returned from leave, Dr. Forsyth reprimanded Ms. Snodgrass for parking in a certain parking lot while Mr. Quinn parked in the same lot and was not reprimanded. (Snodgrass Decl. ¶ 22; Bass Dep. 147:23-149:6.) Additionally, Mr. Quinn, an RPA, was actually paid a substantially higher hourly rate than she was, and received a raise during the time he and Ms. Snodgrass were both employed by Defendant, despite the fact that he had less education than Ms. Snodgrass, did not

have as many certifications as Ms. Snodgrass, could not perform or assist with as many interventional procedures as Ms. Snodgrass, and had less tenure with Defendant and/or WGHS.  (Viscardi Dep. I 81:23-25, 149:3-18, Exs. 12, 19; Bass Dep. 152:4-12, 162:10-164:6, 164:22-165:15, Ex. 161; Snodgrass Decl. ¶ 13 .)  Ms. Snodgrass complained that she thought she was being treated differently than Kevin Quinn because of her gender, including as it pertained to her pay.  (Bass Dep. 113:5-9; Viscardi Dep. I 149:3-18.)

On December 2, 2010, shortly after Ms. Snodgrass returned from leave, Dr. Forsyth complained to Ginny Viscardi about an alleged incident he had with Ms. Snodgrass.  (Snodgrass Dep. 157:5- 158:2, Ex. 31.)  Ms. Snodgrass responded to Dr. Forsyth's complaint and sent a copy to Dr. Krubert, Defendant' CEO.  (Krubert Dep. 101:21-103:20, Ex. 143.)  Dr. Krubert did not investigate Dr. Forsyth's December 2010 allegations.  (Krubert Dep. 101:21-103:20, Ex. 143, 103:21-105:16, 106:8-107:11, Ex. 144.)  Dr. Krubert never conducted an independent investigation into whether any of Dr. Forsyth's or Dr. Ferris' allegations about Ms. Snodgrass were actually true.  (Krubert Dep. 95:24-96:19, 96:22-97:10, 97:16-24, 101:21-103:20, Ex. 143, 103:21-105:16, 106:8-107:11, Ex. 144, 111:18-112:17, Ex. 150, 115:4-116:17.)

**Plaintiff objects to the Magistrate's failure to include the following facts in its analysis of discriminatory animus and pretext:**

- **In December 2010, Dr. Forsyth also questioned Ms. Snodgrass' disability and medical leave, telling Ms. Viscardi that "[t]he exact nature of [Ms. Snodgrass' ailment escapes" him and that he "would have asked for more details about her illness and would have wanted more specifics from her physician's excuse" about Ms. Snodgrass' medical leave. (Krubert Dep. 98:1-2, Ex. 130; Viscardi Dep. I 67:22-69:25.) (Doc. 106-2, ¶ 97.)**

- **Dr. Bass believed that Dr. Forsyth's January 2011 reprimand of Ms. Snodgrass contained "a lot of mischaracterizations," and so Dr. Bass wrote an email responding that "any characterizations of Ms. Snodgrass as being suboptimal and not performing good were untrue...she's a great RA." (Bass Dep. 171:12-175:11, Ex. 249.) (Doc. 106-2, ¶ 102.)**

Dr. Forsyth complained about alleged issues he had, including Ms. Snodgrass allegedly making a patient wait for an extended period of time, being late to the office, and incorrectly mixing barium for a procedure, none of which were true. (Snodgrass Dep. 163:12-166:12, Ex. 33, 166:19-168:9, Ex. 34.) Ms. Snodgrass responded to Dr. Forsyth's allegations and explained to Ms. Viscardi that Dr. Forsyth's allegations were not true. (Viscardi Dep. I 114:10-115:25, Ex. 139, 167:18-168:9.) In the same email, Ms. Snodgrass also complained that Mr. Quinn was not in attendance at morning meetings, saying "I am just bringing this up because I was wondering if he is held under the same standards as I am and in the same manner? It seems that in more than just the morning meetings that Kevin is treated differently than me and I am wondering if this is because I am a woman and he is a man? … This situation is very concerning to me." (Viscardi Dep. I 114:10-115:25,

Ex. 139; Dellinger Dep. 74:13-76:20, Ex. 140.) Ms. Viscardi did not consider Ms. Snodgrass's complaint to be a complaint of discrimination and simply ignored Ms. Snodgrass' email and never responded to Ms. Snodgrass' complaint or asked Ms. Snodgrass if the allegations were true. (Viscardi Dep. I 114:10-115:25, Ex. 139; Viscardi Dep. II 5:22-7:6.) Ms. Dellinger did not consider Ms. Snodgrass' complaint to be a complaint of discrimination and does not recall investigating Ms. Snodgrass' complaint. (Dellinger Dep. 74:13-80:14, Ex. 140.)

In February 2011, Ms. Snodgrass had an additional reconstructive surgery. (Snodgrass Dep. 150:17-152:5, Ex. 27.) Ms. Snodgrass used vacation days for her reconstructive surgery, from February 15 through February 22, 2011, rather than taking any medical leave. (Snodgrass Dep. 152:4-13.)

**Plaintiff objects to the Magistrate's failure to include the following facts in its analysis of discriminatory animus and pretext:**

- **On February 21, 2011, Dr. Forsyth complained to Ms. Viscardi and Dr. Krubert that Ms. Snodgrass "was suddenly out sick for 2.5 days" with no advance notice for a last minute illness. (Viscardi Dep. I 124:4-126:6, Ex. 148.) (Doc. 106-2, ¶ 114.)**

- **Dr. Forsyth also complained that Ms. Snodgrass worked with him "briefly before she took off sick [and] showed no signs of any illness" and "she looked fine and healthy to [him] and to this day I am unaware of the nature of this mysterious illness that resulted in her sudden disappearance." (Viscardi Dep. I 124:4-126:6, Ex. 148.) (Doc. 106-2, ¶ 115.)**

### E.     Dr. Ferris Becomes Medical Director

Dr. Jeremy Ferris took over for Dr. Forsyth, initially as interim Medical Director and then in the Medical Director position in October 2011.  (Deposition of Jeremy Ferris ("Ferris Dep.") 23:10-24:14.)  On numerous occasions after Dr. Ferris became Defendant's Medical Director, Ms. Snodgrass expressed concern to him about the disparity between how many hours she worked versus how many hours Mr. Quinn worked and about the disparity between her pay and Mr. Quinn's pay.  (Ferris Dep.68:1-24, 207:17-208:8; Snodgrass Decl. ¶ 26.)  During these conversations Ms. Snodgrass told Dr. Ferris that her hours were reduced after she returned from medical leave and that she had concerns about that.  (Ferris Dep. 69:2-6, 207:17-208:8; Snodgrass Decl. ¶ 26)

### F.     Dr. Ferris' Treatment of Ms. Snodgrass

In the spring of 2012, Dr. Bass encountered Dr. Ferris in the main reading room at West Georgia Health Systems.  (Bass Dep. 13:18-14:2; Snodgrass Dep. 239:3-239:6, 241:22-242:21.)  On that day in spring of 2012, Dr. Ferris commented "sometimes I wonder if she has chemo brain."  (Bass Dep. 14:3-14:8; Ferris Dep. 152:9-24, 153:5-7, 155:2-5.)

**Plaintiff objects to the Magistrate not including the following facts to the extent these facts are not included in its analysis of discriminatory animus and pretext:**

- Dr. Bass thought that it was a derogatory comment and never experienced Ms. Snodgrass to exhibit any of the symptoms of people that have "chemo brain." (Bass Dep. 14:6 15:13.) (Doc. 106-2, ¶ 136.)

- Dr. Bass told Ms. Snodgrass about Dr. Ferris's "chemo brain" comment within a day or two after hearing Dr. Ferris make that comment. (Bass Dep. 15:14 -19; Snodgrass Dep. 239:3-239:6, 241:22-242:21.) (Doc. 106-2, ¶ 137.)

- Ms. Oliveras was in the room when Dr. Bass told Ms. Snodgrass about Dr. Ferris' chemo brain comment; she appeared to be "pretty disgusted" with the comment. (Bass Dep. 83:23-84:13; Oliveras Dep. 69:2-71:4.) (Doc. 106-2, ¶ 138.)

- Dr. Bass believes that the term "chemo brain," when used as "a derogatory statement about her performance ability" was Dr. Ferris "saying, well, she's not competent to perform her duties because of this disability that created – in his view she had chemo brain." (Bass Dep. 193:18-195:3.) (Doc. 106-2, ¶ 139.)

- Ms. Oliveras describes chemo brain as meaning "the chemotherapy kills brain cells…and it makes you basically stupid." (Oliveras Dep. 69:2-71:4.) (Doc. 106-2, ¶ 140.)

- Ms. Oliveras explains that calling someone "chemo brain" is derogatory and offensive, "[t]hat means you're not working to where you are 100 percent." (Oliveras Dep. 69:2-71:4.) (Doc. 106-2, ¶ 141.)

- The term "chemo brain" refers to a "brain impairment from chemotherapy that could include emotional, mental…performance" and chemotherapy is a treatment for cancer. (Deposition of

Christopher Krubert ("Krubert Dep.") 63:12-64:2.) (Doc. 106-2, ¶ 142.)

- At some point after Dr. Ferris made the "chemo brain" comment, Dr. Ferris made comments related to Ms. Snodgrass' disability a running theme and on more than one occasion he made comments regarding his opinion of her mental state. (Bass Dep. 81:22-82:11.) (Doc. 106-2, ¶ 143.)

- Dr. Ferris regularly complained that Ms. Snodgrass was "acting goofy." (Bass Dep. 80:19-90:1.) (Doc. 106-2, ¶ 144.)

- Dr. Ferris typically related his complaints to his "acting goofy/chemo brain" issue that he perceived Ms. Snodgrass to have; it was the general theme of his complaints. (Bass Dep. 81:22-82:25.) (Doc. 106-2, ¶ 145.)

- Dr. Bass would respond, "What are you talking about, because [he] supervised her procedures and she did nothing wrong. She managed the patient flow at the Women's Center. No biopsies got dropped. Nobody got mismanaged. She didn't do anything she shouldn't have done during the procedure." (Bass Dep. 81:2-15.) (Doc. 106-2, ¶ 146.)

- Dr. Bass, who primarily worked with Ms. Snodgrass, did not observe her dropping the ball or improperly performing procedures. (Bass Dep. 81:18-21.) (Doc. 106-2, ¶ 147.)

- Dr. Bass does not recall Dr. Ferris ever making any sort of comments about Ms. Snodgrass' actual performance or ever expressing any concerns about her technical capabilities. (Bass Dep. 88:13-24.) (Doc. 106-2, ¶ 148.)

Dr. Ferris also treated Mr. Quinn more favorably than Ms. Snodgrass and in

Dr. Bass's opinion Dr. Ferris treated Kevin differently because they are both men –

"They're both good-old boys." (Bass Dep. 77:10-19.) For instance, Dr. Ferris had a

problem with Ms. Snodgrass' kidney biopsy technique but did not have a concern

with Mr. Quinn utilizing the same technique.  (Ferris Dep. 171:25-174:15

G.    **RRAs and Paracentesis Procedures**

RRAs are credentialed to perform a procedure called a paracentesis under the

"direct supervision" of a radiologist.  (Snodgrass Dep. 154:21-155:15, Ex. 29.)  Ms.

Snodgrass was credentialed to perform paracentesis procedures at WGHS as early as

December 18, 2007 under "direct supervision".  (Snodgrass Dep. 154:21-155:15, Ex.

29; Bass Dep. 169:21-171:11, Ex. 246; Krubert Dep. 71:14-72:22, Exs. 37, 37;

Viscardi Dep. 193:16-194:3, Ex. 253.)

**Plaintiff objects to the Magistrate Court's limitation to "'Where 'direct**

**supervision' is required, the [r]adiologist must be present in the office suite and**

**immediately available to furnish assistance and direction throughout the**

**performance of the procedure' but 'is not required to be present in the room**

**when the procedure is performed.'"  (Doc 116, p. 17.)**

**Rather, as Plaintiff established in her Statement of facts (Doc. 106-2, ¶¶**

**155-167):  The different levels of supervision including direct supervision are**

**terms that are predominantly used by Centers for Medicare Medicaid Services**

**("CMS") and refer to levels of supervision that are allowable in order for**

**payments to be made for performance of various procedures.  (Bass Dep. 56:13-**

19

57:5.)  "When CMS says that a procedure requires direct supervision it means that you are in the vicinity, in the building, on the campus of the facility that your mid-level provider is in."  (Bass Dep. 57:6-9; Ferris Dep. 114:25-116:21.) For a procedure such as a paracentesis, which Ms. Snodgrass was approved to perform under direct supervision, a physician has to be *in the vicinity or on campus; they don't have to be physically present in the room for any part of the procedure.*  (Bass Dep. 58:1-11; Ferris Dep. 108:1-6.) (emphasis added.)  Rarely was a physician in the room at all during paracentesis procedures.  (Snodgrass Dep. 194:17 25; Ferris Dep. 108:1-6.)  From the outset of her employment with WGHS and ApolloMD/IPR, Ms. Snodgrass was told by the Radiologists that she could perform procedures under direct supervision so long as the physician was on the West Georgia Health Systems campus.  (Snodgrass Dep. 191:24-192:19, 246:1-7, 246:21-247:24; Bass Dep. 94:21-95:6.)

Dr. Ferris frequently changed his instructions to the RRAs, and sometimes preferred to be physically present in the "building" during the paracentesis procedure.  (Bass Dep. 94:21-95:6; Oliveras Dep. 26:23-27:6, 27:18-21, 71:5-18.) Dr. Ferris said that he had to be in the same building, "but a lot of times, if he was busy at the hospital, he would tell Dannie [Snodgrass] at the Women's Center go ahead and start the case.  It was when it was to his advantage."

**(Oliveras Dep. 32:14-23, 71:5-18; Ferris Dep. 110:19-21, 147:24-148:2.) RRAs regularly "stuck patients," meaning initiated a procedure without the physician in the room; "that was my job. I mean if they came in on every procedure there would be no job for me because they would have to be there all the time."**
**(Snodgrass Dep. 220:14-221:5; Ferris Dep. 147:24-148:2.)**

Ms. Snodgrass successfully performed hundreds of direct supervision procedures during her tenure with Defendant, with no complications, and performed paracentesis procedures regularly without any complications over the course of her employment. (Snodgrass Decl. ¶ 13.) For example, in July, August, and December 2009 combined, Ms. Snodgrass performed 40 paracentesis procedures with various physicians, including Drs. Forsyth and Ferris, with zero complications and performed hundreds of paracentesis procedures after Defendant took over her contract in 2009. (Snodgrass Decl. ¶ 13.) Prior to working at WGHS in 2006, Ms. Snodgrass performed over 200 paracentesis procedures under direct supervision during her 2005-2006 fellowship. (Snodgrass Decl. ¶ 13.) Ms. Snodgrass also performed hundreds of paracentesis procedures while employed at WGHS starting in 2006 and before Defendant took over her contract in 2009. (Snodgrass Decl. ¶ 13.)

**H.      June 29 Paracentesis Procedure**

On June 29, Ms. Snodgrass received a call from an Emory physician referring a

patient to WGHS and ApolloMD for a paracentesis.  (Ferris Dep. 145:19-147:3.)  At

that time, Ms. Snodgrass was in the radiology department of the hospital, while Dr.

Ferris was at the Women's Center.  (Snodgrass Dep. 200:17-25.)  Ms. Snodgrass

called Dr. Ferris at the Women's Center, who told her not to bother him until she was

ready because he is busy.  (Snodgrass Dep. 219:23-219:6; Ferris Dep. 147:9-13,

148:21-24.)

**Plaintiff objects to the Magistrate Court's failure to consider the following**

**facts in its analysis of Ms. Snodgrass' claims and believes that these facts require**

**denial of summary judgment:**

- **Dr. Ferris did not tell Ms. Snodgrass that he had any concern about the patient who was to undergo the paracentesis procedure. (Snodgrass Dep. 199:15-200:6.) (Doc. 106-2, ¶ 174.)**

- **Dr. Ferris was inconsistent in how he wished procedures to be performed: sometimes he would say "I want to be there.  Sometimes he'd say I'm too busy.  I don't want to be there.  Go ahead and do it.  He changed it quite regularly."  (Snodgrass Dep. 246:1-246:14; Oliveras Dep. 26:23-27:6, 27:18-21.) (Doc. 106-2, ¶ 175.)**

- **On June 29, Dr. Ferris never told Ms. Snodgrass that he wanted to be present in the room before the procedure started.  (Snodgrass Dep. 200:14-200:16.) (Doc. 106-2, ¶ 176.)**

- **Dr. Ferris did not tell Ms. Snodgrass that she was not to start the procedure until he was present.  (Snodgrass Dep. 219:23-220:6.) (Doc. 106-2, ¶ 177.)**

- **After the patient arrived and was ready for the procedure, Tasha Crew, the nurse who was helping on the case, called Dr. Ferris to**

tell him the patient was ready and Ms. Crew then told Ms. Snodgrass that Dr. Ferris was in the building. (Snodgrass Dep. 200:17-201:13, 207:2-15, 215:14-24; Bass Dep. 93:5-13, 94:6-14.) (Doc. 106-2, ¶ 178.)

- Believing Dr. Ferris was in the building, Ms. Snodgrass performed the paracentesis procedure on a patient. (Snodgrass Dep. 184:23-185:1, 191:8-12, 201:10-13; Bass Dep. 96:25-97:3, Bass Dep. 187:5-21.) (Doc. 106-2, ¶¶ 179, 180.)

- There is nothing unusual about the way that Ms. Snodgrass performed the paracentesis on June 29 and nothing negative happened in terms of patient care. (Snodgrass Dep. 246:21-23; Bass Dep. 97:4-10.) (Doc. 106-2, ¶ 187.)

- During Ms. Snodgrass' conversation with Dr. Ferris after the procedure he did not tell her that he thought that she was making excuses or that she did anything wrong. (217:13-218:1.) (Doc. 106-2, ¶ 188.)

- Dr. Ferris never told her that she should have double checked to make sure he was in the actual radiology department at the hospital. (Snodgrass Dep. 219:10-13.) (Doc. 106-2, ¶ 189.)

- At this time, Ms. Snodgrass was not concerned that she might lose her job. (Snodgrass Dep. 185:11-14, 212:16-213:4.) (Doc. 106-2, ¶ 190.)

- Both Ms. Snodgrass and Mr. Quinn had previously done paracentesis procedures without Dr. Ferris in the building on numerous occasions. (Snodgrass Dep. 190:16-23.) (Doc. 106-2, ¶ 195.)

- Before this Friday [June 29] Dr. Ferris had never previously discussed sticking a patient or initiating a procedure without him in the building with Ms. Snodgrass. (Snodgrass Dep. 221:22-221:5.) (Doc. 106-2, ¶ 196.)

- **After the procedure, Ms. Snodgrass told Ms. Oliveras that she did not know why Dr. Ferris was upset because she did "everything protocol." (Oliveras Dep. 41:24-42:16.) (Doc. 106-2, ¶ 197.)**

- **Ms. Snodgrass did not ever tell Ms. Oliveras that she was concerned that she might lose her job. (Oliveras Dep. 42:21-23.) (Doc. 106-2, ¶ 198.)**

During the June 29 paracentesis procedure, Dr. Ferris walked in the room and talked to the patient for a minute; he observed that the procedure was going well, filled out paperwork, and walked out of the room without saying anything else. (Snodgrass Dep. 210:18-210:20, 218:20-219:7; Bass Dep. 102:3-10; Ferris Dep. 145:12-18.) Ms. Snodgrass responded that it was going great; Ms. Snodgrass had no reason to believe based on Dr. Ferris' behavior that he was upset with her or the fact that she was undertaking the procedure. (Snodgrass Dep. 218:20-219:7; Bass Dep. 103:5-20, 197:13-25; Ferris Dep. 158:14-159:3, 160:15-161:21.) Dr. Ferris left before the procedure was over and after that Ms. Snodgrass took paperwork into the radiology reading room for him to sign. (Snodgrass Dep. 211:5-211:25.) During the procedure, it was obvious that Dr. Ferris was not concerned that Ms. Snodgrass was not doing the procedure incorrectly; otherwise he would have stayed in the procedure room or taken the catheter out of her hands. (Bass Dep. 103:5-20, 197:13-25; Ferris Dep. 158:14-159:3, 160:15-161:21.) When Ms. Snodgrass saw Dr. Ferris in the radiology reading room he asked her why she did the procedure and she told him that

she thought that he was in the building because Tasha Crew told her that he was. (Snodgrass Dep. 185:11-14, 212:16-213:4; Viscardi Dep. I 170:1-13.)

After this conversation, Ms. Snodgrass was concerned and confused about the way Dr. Ferris was acting and that he asked her to leave because there was nothing abnormal about the procedure. (Snodgrass Dep. 185:11-187:15, 190:2-4.) After this conversation with Dr. Ferris, Ms. Snodgrass approached Ms. Crew and asked her why she told Ms. Snodgrass that Dr. Ferris was in the building if he was not. (Snodgrass Dep. 213:5-213:8; Ferris Dep. 163:24-165:17.) Ms. Crew denied having said so. (Snodgrass Dep. 213:5-213:8; Ferris Dep. 163:24-166:7.)

## I.  Ms. Snodgrass' Termination

The next day, Saturday, Ms. Snodgrass, concerned about Dr. Ferris' agitation during their conversation in the radiology reading room, called Dr. Ferris and talked to him about the procedure. (Snodgrass Dep. 218:2-218:19.) During the Saturday conversation with Dr. Ferris, Ms. Snodgrass said that there must have been a communication error because she was sure that Ms. Crew told her that Dr. Ferris was in the building. (Snodgrass Dep. 219:14-219:22.) Dr. Ferris called Ms. Viscardi and told her his version of the events from the June 29 paracentesis and recommended Ms. Snodgrass' termination. (Viscardi Dep. I 166:2-167:4.) Ms. Snodgrass received an email from Ginny Viscardi on Saturday, June 30 asking Ms. Snodgrass to meet

with her on Monday at 2:00.  (Snodgrass Dep. 222:23-223:13, 227:2-228:15, Ex. 42; Viscardi Dep. I 43:14-20, Ex. 12, 171:17-25.)

On July 2, prior to Ms. Snodgrass' termination, Ms. Viscardi informed Charis Acree, WGHS's Senior Vice President of Operations, that Defendant would be terminating Ms. Snodgrass.  (Acree Dep. 39:3-12, 42:10-19.)  Ms. Acree responded that "that's a decision to make since Ms. Snodgrass was their employee."  (Acree Dep. 41:1-12.)  Ms. Viscardi also alleges that she spoke with Dr. Krubert, Defendant's CEO, and one of the alleged decision makers regarding Ms. Snodgrass' termination and he agreed that terminating Ms. Snodgrass was appropriate.  (Krubert Dep. 125:16-126:5, Ex. 245; Viscardi Dep. I 171:11-16.)  Dr.Krubert does not recall speaking with anybody about the paracentesis procedure or conducting any independent investigation into the allegations made by Dr. Ferris.  (Krubert Dep. 120:11-123:24, 147:22-150:22.)  On Monday, July 2, Ms. Snodgrass met with Ginny Viscardi in Director of Radiology Les Handlin's office; Dr. Ferris and Les Handlin were also present in the meeting.  (Snodgrass Dep. 228:17-228:24.)  In that meeting Ms. Viscardi told Ms. Snodgrass that Apollo MD had "decided to go in a new [or different] direction" and that Defendant were not going to renew her contract. (Snodgrass Dep. 229:15-20; Bass Dep. 106:13-18; Ferris Dep. 225:3-14; Viscardi

Dep. I 173:9-20; Snodgrass Decl. ¶ 29 (Exhibit C, Declaration of Les Handlin

("Handlin Aff.").)

**Plaintiff objects to the Magistrate's limitation of Ms. Snodgrass' testimony related to her contract in her termination meeting. Ms. Snodgrass testified that Ms. Viscardi told her that Defendant was "going to pay [her] 90 days which was owed to [her] under [her] contract but [they] don't want [her] to come back to work after today"; not only that Defendant was going to pay "her 90 days."** (Doc. 106-2, ¶ 213; Doc. 116, p. 21.) **The contract language is critical to both the retaliation claim and the breach of contract claim.** (Snodgrass Dep. 229:21-230:3.) During this meeting, no mention was made of the Friday paracentesis or of deficiencies in Ms. Snodgrass's competency. (Bass Dep. 106:13-18; Snodgrass Decl. ¶ 29; Ferris Dep. 225:3-14.) Ms. Viscardi never asked Ms. Snodgrass if Dr. Ferris instructed her to wait for him for the paracentesis or asked Ms. Snodgrass what her side of the story was. (Viscardi Dep. I 167:14-16, 175:4-19; Viscardi Dep. II 17:7-13.)

**Plaintiff objects to the Magistrate's omission of the following facts because they are evidence of pretext:**

- **Dr. Bass, with whom Ms. Snodgrass worked the majority of her time, absolutely disagreed with the termination decision. (Bass Dep. 107:4-6.) (Doc. 106-2, ¶ 217.)**

- **Other than the times that Ms. Snodgrass was out on medical leave, Dr. Bass worked with or saw Ms. Snodgrass on a daily basis and was able to witness her performance and attitude on a daily basis. (Bass Dep. 115:3-18.) (Doc. 106-2, ¶ 218.)**

- **Dr. Bass would hire Ms. Snodgrass today without hesitation. (Bass Dep. 107:7-10.) (Doc. 106-2, ¶ 219.)**

- **In Dr. Bass' opinion, Defendant's post-hoc reason for Ms. Snodgrass' termination is "a complete fabrication," "it's bullshit;" there was "absolutely not" an actual concern with the procedure she did that day. (Bass Dep. 104:17-105:5.) (Doc. 106-2, ¶ 222.)**

- **Dr. Ferris never complained to Dr. Bass that Ms. Snodgrass was working outside of the scope of her position. (Bass Dep. 182:3-15.) (Doc. 106-2, ¶ 223.)**

On the day of Ms. Snodgrass' termination, and prior to Ms. Snodgrass' termination, Dr. Ferris randomly called Katie Oliveras, manager of the Women's Health Center, into the reading room at the Women's Center and made disparaging comments about Ms. Snodgrass, including calling her "goofy." (Snodgrass Dep. 239:10-240:1; Oliveras Dep. 28:3-19, 34:16-37:7, 45:23-46:16, 54:1-4, Ex. 1, 57:24-59:10.)

- **During this conversation, Dr. Ferris was "real fidgety, kind of all over the place," and started bad-mouthing Dannie [Snodgrass]; it "was almost like he was doing something bad, he knew it was bad inside but he was going to do it." (Oliveras Dep. 34:16-37:7.) (Doc. 106-2, ¶ 227.)**

- **Ms. Oliveras never witnessed Ms. Snodgrass do "anything without the radiologist's permission, ever." (Oliveras Dep. 33:2-4.) (Doc. 106-2, ¶ 228.)**

- **During this conversation, Dr. Ferris called Ms. Snodgrass "goofy" several times and to Ms. Oliveras it came across as how he viewed her as an individual; it had nothing to do with her performance. (Oliveras Dep. 34:16-37:7, 37:14-38:22.) (Doc. 106-2, ¶ 229.)**

- **During this conversation, Dr. Ferris told Ms. Oliveras that ApolloMD was terminating Ms. Snodgrass because they were going in a different direction. (Oliveras Dep. 35:15-19, 39:15-19.) (Doc. 106-2, ¶ 230.)**

Dr. Ferris approached Ms. Oliveras on the following day, July 3, again stating that Ms. Snodgrass was "just goofy" and "needed help, counseling at her church." (Oliveras Dep. 60:23-61:18, Ex. 2.)

## J.     Defendant Breaches Ms. Snodgrass' Employment Contract

On June 29, 2012, Ms. Viscardi requested a copy of Ms. Snodgrass' "signed contract (the new version from last year)." (Viscardi Dep. I 177:11, Ex. 215.) On July 2, 2012, Ms. Viscardi sent a letter to Ms. Snodgrass indicating that she was terminated pursuant to the terms of the agreement dated August 7, 2009. (Viscardi Dep. I 179:10-12, Ex. 220.) Defendant planned to give Ms. Snodgrass the ninety (90) days' severance owed to her under her contract if she signed a release of her claims against Defendant. (Viscardi Dep. I 179:24-180:11, 182:5-11, 185: 15-20, Ex. 229.)

In early August, Defendant became aware of Ms. Snodgrass' having filed a Charge of Discrimination with the EEOC. (Viscardi Decl. ¶ 31; Snodgrass Dep. 236:17-19, 237:9-19, Ex. 44.) After Ms. Snodgrass told Defendant she planned to

file a Charge of Discrimination, and after she actually filed the Charge, Defendant informed Ms. Snodgrass that would no longer pay her the ninety (90) days' severance owed to her under her employment contract. (Viscardi Decl. ¶ 31; Snodgrass Dep. 236:17-19, 237:9-19, Ex. 44, 249:5-10, Ex. 46.) In their response to Plaintiff's Interrogatories, Defendant identified Dr. Krubert and Ms. Viscardi as decision-makers and contended that Dr. Krubert "reviewed and approved the termination." (Krubert Dep. Ex. 252.)

## III.    Ms. Snodgrass' Specific Objections To The Magistrate's Conclusions

This Court should not follow the Magistrate's lead because at summary judgment "[t]he court may not weigh evidence to resolve factual disputes – if a genuine issue of fact is found, summary judgment ***must*** be denied." *Hutcherson v. Progressive Corp.*, 984 F.2d 1152, 1155 (11th Cir. 1993) (emphasis added). The Court "must draw all reasonable inferences in favor of [Barnes]." *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150 (2000). The Court "should give credence to the evidence favoring [Barnes]" and may only credit evidence supporting Defendant "that is uncontradicted and unimpeached," and even then, only "to the extent that the evidence comes from disinterested witnesses." *Id.*

In employment discrimination and retaliation cases, "the plaintiff will always survive summary judgment if [s]he presents circumstantial evidence that creates a

triable issue concerning the employer's discriminatory [or retaliatory] intent." *Smith v. Lockheed-Martin Corp.,* 644 F.3d 1321, 1328 (11th Cir. 2011). "A plaintiff may raise a reasonable inference of the employer's discriminatory [or retaliatory] intent through various forms of circumstantial evidence" and "[a] triable issue of fact exists if the record, viewed in a light most favorable to the plaintiff, presents a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discriminatory [or retaliation] by the decisionmaker." *Id.* (internal quotation and citation omitted).

Alternatively, a plaintiff may survive summary judgment using the familiar *McDonell-Douglas* framework. There, the plaintiff will first adduce evidence which, taken as true, would provide a prima facie case. This is followed by a burden shift to the defendant to articulate a legitimate non-discriminatory reason for the adverse action. Finally, the plaintiff must demonstrate evidence showing the defendant's reason to be pretextual. A plaintiff may demonstrate pretext either by showing that a discriminatory reason more likely motivated the employer, or by showing that the proffered reason for the decision is not worthy of belief. *Young v. General Foods Corp.*, 840 F.2d 825, 828 (11th Cir. 1998). The former showing relies on evidence of the decision maker's discriminatory or retaliatory motive. The latter showing involves evidence of "weaknesses, implausibilities, inconsistencies, incoherencies, or

contradictions in the employer's proffered legitimate reasons for its action." *Combs v. Plantation Patterns*, 106 F.3d 1519, 1538 (11th Cir. 1997).

Virtually every circuit has at one time or another expressed the view that summary judgment is disfavored in employment discrimination cases because the cases, like this one, so often turn on issues of intent and credibility, which only a jury may resolve. The District of Columbia Circuit, for example, has said that "in discrimination cases summary judgment must be approached with special caution." *Aka v. Washington Hosp. Center*, 116 F.3d 876, 880 (D.C. Cir. 1997). The First Circuit has stated that "we must exercise particular caution before sustaining summary judgments for employers on such issues as pretext, motive, and intent." *Straughn v. Delta Air Lines, Inc.*, 250 F.3d 23, 34 (1st Cir. 2001). Similarly, the Second Circuit has stated that "an extra measure of caution is merited in affirming summary judgment in a discrimination action." *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 69 (2d Cir. 2001). The Fourth Circuit has stated that summary judgment is "seldom appropriate" in discrimination cases. *Ballinger v. North Carolina Agric. Extension Serv.*, 815 F.2d 1001, 1004 (4th Cir. 1987) (internal citation omitted). The Fifth Circuit has repeatedly stated that summary judgments "are particularly questionable in cases of employment discrimination." *Waltman v. Int'l Paper Co.*, 875 F.2d 468, 482 (5th Cir. 1989); *Bullard v. OMI, Georgia, Inc.*, 640 F.2d 632, 634

(5th Cir. 1981).  The Seventh Circuit has frequently stated that the summary

judgment standard is to be applied with "added rigor" in discrimination cases.  *Webb*

*v. Clyde L. Choate Mental Health and Dev. Ctr.*, 230 F.3d 991, 997 (7th Cir. 2000)

("We apply this standard with added rigor in employment discrimination cases, where

intent and credibility are crucial issues."); *McCoy v. WGN Cont'l Broad. Co.*, 957

F.2d 368, 370-71 (7th Cir. 1992) (the summary judgment standard "is applied with

added rigor in employment discrimination cases, where intent is inevitably the central

issue.").  In earlier cases, the court went so far as to state that summary judgment is

"notoriously inappropriate" for resolving discrimination claims.  *Stumph v. Thomas &*

*Skinner, Inc.* 770 F.2d 93, 97 (7th Cir. 1985) (citations and internal quotations

omitted).  The Eighth Circuit has stated that "summary judgment should be used

sparingly in employment discrimination cases," *Luciano v. Monfort, Inc.*, 259 F.3d

906, 908 (8th Cir. 2001), and the Tenth Circuit has said "summary judgment should

seldom be used in employment discrimination cases."  *O'Shea v. Yellow Technology*

*Services, Inc.*, 185 F.3d 1093, 1098 (10th Cir. 1999).  Opinions from the Eleventh

Circuit include such remarks as "[a]s a general rule summary judgment is not a

proper vehicle for resolving claims of employment discrimination which often turn

on an employer's motivation and intent," *Delgado v. Lockheed-Georgia Co.*, 815

F.2d 641, 644 (11th Cir. 1987), and "summary judgment in employment

discrimination cases…is especially questionable." *Batey v. Stone*, 24 F.3d 1330, 1336 (11th Cir. 1994) (internal quotation and citation omitted).

In this case, the Magistrate impermissibly exceeded his role at summary judgment. Plaintiff will address the Magistrate's errors regarding discrete facts and distinct claims. The Magistrate weighed disputes in favor of Defendant. As Plaintiff will demonstrate below, the Magistrate also drew inferences in favor of Defendant, rendering it impossible to adopt the R&R without violating Plaintiff's right to a jury trial.

**A. Summary Judgment Should Have Been Denied On Plaintiff's Disability Claim Related To Her Hours/Pay Cut.[4]**

The Magistrate concluded that Ms. Snodgrass established a prima facie case of disability discrimination relating to Defendant reducing her hours to 32 and yet paying her replacement, Kevin Quinn, for 40 hours. (Doc. 116, 45-49.) The Magistrate then granted summary judgment to Defendant because, it concluded, Ms. Snodgrass could not establish that Defendant's reason for paying Mr. Quinn for 40 hours – that he refused to be paid less than 40 hours and she did not – was pretext for disability discrimination. (Doc/ 116, pp. 49-53.) The Magistrate erred in this conclusion.

---

[4] Plaintiff does not object to the R&R relating to her Title VII claim arising out of her reduced hours/pay cut.

A plaintiff may demonstrate pretext either directly, by showing that a discriminatory or retaliatory reason more than likely motivated the employer, or indirectly, by showing that the proffered reason for the decision is not worthy of belief. *Young v. General Foods Corp.*, 840 F.2d 825, 828 (11th Cir. 1998). As to the latter method,

> [t]he district court must, in view of all the evidence, determine whether the plaintiff has cast sufficient doubt on the defendant's proffered nondiscriminatory reasons to permit a reasonable factfinder to conclude that the employer's proffered legitimate reasons were not what actually motivated its conduct. The district court must evaluate whether the plaintiff has demonstrated such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence.

*Combs v. Plantation Patterns*, 106 F.3d 1519, 1538 (11th Cir. 1997) (quotations and citations omitted). To ultimately prevail, "a plaintiff need only demonstrate that a genuine question exists as to whether the reason for the decision was intentional discrimination." *Howard v. BP Oil Co., Inc.*, 32 F.3d 520, 525 (11th Cir. 1994.)

"[T]he plaintiff will always survive summary judgment if [s]he presents circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent." *Smith v. Lockheed Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011). A triable issue of fact exists "if the record, viewed in a light most favorable to the plaintiff, presents a convincing mosaic of circumstantial evidence

that would allow a jury to infer intentional discrimination by the decision maker." *Id*.

Ms. Snodgrass easily met this burden and the Magistrate erroneously concluded

otherwise.

The Magistrate relied solely on the fact that Mr. Quinn refused to work part-

time hours and Ms. Snodgrass, although she complained about the part-time hours did

not outright refuse to work part time as its rationale for granting summary judgment.

((Doc. 116, pp. 51-52.)  However, this conclusion ignores the undisputed fact that

Ms. Snodgrass' medical leave for her mastectomy was a reasonable accommodation

for her disability under the ADAAA.  *See* 29 C.F.R. Part 1630, App. (discussing §

1630.2(o)); *See Garcia-Ayala v. Lederle Parenterals, Inc.*, 212 F.3d 638 (1st Cir.

2000); *Nunes v. Wal-Mart Stores, Inc.*, 164 F.3d 1243, 1247 (9th Cir.1999);

*Haschmann v. Time Warner Entertainment Co.*, 151 F.3d 591, 601 (7th Cir.1998);

*Wood v. Green*, 323 F.3d 1309, 1314 (2003) (quotations omitted).  Accordingly, upon

return from leave, Defendant was obligated to reinstate Ms. Snodgrass to her full-

time position regardless of whether Mr. Quinn refused to be paid for less than full-

time hours.

Ms. Snodgrass has presented ample evidence that the real reason she was

reinstated and only paid for 32 hours while Mr. Quinn was paid for 40 hours (even

when he only worked 32 hours) was because of her disability.  For example, Mr.

Quinn was hired to "cover" for Ms. Snodgrass while she was on medical leave but then transferred from temporary to full-time even after Ms. Snodgrass returned to work and requested to work full time. (Doc. 106-2, ¶¶ 49-50.) While she was on medical leave, Dr. Forsyth "saw Dannie Snodgrass at the Womens Center [].  She looked tired and weak and she had a wig on" and then complained about her presence in the Women's Center.  (Doc. 106-2, ¶ 48.)  After Ms. Snodgrass returned from leave, Dr. Forsyth began "questioning what she was doing and if it was within [her] scope of practice to do those procedures" and medical reconciliation forms.  (Doc. 106-2, ¶ 6 2.)  Ms. Snodgrass was the only individual whose scope of practice was questioned by Forsyth, despite the fact that Ms. Snodgrass's job description and Mr. Quinn's job description were the same.  (Doc. 106-2, ¶ 65.)  On May 12, 2010, Dr. Forsyth emailed Ms. Viscardi and Ms. Dellinger, telling them that he "require[d] an independent medical evaluation of Dannie Snodgrass to insure [sic] that she is qualified to lift a heavy load as required by her job description" and suggested a particular doctor perform the evaluation, despite that Ms. Snodgrass's physicians had already released her with no restrictions.  (Doc. 106-2, ¶ 77.)  In December 2010, Dr. Forsyth also questioned Ms. Snodgrass's disability and medical leave, telling Ms. Viscardi that "[t]he exact nature of [Ms. Snodgrass's ailment escapes" him and that he "would have asked for more details about her illness and would have wanted more

specifics from her physician's excuse" about Ms. Snodgrass's medical leave. (Doc. 106-2, ¶ 97.)

All of this is evidence of both discriminatory animus based on Ms. Snodgrass' disability and pretext. Although Mr. Quinn may have insisted on being paid for 40 hours regardless of how many hours he worked, this demand should not have been granted at the expense of Ms. Snodgrass, a disabled employee, and in violation of the ADAAA. A reasonable jury could conclude that Mr. Quinn was paid for 40 hours while Ms. Snodgrass was paid for 32 because of her disability. Thus, the Magistrate should have denied summary judgment on this claim.

## B.  Summary Judgment Should Have Been Denied On Plaintiff's Disability Claim Arising Out Of Her Termination.[5]

The Magistrate properly concluded that Ms. Snodgrass established a prima facie case of disability discrimination relating to the termination of her employment on July 2, 2012. (Doc. 116, pp. 57-65.) The Magistrate improperly concluded, however, that Ms. Snodgrass did not establish that Defendant's excuse for her termination was pretextual. (Doc. 116, pp. 65-72.)

### 1.  *Shifting Reasons.*

As an initial matter, the reason articulated for Defendant's termination of Ms.

_____

[5]Plaintiff does not object to the Magistrate's conclusion that her termination was not because of her gender.

Snodgrass in its summary judgment brief is not the reason that it articulated for Ms. Snodgrass' termination when it fired her. On Monday, July 2, 2012, Ms. Snodgrass met with Ms. Viscardi in Director of Radiology Les Handlin's office; Dr. Ferris and Les Handlin were also present in the meeting. (Snodgrass Dep. 228:17-228:24.) In that meeting Ms. Viscardi told Ms. Snodgrass that Apollo MD had "decided to go in a new [or different] direction" and that Defendant were not going to renew her contract, not that she was being terminated because she performed an unsupervised paracentesis. (Snodgrass Dep. 229:15-20; Bass Dep. 106:13-18; Ferris Dep. 225:3-14; Viscardi Dep. I 173:9-20; Snodgrass Decl. ¶ 29 (Doc. 106-6, Declaration of Les Handlin ("Handlin Aff.")).) Defendant did not articulate that it alleged that Ms. Snodgrass was terminated for performing an unsupervised paracentesis until after it became aware that Ms. Snodgrass planned to file a charge of discrimination with the Equal Employment Opportunity Commission. (Viscardi Decl. ¶ 31; Snodgrass Dep. 236:17-19, 237:9-19, Ex. 44, 249:5-10, Ex. 46.) Because Defendant changed its story about Ms. Snodgrass' termination, the Magistrate improperly concluded that Ms. Snodgrass failed to prove pretext and summary judgment should have been denied. *Firestine v. Parkview Health Sys., Inc.*, 388 F.3d 229, 236 (7th Cir. 2004) (defendant's "inconsistent story" about the reasons for termination established pretext); *Zaccagnini v. Charles Levy Circulating Co.*, 338 F.3d 672, 678-79 (7th Cir.

2003) (differences between reasons in defendant's interrogatory answer and defendant's summary judgment reasons showed pretext); *Dickson v. Amoco Performance Prods., Inc.*, 910 F. Supp. 629, 637 (N.D. Ga. 1994) (shifting reasons showed pretext).

### 2. *Defendant's post-hoc excuse for Ms. Snodgrass' termination is false.*

More importantly, Ms. Snodgrass did not actually intend to perform an unsupervised paracentesis, did not perform an unsupervised paracentesis, and both Dr. Ferris and Ms. Viscardi knew that she did not perform an unsupervised paracentesis when they terminated her. Thus, this excuse is pretextual.

Paracentesis must be performed under direct supervision. The different levels of supervision including direct supervision are terms that are predominantly used by Centers for Medicare Medicaid Services ("CMS") and refer to levels of supervision that are allowable in order for payments to be made for performance of various procedures. (Bass Dep. 56:13-57:5.) Here, on June 29, 2012, the paracentesis performed by Ms. Snodgrass was done under the direct supervision of Dr. Ferris.

One meaning of direct supervision is that the radiologist must be present in the office suite and immediately available to furnish assistance and direction throughout the performance of the procedure but is not required to be present in the room when the procedure is performed. "When CMS says that a procedure requires direct

supervision it means that you are in the vicinity, in the building, on the campus of the facility that your mid-level provider is in." (Bass Dep. 57:6-9; Ferris Dep. 114:25-116:21.) For a procedure such as a paracentesis, which Ms. Snodgrass was approved to do under direct supervision, it means that a physician has to be in the vicinity or on campus; they don't have to be physically present in the room for any part of the procedure. (Bass Dep. 58:1-11; Ferris Dep. 108:1-6.) Rarely was a physician in the room at all during the paracentesis procedure. (Snodgrass Dep. 194:17 25; Ferris Dep. 108:1-6.) From the outset of her employment with WGHS and ApolloMD, Ms. Snodgrass was told by the radiologists that she could do procedures under direct supervision so long as the physician was on the West Georgia Health Systems campus. (Snodgrass Dep. 191:24-192:19, 246:1-7, 246:21-247:24; Bass Dep. 94:21-95:6.) Dr. Ferris frequently changed his instructions to the RRAs, and sometimes preferred to be physically present in the "building" during the paracentesis procedure." (Bass Dep. 94:21-95:6; Oliveras Dep. 26:23-27:6, 27:18-21, 71:5-18.) Dr. Ferris said that he had to be in the same building, "but a lot of times, if he was busy at the hospital, he would tell Dannie at the Women's Center go ahead and start the case. It was when it was to his advantage." (Oliveras Dep. 32:14-23, 71:5-18; Ferris Dep. 110:19-21, 147:24-148:2.) RAs regularly "stuck patients," meaning initiated a procedure without the physician in the room; "that was my job. I mean if

they came in on every procedure there would be no job for me because they would have to be there all the time." (Snodgrass Dep. 220:14-221:5; Ferris Dep. 147:24-148:2.)

Dr. Ferris did not tell Ms. Snodgrass that he had any concern about the patient who was to undergo the paracentesis procedure. (Snodgrass Dep. 199:15-200:6.) (Doc. 106-2, ¶ 174.) Dr. Ferris was inconsistent in how he wished procedures to be performed: sometimes he would say "I want to be there. Sometimes he'd say I'm too busy. I don't want to be there. Go ahead and do it. He changed it quite regularly." (Snodgrass Dep. 246:1-246:14; Oliveras Dep. 26:23-27:6, 27:18-21.) (Doc. 106-2, ¶ 175.) On June 29, Dr. Ferris never told Ms. Snodgrass that he wanted to be present in the room before the procedure started. (Snodgrass Dep. 200:14-200:16, 219:23-220:6.) (Doc. 106-2, ¶¶ 176, 177.)

After the patient arrived and was ready for the procedure, Tasha Crew, the nurse who was helping on the case, called Dr. Ferris to tell him the patient was ready and Ms. Crew then told Ms. Snodgrass that Dr. Ferris was in the building. (Snodgrass Dep. 200:17-201:13, 207:2-15, 215:14-24; Bass Dep. 93:5-13, 94:6-14.) (Doc. 106-2, ¶ 178.) Believing Dr. Ferris was in the building, Ms. Snodgrass performed the paracentesis procedure on a patient. (Snodgrass Dep. 184:23-185:1, 191:8-12, 201:10-13; Bass Dep. 96:25-97:3, Bass Dep. 187:5-21.) (Doc. 106-2, ¶¶

179, 180.) During the June 29, 2012 paracentesis, Dr. Ferris walked in the room and talked to the patient for a minute; he observed that the procedure was going well and then Dr. Ferris filled out paperwork then walked out of the room and did not say anything else. (Snodgrass Dep. 210:18-210:20, 218:20-219:7; Bass Dep. 102:3-10; Ferris Dep. 145:12-18.) During the procedure, it was obvious that Dr. Ferris was not concerned that Ms. Snodgrass was not doing the procedure incorrectly; otherwise he would have stayed in the procedure room or taken the catheter out of her hands. (Bass Dep. 103:5-20, 197:13-25; Ferris Dep. 158:14-159:3, 160:15-161:21.)

When Ms. Snodgrass saw Dr. Ferris in the radiology reading room he asked her why she did the procedure and she told him that she thought that he was in the building because Tasha Crew told her that he was. (Snodgrass Dep. 185:11-14, 212:16-213:4; Viscardi Dep. I 170:1-13.) There is nothing unusual about the way that Ms. Snodgrass performed the paracentesis on June 29 and nothing negative happened in terms of patient care. (Snodgrass Dep. 246:21-23; Bass Dep. 97:4-10.) (Doc. 106-2, ¶ 187.) During Ms. Snodgrass' conversation with Dr. Ferris after the procedure he did not tell her that he thought that she was making excuses or that she did anything wrong. (217:13-218:1.) (Doc. 106-2, ¶ 188.) Dr. Ferris never told her that she should have double checked to make sure he was in the actual radiology department at the hospital. (Snodgrass Dep. 219:10-13.) (Doc. 106-2, ¶ 189.)

Both Ms. Snodgrass and Mr. Quinn had previously done paracentesis procedures without Dr. Ferris in the building on numerous occasions. (Snodgrass Dep. 190:16-23.) (Doc. 106-2, ¶ 195.) Before this Friday Dr. Ferris had never previously discussed sticking a patient or initiating a procedure without him in the building with Ms. Snodgrass. (Snodgrass Dep. 221:22-221:5.) (Doc. 106-2, ¶ 196.) Ms. Viscardi knew before she terminated Ms. Snodgrass that Ms. Snodgrass had been told that Dr. Ferris was in the building before Ms. Snodgrass started the procedure. (Viscardi Dep. I 175:3-176:14.)

To the extent that Defendant continues to allege that Dr. Krubert was a decision maker with respect to Ms. Snodgrass' termination, he is the quintessential cat's paw. At various times, Defendant has alleged that different persons were the decision makers in this action including, first Ms. Viscardi, Dr. Ferris, Dr. Krubert, and Charis Acree (Doc. 106-2, ¶ 209), next Dr. Ferris and Ms. Viscardi with a rubber stamp by Dr. Krubert (Doc. 106-2, ¶ 241), and finally Ms. Viscardi alone based on Dr. Ferris' story about the June 29 paracentesis (Doc. 83-17, p. 19, 23, 29). In 2011, the Supreme Court endorsed employer liability under the "cat's paw" theory in *Staub v. Proctor Hosp.,* 562 U.S. 411 (2011). An employer is liable if a supervisor performs an act motivated by animus that is intended by the supervisor to cause an adverse employment action, and if that act is a proximate cause of the ultimate

employment action. *Id*. at 420-421. A decision-maker's independent investigation is not enough to negate the illegal animus of the non-decision maker. *Id.* As the *Staub* majority explained,

> We do not think that the ultimate decision maker's exercise of judgment automatically renders the link to the supervisor's bias "remote" or "purely contingent." The decision maker's exercise of judgment is *also* a . . . cause of the employment decision, but it is common for injuries to have multiple . . . causes. Nor can the ultimate decision maker's judgment be deemed a superceding cause of the harm. A cause can be thought "superceding" only if it is a "cause of independent origin that was not foreseeable."

*Id.* (citations omitted). Regardless, under the "cat's paw" theory, causation may be established if the plaintiff shows that the decision maker followed the biased recommendation without independently investigating the complaint against the employee. *Stimpson v. City of Tuscaloosa*, 186 F.3d 1328, 1332 (11th Cir. 1999). Here, Ms. Viscardi relied on Dr. Ferris's and Forsyth's biased recommendations without independently investigating their allegations. (Doc. 106-2, ¶¶ 203, 215.) Similarly, the other individuals identified as decision makers at different stages in this case, Dr. Krubert and Charis Acree, neither acted as decision makers nor conducted any independent investigation into the allegations concerning Ms. Snodgrass. (Doc. 106-2, ¶¶ 208, 210.)

### 3.    *Discriminatory Animus As Evidence Of Pretext*

In addition, Ms. Snodgrass presented substantial evidence of discriminatory

animus in support of pretext and to establish that she was terminated because of her disability.  In the spring of 2012, Dr. Bass encountered Dr. Ferris in the main reading room at West Georgia Health Systems.  (Bass Dep. 13:18-14:2; Snodgrass Dep. 239:3-239:6, 241:22-242:21.)  On that day in spring of 2012 Dr. Ferris commented "sometimes I wonder if she has chemo brain."  (Bass Dep. 14:3-14:8; Ferris Dep. 152:9-24, 153:5-7, 155:2-5.)  Dr. Bass thought that it was a derogatory comment and never experienced Ms. Snodgrass to exhibit any of the symptoms of people that have "chemo brain."  (Bass Dep. 14:6 15:13.)  (Doc. 106-2, ¶ 136.)  Dr. Bass told Ms. Snodgrass about Dr. Ferris's "chemo brain" comment within a day or two after hearing Dr. Ferris make that comment.  (Bass Dep. 15:14 -19; Snodgrass Dep. 239:3-239:6, 241:22-242:21.)  (Doc. 106-2, ¶ 137.)

Ms. Oliveras was in the room when Dr. Bass told Ms. Snodgrass about Dr. Ferris's chemo brain comment; she appeared to be "pretty disgusted" with the comment.  (Bass Dep. 83:23-84:13; Oliveras Dep. 69:2-71:4.) (Doc. 106-2, ¶ 138.) Dr. Bass believes that the term "chemo brain," when used as "a derogatory statement about her performance ability" was Dr. Ferris "saying, well, she's not competent to perform her duties because of this disability that created – in his view she had chemo brain."  (Bass Dep. 193:18-195:3.) (Doc. 106-2, ¶ 139.)  Ms. Oliveras describes chemo brain as meaning "the chemotherapy kills brain cells…and it makes you

basically stupid." (Oliveras Dep. 69:2-71:4.) (Doc. 106-2, ¶ 140.) Ms. Oliveras

explains that calling someone "chemo brain" is derogatory and offensive, "[t]hat

means you're not working to where you are 100 percent." (Oliveras Dep. 69:2-71:4.)

(Doc. 106-2, ¶ 141.) The term "chemo brain" refers to a "brain impairment from

chemotherapy that could include emotional, mental…performance" and

chemotherapy is a treatment for cancer. (Deposition of Christopher Krubert

("Krubert Dep.") 63:12-64:2.) (Doc. 106-2, ¶ 142.)

At some point after Dr. Ferris made the "chemo brain" comment, Dr. Ferris

made comments related to Ms. Snodgrass' disability a running theme and on more

than one occasion he made comments regarding his opinion of her mental state.

(Bass Dep. 81:22-82:11.) (Doc. 106-2, ¶ 143.) Dr. Ferris regularly complained that

Ms. Snodgrass was "acting goofy." (Bass Dep. 80:19-90:1.) (Doc. 106-2, ¶ 144.) Dr.

Ferris typically related his complaints to his "acting goofy/chemo brain" issue that he

perceived Ms. Snodgrass to have; it was the general theme of his complaints. (Bass

Dep. 81:22-82:25.) (Doc. 106-2, ¶ 145.) Dr. Bass would respond, "What are you

talking about, because [he] supervised her procedures and she did nothing wrong.

She managed the patient flow at the Women's Center. No biopsies got dropped.

Nobody got mismanaged. She didn't do anything she shouldn't have done during the

procedure." (Bass Dep. 81:2-15.) (Doc. 106-2, ¶ 146.) Dr. Bass, who primarily

worked with Ms. Snodgrass, did not observe her dropping the ball or improperly performing procedures.  (Bass Dep. 81:18-21.) (Doc. 106-2, ¶ 147.)  Dr. Bass does not recall Dr. Ferris ever making any sort of comments about Ms. Snodgrass' actual performance or ever expressing any concerns about her technical capabilities.  (Bass Dep. 88:13-24.)  (Doc. 106-2, ¶ 148.)

On the day of Ms. Snodgrass' termination, and prior to Ms. Snodgrass' termination, Dr. Ferris randomly called Katie Oliveras, manager of the Women's Health Center, into the reading room at the Women's Center and made disparaging comments about Ms. Snodgrass, including calling her "goofy."  (Snodgrass Dep. 239:10-240:1; Oliveras Dep. 28:3-19, 34:16-37:7, 45:23-46:16, 54:1-4, Ex. 1, 57:24-59:10.)  During this conversation, Dr. Ferris was "real fidgety, kind of all over the place," and started bad-mouthing Dannie; it "was almost like he was doing something bad, he knew it was bad inside but he was going to do it."  (Oliveras Dep. 34:16-37:7.)  (Doc. 106-2, ¶ 227.)  Ms. Oliveras never witnessed Ms. Snodgrass do "anything without the radiologist's permission, ever."  (Oliveras Dep. 33:2-4.)  (Doc. 106-2, ¶ 228.)  During this conversation, Dr. Ferris called Ms. Snodgrass "goofy" several times and to Ms. Oliveras it came across as how he viewed her as an individual; it had nothing to do with her performance.  (Oliveras Dep. 34:16-37:7, 37:14-38:22.) (Doc. 106-2, ¶ 229.)  During this conversation, Dr. Ferris told Ms.

Oliveras that ApolloMD was terminating Ms. Snodgrass because they were going in a different direction.  (Oliveras Dep. 35:15-19, 39:15-19.)  (Doc. 106-2, ¶ 230.)  Only later did Dr. Ferris approach Ms. Oliveras and again stating that Ms. Snodgrass was "just goofy" and "needed help, counseling at her church."  (Oliveras Dep. 60:23-61:18, Ex. 2.)

### 4.    *Quinn Is A Comparator*

Finally, contrary to the Magistrate's conclusion, Defendant actually admits that Quinn, Ms. Snodgrass' non-disabled comparator, at least for a period of time, continued to violate protocol after Ferris told him not to and was not terminated. Specifically, Ferris testified:

> Q.    And did you have any issues with Kevin after that meeting in terms of the guidelines that we're speaking of?
>
> A.    100 percent compliance was not immediate on either side from either radiologist assistant . . .

(Ferris Dep. 113:6-12.)

### 5.    *Summary Judgment Should Be Denied*

"[T]he plaintiff will always survive summary judgment if [s]he presents circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent."  *Smith v. Lockheed Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011).  A triable issue of fact exists "if the record, viewed in a light most favorable to the plaintiff, presents a convincing mosaic of circumstantial evidence

that would allow a jury to infer intentional discrimination by the decision maker." *Id*. Ms. Snodgrass easily met this burden and the Magistrate erroneously concluded otherwise.

Contrary to the Magistrate's conclusion, Ms. Snodgrass established pretext. First, Ms. Snodgrass established that she was not terminated for engaging in an unsupervised paracentesis. Ms. Snodgrass was terminated because ApolloMD was going in a different direction. Only after Ms. Snodgrass filed a Charge of Discrimination did Defendant change its story and say that Ms. Snodgrass performed an unsupervised paracentesis. Moreover, Ms. Snodgrass did not actually perform an unsupervised paracentesis. Rather, Ms. Snodgrass performed within protocol in performing the paracentesis because she had been told that Dr. Ferris was in the building. Of course the inference is that he actually was in the building since she was told that he was. In addition, Ms. Snodgrass presented substantial evidence of disability animus on the part of Dr. Ferris, the person who recommended termination. Finally, Mr. Quinn is a comparator because Dr. Ferris himself admits that Mr. Quinn did not comply 100 percent after being given the directive, and yet he was not terminated. Nor was Tasha Crew, the employee who told Ms. Snodgrass that Dr. Ferris was in the building terminated. Thus, the Magistrate should have denied summary judgment on this claim.

## C.     Defendant Retaliated Against Plaintiff.[6]

Ms. Snodgrass objects to the Magistrate's misconstrual of her retaliation claim that disregarded the entirety of her Complaint, and also objects to his conclusion that summary judgment should be granted on this claim.

On Monday, July 2 Ms. Snodgrass met with Ginny Viscardi in Director of Radiology Les Handlin's office; Dr. Ferris and Les Handlin were also present in the meeting.  (Snodgrass Dep. 228:17-228:24.)  In that meeting Ms. Viscardi told Ms. Snodgrass that Apollo MD had "decided to go in a new [or different] direction" and that Defendant were not going to renew her contract.  (Snodgrass Dep. 229:15-20; Bass Dep. 106:13-18; Ferris Dep. 225:3-14; Viscardi Dep. I 173:9-20; Snodgrass Decl. ¶ 29 (Doc. 106-6, Handlin Aff.)  Ms. Viscardi also told Ms. Snodgrass that Defendant was "going to pay you your 90 days which was owed to [her] under her contract but we don't want you to come back to work after today."  (Doc. 106-2, ¶ 213.)  Since Ms. Viscardi knew about the June 29, 2012 paracentesis procedure at the time she told Ms. Snodgrass that she would be paid the 90 days she was owed "under the contract," there are only two possible inferences, and they both cut in Ms.

_____

[6] Plaintiff only objects to the R&R with respect to her retaliation claim arising out od Defendant's failure to pay her severance.

Snodgrass' favor and require that summary judgment be denied. The first inference is that at the time Ms. Viscardi terminated Ms. Snodgrass, she did not believe Ms. Snodgrass had violated protocol with respect to the paracentesis because MS. Snodgrass had been told that Dr. Ferris was in the building (and frankly may have been in the building). The second possible inference is that Ms. Viscardi did not believe that Ms. Snodgrass' conduct on June 29, 2012 warranted a "for cause" termination.

On August 3, Defendant informed Ms. Snodgrass that she would not be paid the severance owed to her as a result of their failure to provide ninety days' notice to her under her Physician Extender Employment Agreement unless she signed an agreement releasing all of her claims against Defendant. (Compl. ¶ 69.) This was true despite the fact that her contract entitled her to severance, as recognized by Ms. Viscardi in the termination meeting. (Doc. 106-2, ¶ 213.) On August 7, 2012, Ms. Snodgrass contacted Defendant through counsel and informed them that she would not sign the release and that she believed that she continued to be discriminated and retaliated against because she could not be required to sign a release of her claims in order to receive her contractually-owed separation payment. (Compl. ¶ 70.) Ms. Snodgrass included a copy of the Charge of Discrimination she intended to file with the Equal Employment Opportunity Commission with her August 7 correspondence.

(Compl. ¶ 71.)  Defendants' counsel acknowledged receipt of Ms. Snodgrass'

communication on August 9, 2012.  (Compl. ¶ 72.)  Hearing nothing further from

Defendants, Ms. Snodgrass filed her first Charge of Discrimination on August 21,

2012. (Comp. ¶ 73.)  On August 28, 2012, only after Defendant learned that Ms.

Snodgrass filed a Charge of Discrimination, Defendant contacted Ms. Snodgrass

directly and informed her that because she did not sign the general release of all of

her claims, they would not be paying her the separation payment due and owing to

her under the Physician Extender Employment Agreement.  (Compl. ¶ 74; Viscardi

Decl. ¶ 31; Snodgrass Dep. 236:17-19, 237:9-19, Ex. 44, 249:5-10, Exs. 44 & 46.)

In the correspondence, Defendant, for the first time, changed the reason for Ms.

Snodgrass' termination and alleged that she was terminated because of the June 29,

2012 paracentesis procedure and "incidents with Dr. Forsyth."  (Snodgrass Dep. Ex.

44.)  As set forth above and contrary to what the Magistrate concluded in his R&R,

Ms. Snodgrass raised this retaliation claim in Count IV of her Complaint (which

adopted the facts as stated above into the claim) based on the facts as identified

above.  (Compl. ¶ 108.) *See Hunt v. Cent. Consol. Sch. Dist.*, 951 F. Supp. 2d 1136,

1220 (D.N.M. 2013) (denying motion to dismiss because facts alleged throughout

complaint and heading put defendant on notice of claims against it); *Weiland v. Palm*

*Beach County Sheriff's Office*, 792 F.3d 1313, 1324 (11th Cir. 2015) ("this is not a

situation where a failure to more precisely parcel out and identify the facts relevant to each claim materially increased the burden of understanding the factual allegations underlying each count. This may explain why the defendants did not move for a more definite statement under Federal Rule of Civil Procedure 12(e) or otherwise assert that they were having difficulty knowing what they were alleged to have done and why they were liable for doing it.")

The Magistrate Judge erred in concluding that ApolloMD did not retaliate against Ms. Snodgrass because it made the decision to condition her severance on signing a release before she engaged in protected activity because ApolloMD did in fact subject her to an adverse employment action after that. (Doc. 116, pp. 76-78.) Specifically, after it learned that Ms. Snodgrass engaged in protected activity (which is undisputed), ApolloMD took a different position on the interpretation of the employment contract that required it to pay severance to Ms. Snodgrass – one that enabled it to deny her money to which she was entitled. After learning that she engaged in protected activity, ApolloMD changed its position to assert that she was terminated with cause so that it could argue it did not have to pay her any severance and create a supposed legitimate non-discriminatory reason for the employment discrimination action it learned was coming. (Snodgrass Dep. Ex. 44.) The fact that ApolloMD conditioned the severance on a concomitant release before the protected

activity does not mean that its new assertion that she was terminated with cause was not an adverse employment action for purposes of her retaliation claim, and summary judgment should have been denied on this claim.

### D. Defendant breached Plaintiff's contract in bad faith.

The Magistrate also erred in granting summary judgment on Ms. Snodgrass' breach of contract claim. In granting summary judgment, the Magistrate erroneously concluded that Ms. Snodgrass performed the paracentesis on June 29, 2012 without supervision. (Doc. 116, p. 81.) This is simply false.

More importantly, Ms. Snodgrass did not actually intend to perform an unsupervised paracentesis, did not perform an unsupervised paracentesis, and both Dr. Ferris and Ms. Viscardi knew that she did not perform an unsupervised paracentesis when they terminated her. Thus, this excuse is pretextual.

Paracentesis must be performed under direct supervision. The different levels of supervision including direct supervision are terms that are predominantly used by Centers for Medicare Medicaid Services ("CMS") and refer to levels of supervision that are allowable in order for payments to be made for performance of various procedures. (Bass Dep. 56:13-57:5.) Here, on June 29, 2012, the paracentesis performed by Ms. Snodgrass was done under the direct supervision of Dr. Ferris.

One meaning of direct supervision is that the radiologist must be present in the office suite and immediately available to furnish assistance and direction throughout the performance of the procedure but is not required to be present in the room when the procedure is performed. "When CMS says that a procedure requires direct supervision it means that you are in the vicinity, in the building, on the campus of the facility that your mid-level provider is in." (Bass Dep. 57:6-9; Ferris Dep. 114:25-116:21.) For a procedure such as a paracentesis, which Ms. Snodgrass was approved to do under direct supervision, it means that a physician has to be in the vicinity or on campus; they don't have to be physically present in the room for any part of the procedure. (Bass Dep. 58:1-11; Ferris Dep. 108:1-6.) Rarely was a physician in the room at all during the paracentesis procedure. (Snodgrass Dep. 194:17 25; Ferris Dep. 108:1-6.) From the outset of her employment with WGHS and ApolloMD, Ms. Snodgrass was told by the radiologists that she could do procedures under direct supervision so long as the physician was on the West Georgia Health Systems campus. (Snodgrass Dep. 191:24-192:19, 246:1-7, 246:21-247:24; Bass Dep. 94:21-95:6.) Dr. Ferris frequently changed his instructions to the RRAs, and sometimes preferred to be physically present in the "building" during the paracentesis procedure." (Bass Dep. 94:21-95:6; Oliveras Dep. 26:23-27:6, 27:18-21, 71:5-18.) Dr. Ferris said that he had to be in the same building, "but a lot of times, if he was

busy at the hospital, he would tell Dannie at the Women's Center go ahead and start the case. It was when it was to his advantage." (Oliveras Dep. 32:14-23, 71:5-18; Ferris Dep. 110:19-21, 147:24-148:2.) RAs regularly "stuck patients," meaning initiated a procedure without the physician in the room; "that was my job. I mean if they came in on every procedure there would be no job for me because they would have to be there all the time." (Snodgrass Dep. 220:14-221:5; Ferris Dep. 147:24-148:2.)

Dr. Ferris did not tell Ms. Snodgrass that he had any concern about the patient who was to undergo the paracentesis procedure. (Snodgrass Dep. 199:15-200:6.) (Doc. 106-2, ¶ 174.) Dr. Ferris was inconsistent in how he wished procedures to be performed: sometimes he would say "I want to be there. Sometimes he'd say I'm too busy. I don't want to be there. Go ahead and do it. He changed it quite regularly." (Snodgrass Dep. 246:1-246:14; Oliveras Dep. 26:23-27:6, 27:18-21.) (Doc. 106-2, ¶ 175.) On June 29, Dr. Ferris never told Ms. Snodgrass that he wanted to be present in the room before the procedure started. (Snodgrass Dep. 200:14-200:16, 219:23-220:6.) (Doc. 106-2, ¶¶ 176, 177.)

After the patient arrived and was ready for the procedure, Tasha Crew, the nurse who was helping on the case, called Dr. Ferris to tell him the patient was ready and Ms. Crew then told Ms. Snodgrass that Dr. Ferris was in the building.

(Snodgrass Dep. 200:17-201:13, 207:2-15, 215:14-24; Bass Dep. 93:5-13, 94:6-14.) (Doc. 106-2, ¶ 178.) Believing Dr. Ferris was in the building, Ms. Snodgrass performed the paracentesis procedure on a patient. (Snodgrass Dep. 184:23-185:1, 191:8-12, 201:10-13; Bass Dep. 96:25-97:3, Bass Dep. 187:5-21.) (Doc. 106-2, ¶¶ 179, 180.) During the June 29, 2012 paracentesis, Dr. Ferris walked in the room and talked to the patient for a minute; he observed that the procedure was going well and then Dr. Ferris filled out paperwork then walked out of the room and did not say anything else. (Snodgrass Dep. 210:18-210:20, 218:20-219:7; Bass Dep. 102:3-10; Ferris Dep. 145:12-18.) During the procedure, it was obvious that Dr. Ferris was not concerned that Ms. Snodgrass was not doing the procedure incorrectly; otherwise he would have stayed in the procedure room or taken the catheter out of her hands. (Bass Dep. 103:5-20, 197:13-25; Ferris Dep. 158:14-159:3, 160:15-161:21.)

When Ms. Snodgrass saw Dr. Ferris in the radiology reading room he asked her why she did the procedure and she told him that she thought that he was in the building because Tasha Crew told her that he was. (Snodgrass Dep. 185:11-14, 212:16-213:4; Viscardi Dep. I 170:1-13.) There is nothing unusual about the way that Ms. Snodgrass performed the paracentesis on June 29 and nothing negative happened in terms of patient care. (Snodgrass Dep. 246:21-23; Bass Dep. 97:4-10.) (Doc. 106-2, ¶ 187.) During Ms. Snodgrass' conversation with Dr. Ferris after the

procedure he did not tell her that he thought that she was making excuses or that she did anything wrong.  (217:13-218:1.) (Doc. 106-2, ¶ 188.) Dr. Ferris never told her that she should have double checked to make sure he was in the actual radiology department at the hospital.  (Snodgrass Dep. 219:10-13.) (Doc. 106-2, ¶ 189.)

Both Ms. Snodgrass and Mr. Quinn had previously done paracentesis procedures without Dr. Ferris in the building on numerous occasions.  (Snodgrass Dep. 190:16-23.)  (Doc. 106-2, ¶ 195.)   Before this Friday Dr. Ferris had never previously discussed sticking a patient or initiating a procedure without him in the building with Ms. Snodgrass.  (Snodgrass Dep. 221:22-221:5.)  (Doc. 106-2, ¶ 196.) Ms. Viscardi knew before she terminated Ms. Snodgrass that Ms. Snodgrass had been told that Dr. Ferris was in the building before Ms. Snodgrass started the procedure. (Viscardi Dep. I 175:3-176:14.)

Because Ms. Snodgrass did not perform an unsupervised paracentesis procedure, Ms. Viscardi terminated Ms. Snodgrass without cause on July 2, 2012 and told her she would be paid her severance in accordance with the contract.  (Snodgrass Dep. 229:21-230:3.)  Thus, when Defendant failed to pay Ms. Snodgrass for her notice period, it did so in bad faith, in violation of the contract, and in violation of O.C.G.A. § 13-6-11.  Ms. Snodgrass objects to the Magistrate's conclusion otherwise and summary judgment must be denied.

**IV.**  <u>**Conclusion**</u>

In deciding Defendant's Motion for Summary Judgment, the Magistrate Court misapplied Eleventh Circuit precedent and made crucial factual inferences in favor of Defendant while improperly isolating and disregarding pieces of Plaintiff's evidence. Accordingly, Ms. Snodgrass objects to the Magistrate Court's findings on certain factual issues and with respect to her hours/pay cut claim and termination claim based on her disability, her retaliation claim with respect to Defendant's failure to pay her for her notice period, and her breach of contract and O.C.G.A. § 13-6-11 claims, asks the District Court to sustain her objections, and requests that summary judgment be denied with respect to those claims.

Respectfully submitted this 11th day of January, 2016.

LEGARE ATTWOOD & WOLFE LLC

s/ Cheryl B. Legare
Georgia Bar No. 038553
cblegare@buckleylawatl.com

400 Colony Square
Suite 1000
1201 Peachtree Street NE
Atlanta, GA  30361
Telephone: (470) 823-4000
Facsimile:  (470) 201-1212

BUCKLEY BEAL, LLP

s/ Rachel Berlin
Georgia Bar No. 707419
rberlin@buckleybeal.com

Promenade, Suite 900
1230 Peachtree Street NE
Atlanta, GA  30309
Telephone:  (404) 781–1100
Facsimile:   (404) 781–1101

*Co-Counsel for Plaintiff*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| DANIELLE SNODGRASS, | ) | |
| | ) | |
| Plaintiff, | ) | CIVIL ACTION |
| | ) | FILE NO. 1:13-cv-03958-SCJ |
| v. | ) | |
| | ) | |
| INDEPENDENT PHYSICIANS | ) | |
| RESOURCE, INC. and | ) | |
| APOLLOMD, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## CERTIFICATE OF SERVICE

I hereby certify that on January 11, 2016, I electronically filed **Plaintiff's Objections to the Magistrate Court's Report and Recommendation** with the Clerk of Court using the CM/ECF system which will automatically send email notification of such filing to the following attorneys of record:

      Benton J. Mathis, Jr.
      Martin B. Heller

          LEGARE, ATTWOOD & WOLFE, LLC

          s/ Cheryl B. Legare
          Georgia Bar No. 038553
          cblegare@law-llc.com